BILL LOCKYER
Attorney General of the State of California
JAMES M. HUMES
Chief Assistant Attorney General
FRANCES T. GRUNDER
Senior Assistant Attorney General
ALVIN GITTISRIBOONGUL
Supervising Deputy Attorney General
MARIA G. CHAN, State Bar No. 192130
Deputy Attorney General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone:  (916) 323-1940
 Fax:  (916) 324-5205

Attorneys for Defendants Goughnour, Knowles,
Martel, Pliler, Vance, Walker and Willey
SF2004401398

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **GREGORY LYNN NORWOOD,** | NO. 2:03-cv-2554 GEB GGH P |
| Plaintiff, | **DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| **v.** | |
| **EDWARD ALAMEIDA, JR., et al.,** | |
| Defendants. | Fed.R.Civ.P. 56 |

In accordance with Local Rule 56-260(a) of this Court, Defendants submit the

following statement of undisputed facts[1] with references to the supporting evidence:

///

///

---

1. This statement of undisputed facts is for purposes of this motion for summary judgment only.  Defendants reserve the right to offer additional or differing facts should this case proceed to trial.

**Background**

1.  On March 1, 1995, Plaintiff, Gregory Lynn Norwood was sentenced to a term of life without the possibility of parole in state prison following convictions for First Degree Murder (Pen. Code § 187(A)) and Second Degree Robbery (Pen. Code § 211).  Exh. A.  At all times relevant to this action, Norwood, a Black inmates, was incarcerated at the California State Prison in Sacramento (CSP-Sacramento) in Facility B.  (Am. Compl.)

2.  At all times relevant to this action, Defendants were employed by the California Department of Corrections and Rehabilitation (CDCR) at CSP-Sacramento.  Cheryl Pliler was the Warden of CSP-Sacramento from July 1998 to October 2003;  Michael Knowles was the Warden of CSP-Sacramento beginning in October 2003; Steve Vance was the Captain of Facility B from September 2001 to September 2003; David Willey was the Facility B Captain, *acting*, from September 3, 2003 to September 19, 2003, and from October 14, 2003 to January 16, 2004; James Walker was the Facility B Associate Warden, *acting*, in September 2003;  Thomas Goughnour was the Facility B Associate Warden during the May 2002 lockdown; and Michael Martel was the Facility B Associate Warden beginning in March 2003.  Exh. B, ¶2; Exh. C, ¶ 3; Exh. D, ¶ 2; Exh. E, ¶ 2.  (*See also* Am. Compl.).

3.  Since its creation, CSP-Sacramento has been a Level IV prison – a maximum security prison – because the inmates confined at that institution are deemed to pose the greatest threats to institutional security and safety of staff.  Exh. D, ¶ 3.

4.  CSP-Sacramento is organized in three identical sets of buildings – Facility A, B, and C – with each facility comprised of eight blocks, and each block consisting of 64 cells and 128 beds.  Exh. D, ¶ 4.

5.  Facility A is considered a "soft" yard.  This is because the inmates housed in Facility A are the former "protective custody" inmates, or those with "sensitive needs."  These inmates tend to be very compliant and generally non-violent.  This is a mellow yard where there may be one serious incident per year.  Facility C generally houses inmates who want to program and stay out of trouble.  Facility B traditionally has housed inmates who refuse to program and consistently get into trouble.  Exh. D, ¶ 5.

1      6.  During 2002 and 2003, approximately 1,000 prisoners were confined in each of the

2 three facilities at CSP-Sacramento.  The prisoners in each facility were of all races and ethnic

3 groups – Black, White, Hispanics, Asians, American Indian, etc.  Exh. D, ¶ 6.

4      7.  At CSP-Sacramento, each facility is self-contained and built around a yard where,

5 absent unusual conditions, inmates are allowed to exercise daily.  Exh. D, ¶ 7.

6      8.  Each facility also has four small yards, also referred to as concrete yards.  There is

7 one concrete yard between each of the eight housing blocks.  These are very small yards

8 measuring about 50 by 50 feet.  These yards were not intended to be used for general population

9 exercise.  At most, about 20 inmates can be placed on these yards at a time.  Exh. D, ¶ 8.

10      9.  In certain circumstances, however, one or more of the several concrete yards have

11 been used as areas for inmates to exercise in modified programs, but only when staff are certain

12 that inmates will not assault one another and it is safe to release inmates to such yards.

13 Exh. D, ¶ 9.

14 **CDCR Lockdown Policies and Procedures**

15      10.  A lockdown is the restriction of all inmates to their cells/dormitory beds

16 encompassing no less than a housing unit.  True lockdowns are rare occasions, generally

17 following very serious threats to institutional security and the safety of staff and inmates.  During

18 a lockdown, all normal programing is suspended until it is determined that it is safe to resume

19 normal programing.  Exh. D, ¶ 10.

20      11.  Normal programing means inmates attend work and education programs. They are

21 released to the yard for recreation in large groups according to their yard schedule.  The yard

22 population is limited to 150 inmates at a time.  Inmates have regular visiting, canteen, and

23 telephone privileges.  They attend the law library and religious services.  During a lockdown,

24 however, these programs are suspended and inmates are confined to their cells.  Inmate

25 movement is controlled, under close supervision, and under escort with mechanical restraints.

26 Exh. D, ¶ 11.

27 ///

28 ///

1      12.  Pursuant to CDCR policies and procedures, whenever there is a serious incident

2  the initial incident response is as follows:  The first priority is to isolate, contain, and control the

3  situation to the smallest area possible.  Next, is to provide medical attention for all injured

4  followed by the preservation of evidence.  Staff will then identify all involved persons and

5  ensure appropriate written documentation/reports are completed and submitted within designated

6  time frames.  Exh. D, ¶ 12.

7      13.  Once the initial incident response is completed, assessment of the causes and

8  determination of program activity status begins.  Depending on the seriousness of the situation, it

9  may be necessary to modify or restrict program activities.  Available options are to modify

10  programs, lockdown, or declare a State of Emergency.  These options serve to restrict potentially

11  volatile persons or groups, and affords additional time to evaluate overall operations.  Exh. D, ¶

12  13.

13      14.  If it is determined that a lockdown is necessary, a program status report is

14  immediately developed to ensure both staff and inmates know what is expected.  Maintaining

15  essential services, i.e., medical/mental health, hygiene, and access to courts are mandates.  The

16  plan is reviewed regularly and revised as scheduled activities are resumed.  Staff and inmates are

17  updated as revisions are made.  Exh. D, ¶ 14.

18      15.  The Facility Captain generally decides to institute a lockdown and makes the

19  recommendation to the Warden who approves or disapproves the recommendation.  Once a

20  lockdown is instituted, the Warden makes the decision when it is safe to unlock and return to

21  normal programming.  Exh. D, ¶ 15.

22      16.  Following an incident that results in the decision to lockdown a facility, the

23  process of investigating and gathering intelligence begins.  This includes searches of all inmate

24  cells, common areas, dining halls, janitorial rooms, and the outside yard.  Searching the outside

25  yard often consists of digging up the ground in search for weapons.  The purpose of these

26  searches is to uncover any weapons that will later be used to harm inmates or staff.  Exh. D, ¶ 16.

27  ///

28  ///

1    17.  While it may take anywhere from 15 to 20 days to complete a search of a facility,

2 this time may be significantly extended if during the search critical information is discovered

3 necessitating further searches.  Exh. D, ¶ 17.

4    18.  At the same time, inmate interviews are conducted.  Every inmate in the facility is

5 interviewed.  This can be anywhere from 1000 to 1100 inmates.  Staff are also interviewed.  The

6 purpose of the interviews is to gather intelligence for the purpose of determining when it is safe

7 to return to normal programing.  The interview process may also be extended depending on the

8 type of information obtained and the necessity for following up on leads.  Exh. D, ¶ 18.

9    19.  In addition, staff are communicating with other institutions as well as headquarters

10 to compare the intelligence gathered and ensure that it is safe to resume normal programing.  It is

11 common to have staff at other institutions interview inmates there as well as to monitor their

12 mail and telephone communications.  The main priority is always the safety of inmates and staff

13 while working on a plan to unlock the facility.  Exh. D,¶ 19.

14    20.  It is the CDCR's policy to return to full normal programing as soon as it is safe to

15 do so.  Depending on the magnitude and dynamics of the incident, movement towards full

16 program activities will be made.  Exh. D, ¶ 20.

17    21.  How a facility is unlocked depends greatly on the nature of the incident and is

18 determined on a case by case basis.  Movement back to full normal programing is planned and

19 occurs during normal business hours when the majority of regularly scheduled staff are present

20 and have been fully briefed on the plan of operation.  Exh. D, ¶ 21.

21    22.  The task of releasing inmates to full normal programing is accomplished

22 incrementally beginning with small numbers of inmates and progressing to larger numbers as it

23 is determined that it is safe to do so.  Generally, critical workers are released first.  Additional

24 increases in numbers are accomplished by expanding the critical workers list and returning

25 inmates first to priority assignments.  As inmates are returned to work assignments, their

26 privileges are also restored incrementally.  Exh. D, ¶ 22.

27 ///

28 ///

1      23.  The remaining and unassigned inmates are then included in releases for return to

2  full programing.  Generally, non-involved races are released first, followed by non-involved

3  groups (gang affiliations), and so on.  Inmates are released in small groups to the dayroom and/or

4  the recreation yard.  This provides staff an opportunity to observe their conduct in a controlled

5  setting.  During releases of these inmates, incremental positive program activities are also

6  scheduled for them such as telephone calls, canteen, or quarterly packages.  Exh. D, ¶ 23.

7      24.  There are times when during the unlock process, another incident will occur

8  requiring that those inmates who have begun the incremental release process be locked down

9  until an investigation of the incident can be completed.  Exh. D, ¶ 24.

10      25.  During a lockdown, there are mandatory weekly meetings with the Warden (or

11  Chief Deputy Warden) to discuss the status of the lockdown, in addition to daily briefings.  The

12  purpose of the meetings is to report to the Warden on the status of the lockdown and to continue

13  developing a plan to resume normal programming as soon as possible.  The meetings focus on

14  investigation updates to determine progress, review interview/intelligence results, and establish

15  or revise the plan of operation.  The Warden may require more frequent meetings depending on

16  the individual circumstances related to each lockdown.  Those present at these meetings include

17  the Warden or Chief Deputy Warden, Facility Captain, Associate Warden, Use of Force

18  Coordinator, and any other line staff member with relevant information.  Exh. D, ¶ 25.

19      26.  Between the period of January 2002 through September 2003, there were four

20  very serious inmate assaults on staff in Facility B with the use of inmate manufactured weapons.

21  Following each incident, the decision was made to place the facility on lockdown status until an

22  investigation could be completed and it could be determined that it was safe to unlock.  Exh. D, ¶

23  26.

24      27.  In addition to the staff assaults, there were various other incidents of violence

25  during the relevant time period involving inmates and the use of inmate manufactured weapons.

26  All of these factors, combined with the information that was being uncovered through

27  interviews, searches, and monitoring of inmate mail and communications, contributed to the

28  duration of the lockdowns.  Exh. D, ¶ 27.

**January 4, 2002: Attempted Murder/Stabbing of a Peace Officer**

      28.  Steve Vance was the Facility Captain over B Facility from September 2001 to September 2003.  Exh. B, ¶ 2.

      29.  On January 2, 2002, an inmate turned on officer Haggard and attempted to murder him.  As staff responded to the incident, other inmates joined in and attacked responding staff members.  In total, 11 inmates brutally attacked four correctional officers in the B Facility 3/4 dining room. Inmate manufactured weapons were used in the attack.  The involved inmates refused several orders to stop the attack.  Exh. B, ¶3; Exh. E, ¶ 4; Exh. F.

      30.  Three of the four officers received injuries consisting of puncture wounds.  They were transported to the hospital where they received treatment for their injuries.  Exh. B, ¶ 4; Exh. F. Officer Haggard was hospitalized in the intensive care unit.  Exh. E, ¶ 4.

      31.  As responding staff assisted in searching and escorting the involved inmates out of the dining room, staff discovered an inmate manufactured weapon on the floor between the fourth dining room table from 4 block and the wall.  The weapon measured approximately 5 3/4 inches long by 3/8 inches in diameter, and was constructed of a sharpened metal point measuring approximately 15/16 inches long, attached to a plastic pen to form a handle.  Exh. B, ¶ 5; Exh. F.

      32.  During a subsequent search of the dining room by the investigative services unit, staff discovered one inmate manufactured weapon secreted inside a milk carton on the fourth dining room table from 4 block.  The weapon measured approximately 4 3/4 inches long by 3/4 inches in diameter.  It was constructed of round metal rod, sharpened to a  point at one end and wrapped with tape and cellophane at the other.  Exh. B, ¶ 7; Exh. F.

      33.  A lockdown of all inmates in B Facility was ordered and the decision was approved by Warden Pliler.  Exh. B, ¶ 8.  During a lockdown, inmates are confined to their cells. They are cell fed and are allowed to exit their cells for controlled showers.  They are provided essential services such as medical attention.  Inmates are not allowed to go to their assigned work or education programs.  They are not allowed to go to the yard because of the degree of danger which presents itself when there are large numbers of inmates on a yard at the same time. Exh. B, ¶ 9.

34. Pursuant to CDCR policy and procedures, immediately following the lockdown, an investigation was commenced into the cause of the assault on staff. It was unknown at the time whether this was an isolated incident or whether there were other possible planned attacks on staff. Staff worked diligently to identify whether there were other inmates who played a role in the attack on staff and have those inmates removed. Exh. B, ¶ 10.

35. The first month following the incident was occupied with conducting searches, interviewing inmates and staff, and gathering intelligence from various sources. This entailed interviewing all of the inmates in B Facility consisting of approximately 1000 to 1100 inmates in the facility at that time. The inmates refused to talk for fear of retaliation by other inmates. As a result, the information was slow in coming forward. Exh. B, ¶ 11.

36. Additionally, staff had to conduct thorough searches of all inmate cells as well as common areas. During these searches, the main yard was dug up in search of weapons that could have been buried. Exh. B, ¶ 12.

37. Furthermore, during the process of investigating and gathering intelligence, staff were presented with information which raised more questions and concerns. Because they could not be certain that this was an isolated incident, it was not safe to unlock or to begin the process of restoring yard privileges to the inmate population. Exh. B, ¶ 13.

38. Also of great concern was the fact that the inmates who assaulted staff were Southern Hispanics. This prison group is the most influential, organized, and dangerous prison group. Generally, attacks such as this one do not occur unless it has been approved by the leaders of this group. Because of this, it was believed that the Southern Hispanics had put a hit out on staff. Exh. B, ¶ 14.

39. There was a very serious and viable threat to staff safety that had to be fully investigated. The threat level was the highest Mr. Vance had seen in his 22 year career with CDCR. Exh. B, ¶ 14.

40. Staff were also investigating the possibility that the attacks had been ordered by the Mexican Mafia at Pelican Bay State Prison. Staff was communicating with prison staff at

///

1  Pelican Bay as well as other institutions and comparing information and verifying leads.

2  Inmates at Pelican Bay were also being interviewed in an attempt to gain information.  Exh. B, ¶

3  15.

4        41.   Inmates in the other facilities at CSP-Sacramento were also being interviewed, as

5  well as those in Administrative Segregation.  Staff were reading inmate mail in search of

6  information.  Notes were also being passed by inmates to staff with information which had to be

7  verified.  Exh. B, ¶ 16.

8        42.   As a result, during the initial phase of the investigation, the inmates in B Facility

9  were not permitted to return to their regular program activities, including daily yard exercise,

10  until all involved inmates could be identified and removed from the general population and all

11  searches for weapons had been completed.  Mr. Vance  and other custodial staff responsible for

12  B Facility concluded that until the investigation was complete and all involved inmates could be

13  identified and removed from the general population in B Facility, release of prisoners to the main

14  exercise yard posed an unacceptable risk of renewed violence that threatened the safety of

15  inmates and staff.  Exh. B, ¶ 17.

16        43.   Between January 4, 2002 and March 8, 2002, through interviews and searches,

17  staff continued to obtain information, which indicated that there was a serious and viable threat

18  to institutional safety.  While the goal was to return to normal programing, Mr. Vance's first

19  priority was to ensure the safety of staff and inmates.  Due to the nature of the information that

20  was being revealed through the investigation process, and staff's responsibility to follow all

21  leads, it was not safe to begin the process of releasing inmates.  Exh. B, ¶ 18.

22        44.   Also, on February 22, 2002, there was another attempted murder of a peace officer

23  by inmates in C Facility.  This incident occurred only one day after C Facility began the process

24  of unlocking that facility.  While this incident occurred in a different facility, it affected both A

25  Facility and B Facility because of the nature of the assault on staff and the fact that there existed

26  a viable threat against staff  members.  Exh. B, ¶ 19.

27        45.   On March 8, 2002, staff began the process of releasing inmates in B Facility to

28  normal programing.  Pursuant to CDCR policy, the critical workers were released first by giving

1  them the opportunity to go to the yard for exercise on Saturdays and Sundays, and restoring

2  various other programs and privileges to this group.  This group consisted of approximately 95

3  inmates.    This allowed staff to observe these inmates in relatively small numbers.  On March

4  14, 2002, about 35 critical workers were added to the group.  Exh. B, ¶ 20.

5         46.  On March 27, 2002, the critical worker's list was augmented to include

6  approximately 210 workers, including Norwood.  Exh. B, ¶ 21.

7         47.  Other groups of inmates were incrementally added to the list of inmates to be

8  released.  By April 3, 2002, all non-Hispanic inmates in B Facility were allowed to go to the

9  yard for exercise according to an approved yard schedule.  Exh. B, ¶ 22.

10         48.  On April 15, 2002, a stabbing/slashing assault occurred on the main exercise yard

11  involving White inmates.  This incident delayed efforts to resume a full normal program,

12  however, staff continued to work diligently in doing so.  Exh. B, ¶ 23.

13         49.  The entire time, weekly meetings with the Warden, Associate Warden, Facility

14  Captain, Use of Force Coordinator and other critical staff members were taking place to discuss

15  the progress made and the status of the lockdown.  Exh. B, ¶ 24.

16  **May 8, 2002:  Attempted Murder On A Peace Officer**

17         50.  On May 8, 2002, while still in the process of resuming a full normal program in B

18  Facility, officer Tuter was attacked by a Black inmate with an inmate manufactured weapon.

19  The inmate aggressively attacked officer Tuter by striking him repeatedly in the head with a

20  weapon.  The weapon was 4 ½ inches long, ½ inch wide, 1/4 inch thick, and sharpened to a point

21  at one end.  The other end was covered in two inches of plastic wrap as a handle.  The weapon

22  appeared to have been fashioned from a tooth brush.  Exh. B, ¶ 25; Exh. G.

23         51.  As a result of the attack on officer Tuter, as well as the prior January 4, 2002,

24  attack on other staff members, and the April 15, 2002 stabbing/slashing  assault by White

25  inmates, Mr. Vance ordered a lockdown of all inmates in B Facility.  The decision was approved

26  by Terry Rosario who was the acting Warden at that time.  Exh. B, ¶ 26.

27         52.  All programs were suspended, including the use of the yard for recreation

28  purposes.  Exh. B, ¶ 27.

1        53.  Pursuant to CDCR policy and procedures, immediately following the lockdown,

2    an investigation was commenced into the cause of the attack of officer Tuter.  This included a

3    search of all cells and common areas, interviews with all inmates and staff, and gathering of

4    intelligence and information from other sources.  Exh. B, ¶ 28.

5        54.  Inmates were not talking and the information was slow in coming forward.  Exh.

6    B, ¶ 29.

7        55.  By July 1, 2002, some of the privileges were being restored to inmates such as

8    visiting, canteen, packages, and telephone access.  On July 11, 2002, Southern Hispanics and

9    Mexican Nationals were allowed to use the small concrete yards for recreation in groups of up to

10   16 inmates per yard.  The Whites, American Indians, Others[2], and critical workers were released

11   to the main yard in groups of up to 50 at a time.  By July 16, 2002, Southern Hispanics were

12   released to the small concrete yards in groups of up to 20 inmates.  Whites, American Indians,

13   Mexican Nationals, and Others were released to the main yard in groups of up to 100 inmates.

14   By July 31, 2002, Blacks were released to the small concrete yards in groups of up to 20 inmates

15   and all other inmates were normal with a maximum of 150 inmates on the main yard at a time.

16   Exh. B, ¶ 30.

17       56.  Over the course of the next few months, staff continued to work towards resuming

18   a full normal program in all respects.  On occasion, they experienced some set backs resulting in

19   temporarily suspending yard and privileges at various times due to threats on staff and inmate

20   safety, or based on information received indicating there was a threat of violence.  Nonetheless,

21   Mr. Vance and other staff continued to work towards the goal of resuming a full normal

22   program.  Exh. B, ¶ 31.

23       57.  The entire time, meetings with the Warden, Associate Warden, Facility Captain,

24   Use of Force Coordinator and other critical staff members were taking place to discuss the

25   progress made and the status of the lockdown.  The meetings were taking place at least twice a

26   week.  Exh. B, ¶ 32.

27

28

---

2.  The classification of "Other" is given to the Asian and Pacific Islander group of inmates.

**December 28, 2002:  Attempted Murder On a Peace Officer/Melee**

58.  On December 28, 2002, a riot occurred on the B Facility main exercise yard where a large number of Black inmates attacked and physically assaulted staff.  The attack began when Sergeant Murphy observed two inmates engaged in what appeared to be a fistfight on the B Facility main exercise yard.  Sergeant Murphy ordered the two inmates to stop and get down, but they did not comply.  Sergeant Murphy instructed the central tower officer to order the yard down[3/].  Sergeant Murphy used his O.C. Pepper Spray on the two inmates and they immediately got down on the ground.  Sergeant Murphy was then attacked by another inmate.  At the same time, numerous other inmates got up and ran towards Sergeant Murphy to attack him.  Sergeant Murphy was forced to the ground and five inmates jumped on him and struck him numerous times.  Exh. B, ¶ 33;  Exh. H.

59.  As other staff members responded to the yard, inmates got up from the prone position and attacked the responding staff.  Many of the inmates had inmate manufactured weapons.  In total, six inmate manufactured weapons were recovered.  Exh. B, ¶ 34; Exh. H.

60.  Based on subsequent staff interviews and reports, it was determined that the fist fight between the two inmates was a diversion for the purpose of distracting and attacking staff.  Further investigation and review of the videotapes of the incident identified at least 24 inmates as active participants on the staff assaults.  Exh. B, ¶ 35;  Exh. H.

61.  Nine staff members sustained injuries as a result of this incident.  Exh. B, ¶ 36;  Exh. H.

62.  At the time of this incident, B Facility was still in the process of unlocking and resuming a full normal program.  This incident, coupled with numerous other incidents of violence between the inmates, led to Mr. Vance instituting a full lockdown again.  Exh. B, ¶ 37.

63.  The other incidents of violence included an incident on August 22, 2002, on the B Facility 7 block and 2 block mini concrete yards involving White and Hispanic inmates, where numerous inmates received serious injuries.  Subsequent to this incident, numerous inmate

---

3.  "Yard down" requires that all the inmates get down in the prone position and remain in that position until staff instruct them to get up.

1  manufactured weapons were discovered in possession of the White and Southern Hispanic

2  inmates.  Exh. B, ¶ 38.

3         64.  Also, on October 3, 2002, during the unlock process, another incident occurred on

4  the B Facility main yard involving White and Hispanic inmates which also resulted in several

5  inmates receiving serious injuries.  Again, numerous inmate manufactured weapons were

6  discovered in possession of the White and Southern Hispanic inmates.  Exh. B, ¶ 39; Exh. D, ¶

7  30.

8         65.  Finally, on December 15, 2002, during evening showers, another incident

9  occurred involving White and Hispanic inmates resulting in an inmate receiving serious injuries.

10  Exh. B, ¶ 40.

11         66.  Due to all of these violent incidents, it was determined that there was a threat to

12  everyone's safety and security and therefore, all level four inmates would remain on lockdown

13  status until further notice.  Exh. B, ¶ 41.

14         67.  An investigation into the December 28, 2002 attack on staff was immediately

15  commenced.  This included a search of all cells and common areas, interviews with all inmates

16  and staff, and gathering of intelligence and information from other sources.  Exh. B, ¶ 42.

17         68.  Over the course of the next several months, staff continued to work towards

18  resuming a full normal program in all respects, encountering set backs in the process.  On

19  February 16, 2003, an incident occurred in B Facility 4 block involving White inmates and the

20  use of a deadly weapon, causing a delay in staff's efforts to unlock the facility.  Nonetheless, Mr.

21  Vance and his staff continued to work towards the goal of resuming a full normal program.

22  Exh. B, ¶ 43.

23         69.  By February 21, 2003, the process of unlocking B Facility began.  Staff started by

24  releasing a small number of uninvolved inmates first and observing their behavior prior to

25  adding to the groups.  On March 18, 2003, they began releasing the Whites and Hispanics to the

26  small concrete yards in small groups.  Exh. B, ¶ 44.

27         70.  Staff continued to encounter set backs.  On May 5, 2003, there were two separate

28  stabbing assaults involving White inmates in which both victims sustained serious injuries.  On

1   June 1, 2003, there was a slashing incident involving White inmates.  Staff, however, continued

2   moving forward with the plan to incrementally unlock the facility.  Exh. B, ¶ 45.

3       71.  By May 15, 2003, Asians and American Indians were released to the yard on a

4   normal schedule.  Hispanics were released to the small cement yards.  Blacks were released to

5   the small cement yards on a rotating schedule.  Exh. B, ¶ 46.

6       72.  As with all other lockdown situations, weekly meetings with the Warden,

7   Associate Warden, Facility Captain, Use of Force Coordinator and other critical staff members

8   were taking place to discuss the progress made and the status of the lockdown. These meetings

9   were taking place more often than once a week.  Exh. B, ¶ 47.

10   **September 3, 2003: Attempted Murder of a Peace Officer**

11       73.  David Willey was in the position of *acting* Captain of Facility B from September

12   2, 2003 to September 19, 2003, and then again from October 14, 2003 to January 16, 2004.  Exh.

13   C, ¶ 3.

14       74.  On September 3, 2003, officer Curry was brutally attacked by an inmate with an

15   inmate manufactured weapon (metal can lid).  Officer Curry was slashed numerous times in the

16   face and neck areas, punched in the nose, and flung down the stairs by the inmate.  Exh. C, ¶ 4;

17   Exh. I.

18       75.  As a result of the attack on officer Curry, Mr. Willey ordered a lockdown of all

19   inmates in Facility B.  The decision was approved by the Warden.  Based on staff's perceptions

20   of the staff assault and the injuries incurred, Mr. Willey believed it would be prudent to

21   lockdown the inmates and attempt to find out the dynamics of the assault on staff and at the same

22   time give staff an opportunity to decompress after the trauma of the incident.  Mr. Willey also

23   believed that due to the unusual number of staff assaults, which had taken place in a relatively

24   short period of time, it was necessary to conduct an investigation to gather information from

25   inmates willing to talk with staff concerning the reasons for the staff assaults.  Prison officials

26   needed to ascertain if the causes of the attack and whether there was a conspiracy to attack staff.

27   Exh. C, ¶ 5.

28   *///*

76. Additionally, because of the unusually high number of recent staff assaults, a State of Emergency was declared by the Director of the CDCR.  A State of Emergency can only be declared by the Director.  During a State of Emergency, the Warden may authorize the postponement of nonessential administrative decisions, actions, and the normal time requirements for such decisions and actions as deemed necessary because of the emergency.  This may include, but is not limited to, classification committee hearings, disciplinary proceedings, and the review and action on inmate appeals.  Exh. C, ¶ 6.

77. Immediately following the lockdown, an investigation was commenced.  The investigation involved interviewing all inmates and conducting searches.  There were approximately 1000 to 1100 inmates in Facility B and all inmates had to be interviewed.  This is a time consuming process because the inmates had to be removed from their cells and escorted to the program office to be interviewed one at a time.  Exh. C, ¶ 7.

78. In many instances, inmates refused to talk for fear of being labeled snitches.  For example, when an inmate is removed for an interview, the other inmates in the housing unit know why he has been removed from his cell.  If the inmate is gone for a long period of time, say an hour, and all other inmates were only gone for 15 minutes, the others assume the inmate is "talking" and this may jeopardize the safety of that inmate because he is now labeled a snitch.  Therefore, staff was forced to use other means or excuses for removing inmates who had information they were willing to divulge.  The process took a great deal of time to complete.  Exh. C, ¶ 8.

79. The weeks following the incident were also occupied with conducting searches.  Every cell had to be searched, as well as all common areas.  This too is a very time consuming process that takes several weeks to complete.  Exh. C, ¶ 9.

80. Furthermore, during the interview process and searches, information was discovered or leads were given, which had to be pursued.  For example, during interviews, information was divulged indicating that more assaults on staff were planned.  These leads had to be followed and fully investigated before inmates could be released to their normal programs.  For example, staff received information that the attack on officer Curry was the result of a

1  personal conflict the inmate had with another staff member and officer Curry was the target of

2  opportunity.  However, staff also received information that inmates affiliated with the Blue Note

3  Crips were conspiring to assault staff.  In light of this information, it was not safe to release

4  inmates prior to investigating and having a certainty that no further violence was planned.  Exh.

5  C, ¶ 10.

6      81.  Additionally, the information discovered had to be shared with other institutions.

7  Information is routinely shared with all other institutions via the Incident Report.  The Incident

8  Report is sent to CDCR Headquarters for tracking purposes.  The Incident Report is also given to

9  the Law Enforcement Investigative Unit (LEIU) for information gathering.  The LEIU is able, by

10  way of these reports, to advise the Director of any patterns that may be occurring statewide.  For

11  example, staff would be able to determine if a particular ethnic group, prison gang, or disruptive

12  group was committing an unusual number of staff assaults.  This information is shared via

13  conference calls with the Director's office to all institutions, as well as e-mails.  Exh. C, ¶ 11.

14      82.  This process took time, and in this case, it took approximately four weeks before

15  prison officials felt they had sufficient information to begin the process of incrementally

16  unlocking the inmates in Facility B.  The main priority was to ensure the safety and security of

17  all staff and inmates.  The only way to do so was to conduct an investigation and to keep the

18  inmate population locked down until it could be determined that it was safe to begin un-locking

19  the inmates.  It was simply not safe to release inmates to yards in great numbers without being

20  confident that similar attacks would not occur.  Exh. C, ¶ 12.

21      83.  Releasing the inmates to the small yards was not a feasible alternative at that time

22  because officials were still in the process of gathering information and were not confident that it

23  was safe for either staff or inmates to be released even in small groups of 20.  Prison officials did

24  not have the information available to determine if a threat to staff existed with the inmates.

25  Releasing inmates at this point with little or no information could result in more staff/inmate

26  assaults as the inmates were being processed out to the yard, even in small groups.  Without

27  reliable information, inmates allowed to go to the yard could, in fact, have enemies being

28  released at the same time.  Exh. C, ¶ 13.

84.   By October 14, 2003, White, Hispanic, and Other inmates began to be released for normal programing, including the yard, while the investigation was ongoing.  Exh. C, ¶ 14.  On November 4, 2003, the lockdown was lifted for non-Crip Black inmates.  Exh. C, ¶ 15.  By December 3, 2003, Facility B returned to normal programing.  Exh. C, ¶ 16.

85.   As groups of inmates were being incrementally unlocked, prison officials continued to investigate and obtain information.  Part of this process included observing the conduct and behavior of those inmates as they were unlocked.  Exh. C, ¶ 17.

86.   While the lock down was instituted as a result of the September 3, 2003 assault on officer Curry, the length of the lock down was directly affected by the information obtained during the investigation following the assault.  It was also affected by "incidents" between the groups of inmates which occurred during the investigation and the process of incrementally unlocking.  All of these factors were critical in the decisions during the lockdown.  Exh. C, ¶ 18.

87.   Weekly meetings were held in which the Warden, Associate Warden, Facility Captain, Use of Force Coordinator, and any other staff member with information were present. The purpose of these meetings were to report back to the Warden on the progress staff were making in restoring the facility to a normal program.  During these meetings, staff discussed the progress of the investigation and the information obtained.  Exh. C, ¶ 19.

88.   Meetings with staff were also held to disseminate information regarding the progress of the investigation and unlock procedure.  This also gave staff the opportunity to pass on information they may have gathered from inmates within their housing units that could impact the unlock process.  Exh. C, ¶ 20.

89.   Given the nature of the attack on officer Curry, the long history of violent outbreaks in Facility B, and the numerous attacks on staff in the preceding year and a half, as well as other incidents of violence, the lockdown was necessary in order to ensure the safety of all staff and inmates.  Exh. C, ¶ 21.

90.   During first few weeks of the lockdown, inmates could not be released to the yard because prison officials did not have sufficient information to conclude that it was safe to release large numbers of inmates to the yard.  Exh. C, ¶ 22.

91. It has been Mr. Willey's experience that releasing inmates, even in small groups, without the benefit of reliable information, could result in assaults of inmates or staff. If an inmate has a conflict with another inmate and staff do not have information to indicate that the conflict is more than a personal issue, it could result in a confrontation not only between the two inmates but also between any associates of the inmates. Staff have no way of knowing if a particular group or affiliation were targeting members of their own group for assault. The number of inmates released is not necessarily relevant to what may occur on a small yard. The leaders of inmate groups/gangs/affiliations expect and demand retribution for any perceived wrong. They expect even one inmate of their group to seek retribution, even if out-numbered. For these reasons, it is imperative that staff conduct investigations and follow up on all leads if they are going to ensure the safety of staff and inmates.

92. As soon as prison officials were confident that inmates could be released and returned to normal programing, the facility was unlocked.

**Legitimate Safety and Security Justifications For Denial of Outdoor Exercise Pending Investigation and Threat Assessment**

93. Following each one of these incidents, the decision was made to place the facility on lockdown status until an investigation could be completed into the cause of the brutal attacks on staff members. The decision to lockdown the facility was based on concerns for both inmate and staff safety. Exh. E, ¶ 8.

94. Termination of a lockdown and a return to normal programming could not occur until all the perpetrators of the violence were identified and transferred to other Level IV institutions, and a determination was made that it was safe for staff and inmates to return to normal programming. Exh. E, ¶ 9.

95. Historically, there had not been many life threatening assaults on staff. Due to the nature of the inmate attacks on staff in these four incidents, and the fact that these were attempts to murder staff, prison officials were forced to take extra precautions and investigate thoroughly to find out the causes of these attacks. Exh. E, ¶ 10.

///

96. The investigations were time and labor intensive as prison staff were required to interview all the inmates in the facility, and conduct thorough searches of the cells, common areas, and yard. Every piece of evidence was examined and all leads were followed. Staff were also sharing the information uncovered with staff at CDCR headquarters and other institutions in order to determine if this was a statewide conspiracy to attack staff. Reports had to be completed. As the investigations were progressing, and inmates were being identified as posing threats to the security of the prison, those inmates had to be transported to other prisons. This process also took time. Exh. E, ¶ 11.

97. The main priority for prison officials was maintaining the safety and security of the institution. The goal was to resume normal programing as quickly as possible while ensuring that staff and inmates were safe from further acts of violence. Exh. E, ¶ 12.

98. Additionally, while staff were investigating the attacks on staff and working toward the goal of unlocking the facility, there continued to be other incidents of violence among inmates, often involving the use of inmate manufactured weapons, delaying the prison's goal of resuming a full normal program. Exh. E, ¶¶ 13, 14, 15, 16, 17.

99. Staff were faced with a very serious and volatile situation. Staff members were being attacked and inmates continued their racial and/or gang related wars at every opportunity. The safety risk was one of the highest Ms. Pliler had seen in her long career with CDCR. Exh. E, ¶ 18.

100. At the onset of the various lockdowns, the inmates could not have outdoor exercise because of the risk of renewed violence and injuries. Identification and removal of those inmates involved in both the staff assaults and the racial and gang related wars, before permitting inmates to congregate was the surest way to reduce the changes for renewed violence against staff and inmates. Exh. E, ¶ 19.

101. As a result, inmates were not permitted outdoor exercise in the main yard, the small yards, or in any other area of CSP-Sacramento, because the risk of violence and injury was too great. As the investigations progressed, however, and it was determined that it was safe, prison officials started by allowing small groups of inmates to the yard. Exh. E, ¶ 20.

102. The main yard in Facility B, which included a running area, and volleyball and basketball courts was the only feasible place for inmates to go for outdoor exercise and recreation. Exh. B, ¶ 48.

103. It is CDCR's policy to program inmates of different racial and ethnic groups together. Provided that the inmates fomenting violence are identified and removed from the general population, a single yard program for all inmates created a safer environment for all involved by reducing perceived differences between the different racial and ethnic groups and the hostilities that arose from such perceptions. Exh. B, ¶ 49. Integrated outdoor exercise also minimized the changes of releasing an inmate to a hostile yard, or other program facility, e.g., classrooms, work locations, etc., where he could be attacked. Exh. B, ¶ 50.

104. Under these circumstances, where four separate incidents where inmates attempted to murder staff, over a short span of time, combined with numerous incidents of violence between inmates, all with use of inmate manufactured weapons, we concluded that it was not safe to release inmates to the yard. Our main priority was to maintain the safety of the institution and at that time, we could not safely release the inmates to the yard in light of the information we had available to us. Exh. B, ¶ 51.

105. In certain circumstances, Ms. Pliler approved of the use of one or more of several small yards within the main yards of CSP-Sacramento as areas for inmates to exercise in modified programs, but only when she was sure that the inmates would not assault one another. At most, 20 inmates can use the yard at a time. This is not always a feasible alternative and the decision to release inmates to the small concrete yards depends on whether the information we have indicates that it is safe to do so. Even then, when allowed to go to the small yards, inmates continued the violence against each other. Exh. E, ¶ 21; Exh. B, ¶ 52.

106. When there is an incident of the magnitude of these four incidents, it requires investigation into the causes and circumstances of the incident. Inmates cannot be safely released without information regarding the situation. This information can identify what inmate(s), gangs, or ethnic groups that may have been involved. The information can also provide information concerning the reasons why the situation occurred and if the "problem" was

corrected or whether the incident is still simmering.  Failure to having this type of critical information prior to releasing inmates would most likely result in further assaults on inmates and/or staff.

Exh. D, ¶¶ 28, 29.

107.  The process of unlocking a facility following a lockdown is a time consuming process.  The main goal was to return to a full normal program as quickly as possible.  The priority, however, was to ensure staff and inmate safety.  The process takes time and cannot be accomplished hastily without risk to safety.  Exh. E, ¶ 24.

108.  During the lockdowns relevant to this litigation, all CDCR policies and procedures were followed in deciding to implement the lockdowns and unlocking Facility B. Exh E, ¶ 32.

Dated:  March 23, 2006

Respectfully submitted,

BILL LOCKYER
Attorney General of the State of California

JAMES M. HUMES
Chief Assistant Attorney General

FRANCES T. GRUNDER
Senior Assistant Attorney General

ALVIN GITTISRIBOONGUL
Supervising Deputy Attorney General


*/s/ Maria G. Chan*

_____
MARIA G. CHAN
Deputy Attorney General

Attorneys for Defendants

30100273.wpd

---

Defendants' Separate Statement of Undisputed Material Facts In Support of Motion for Summary Judgment