# EXHIBIT A

753407

MAR 1 1995

OBIS TO GO S/W NOTED

# ABSTRACT OF JUDGMENT – PRISON COMMITMENT
## INDETERMINATE SENTENCE

FORM CR 292

- [X] SUPERIOR
- [ ] MUNICIPAL
- [ ] JUSTICE

COURT OF CALIFORNIA, COUNTY OF **LOS ANGELES**

BRANCH OR JUDICIAL DISTRICT: **WEST**

COURT (I.D.): 1 9 0 0 1 1

33166080 am

ENTERED OBIS

PEOPLE OF THE STATE OF CALIFORNIA versus

DEFENDANT: 01 NORWOOD, GREGORY LYNN
AKA:

[X] PRESENT  SA120316 -A
[ ] NOT PRESENT

COMMITMENT TO STATE PRISON  AMENDED  -D
ABSTRACT OF JUDGMENT  ABSTRACT [ ]  -E

| DATE OF HEARING (MO) (DAY) (YR) | DEPT. NO. | JUDGE | CLERK |
|---|---|---|---|
| FEB 10, 1995 | WEF | LESLIE W LIGHT | C GILLETT |

| REPORTER | COUNSEL FOR PEOPLE | COUNSEL FOR DEFENDANT | PROBATION NO. or PROBATION OFFICER |
|---|---|---|---|
| C YAMAOKA | L RUBIN | E PERLO | 237717 |

1. DEFENDANT WAS CONVICTED OF THE COMMISSION OF THE FOLLOWING FELONIES:
   [ ] ADDITIONAL COUNTS ARE LISTED ON ATTACHMENT _____ (NUMBER OF PAGES) _____

| COUNT | CODE | SECTION NUMBER | CRIME | YEAR CRIME COMMITTED | DATE OF CONVICTION MO | DAY | YEAR | CONVICTED BY JURY TRIAL | COURT TRIAL | PLEA | CONCURRENT | CONSECUTIVE | 654 STW |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | PC | 187(A) | MURDER 1ST DEGREE | 92 | 12 | 09 | 94 | X | | | | | |
| 2 | PC | 211** | ROBBERY 2ND | 92 | 12 | 09 | 94 | X | | | | | X |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

2. ENHANCEMENTS charged and found true **TIED TO SPECIFIC COUNTS** (mainly in the § 12022-series) including WEAPONS, INJURY, LARGE AMOUNTS OF CONTROLLED SUBSTANCES, BAIL STATUS, ETC.) For each count list enhancements horizontally. Enter time imposed for each or "S" for stayed or stricken. DO NOT LIST enhancements charged but not found true or stricken under § 1385. Add up time for enhancements on each line and enter line total in right-hand column.

| Count | Enhancement | Yrs. or "S" | Enhancement | Yrs. or "S" | Enhancement | Yrs. or "S" | Enhancement | Yrs. or "S" | Enhancement | Yrs. or "S" | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 12022.5A | 4 | 12022.A2 | S | | | | | | | 4 |
| 2 | 12022.5A | S | 12022.A2 | S | | | | | | | |

3. ENHANCEMENTS charged and found true **FOR PRIOR CONVICTIONS OR PRIOR PRISON TERMS** (mainly § 667-series) and OTHER:
   List all enhancements based on prior convictions or prior prison terms charged and found true. If 2 or more under the same section, repeat it for each enhancement (e.g., if 2 non-violent prior prison terms under § 667.5(b), list § 667.5(b) 2 times). Enter time imposed for each or "S" for stayed or stricken. DO NOT LIST enhancements charged but not found true or stricken under § 1385. Add time for these enhancements and enter total in right-hand column. Also enter here any other enhancement not provided for in space 2.

| Enhancement | Yrs. or "S" | Enhancement | Yrs. or "S" | Enhancement | Yrs. or "S" | Enhancement | Yrs. or "S" | Enhancement | Yrs. or "S" | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 667(A) | 5 | 667.5B | S | 667(A) | 5 | 667(A) | 5 | | | 15 |
| Enhancement | Yrs. or "S" | Enhancement | Yrs. or "S" | Enhancement | Yrs. or "S" | Enhancement | Yrs. or "S" | Enhancement | Yrs. or "S" | Total |

4. Defendant was sentenced to State Prison for an indeterminate term:
   - A. [X] For LIFE WITHOUT THE POSSIBILITY OF PAROLE on counts **1**
   - B. [ ] For LIFE WITH POSSIBILITY OF PAROLE on counts _____
   - C. [ ] For 15 years to life, WITH POSSIBILITY OF PAROLE on counts _____
   - D. [ ] For 25 years to life, WITH POSSIBILITY OF PAROLE on counts _____
   - E. [ ] For other term prescribed by law on counts _____  (Specify term on separate sheet if necessary.)
   **PLUS enhancement time shown above.**

5. [ ] Indeterminate sentence shown on this abstract to be served [ ] consecutive to [ ] concurrent with any prior incompleted sentence(s).

6. Other Orders: (List all consecutive/concurrent sentence relationships, fines, etc. if not shown above)
   **$200.00 FINE**

   (Use an additional page if necessary.)

7. [X] The Court advised the defendant of all appeal rights in accordance with rule 470, California Rules of Court. (AFTER TRIAL ONLY)

8. EXECUTION OF SENTENCE IMPOSED:
   - A. [X] AT INITIAL SENTENCING HEARING
   - B. [ ] AT RESENTENCING PURSUANT TO DECISION ON APPEAL
   - C. [ ] AFTER REVOCATION OF PROBATION
   - D. [ ] AT RESENTENCING PURSUANT TO RECALL OF COMMITMENT (PC § 1170(d))
   - E. [ ] OTHER

| DATE OF SENTENCE PRONOUNCED (MO) (DAY) (YR) | CREDIT FOR TIME SPENT IN CUSTODY | TOTAL DAYS | INCLUDING: ACTUAL LOCAL TIME | LOCAL CONDUCT CREDITS | STATE INSTITUTIONS |
|---|---|---|---|---|---|
| 2-10-95 | | 1219 | 813 | 406 | [ ] DMH   [ ] CDC |

DEFENDANT IS REMANDED TO THE CUSTODY OF THE SHERIFF, TO BE DELIVERED:
- [X] FORTHWITH
- [ ] AFTER 48 HOURS, EXCLUDING SATURDAYS, SUNDAYS AND HOLIDAYS

INTO THE CUSTODY OF THE DIRECTOR OF CORRECTIONS AT THE RECEPTION-GUIDANCE CENTER LOCATED AT:
- [ ] CALIF. INSTITUTION FOR WOMEN—FRONTERA
- [ ] WASCO
- [ ] OTHER (SPECIFY):
- [ ] CCWF—CHOWCHILLA
- [ ] SAN QUENTIN
- [X] CALIF. INSTITUTIONS FOR MEN—CHINO
- [ ] R.J. DONAVAN
- [ ] DEUEL VOC. INST.

I hereby certify the foregoing to be a correct abstract of the judgment made in this action.

DEPUTY'S SIGNATURE

CLERK OF THE COURT

FEB 24, 1995

This form is prescribed under Penal Code § 1213.5 to satisfy the requirements of § 1213 for indeterminate sentences. Attachments may be used but must be referred to in this document.

Form Approved by the
Judicial Council of California
Effective January 1, 1993

**ABSTRACT OF JUDGMENT – PRISON COMMITMENT – INDETERMINATE**

# EXHIBIT B

1 | BILL LOCKYER
Attorney General of the State of California
2 | JAMES M. HUMES
Chief Assistant Attorney General
3 | FRANCES T. GRUNDER
Senior Assistant Attorney General
4 | ALVIN GITTISRIBOONGUL
Supervising Deputy Attorney General
5 | MARIA G. CHAN, State Bar No. 192130
Deputy Attorney General
6 |   1300 I Street, Suite 125
    P.O. Box 944255
7 |   Sacramento, CA 94244-2550
    Telephone:  (916) 323-1940
8 |   Fax:  (916) 324-5205

9 | Attorneys for Defendants Goughnour, Knowles,
Martel, Pliler, Vance, Walker and Willey
10 | SF2004401398

11

12 | IN THE UNITED STATES DISTRICT COURT

13 | FOR THE EASTERN DISTRICT OF CALIFORNIA

14 | SACRAMENTO DIVISION

15

16 | **GREGORY LYNN NORWOOD,**                    NO. 2:03-cv-2554 GEB GGH P

17 |                                 Plaintiff,   **DECLARATION OF STEVE
                                                 VANCE IN SUPPORT OF**
18 |         v.                                   **DEFENDANTS' MOTION FOR
                                                 SUMMARY JUDGMENT**
19 | **EDWARD ALAMEIDA, JR., et al.,**

20 |                                 Defendants.

21

22 |         I, S. VANCE, declare:

23 |         1.  I am an employee of the California Department of Corrections and Rehabilitation

24 | (CDCR). I have been employed by CDCR since 1980.  I have been employed at the California

25 | State Prison in Sacramento (CSP-Sacramento) since July 1, 1993.

26 |         2.  Presently, I am a Correctional Captain in the Investigative Services Unit at CSP-

27 | SAC.  I have been a Captain since February 23, 1999.  I was the Captain of B Facility from

28 | September 2001 to September 2003.

**January 4, 2002: Attempted Murder/Stabbing of a Peace Officer**

3.  On January 2, 2002, at 0645 hours, in B Facility, eleven inmates brutally attacked four correctional officers in the B Facility 3/4 dining room. Inmate manufactured weapons were used in the attack.  The involved inmates refused several orders to stop the attack.  This was not just an attack on staff; this was an attempt to murder a peace officer.

4.  Three of the four officers received injuries consisting of puncture wounds and requiring that they be transported to the hospital where they received treatment for their injuries.

5.  As responding staff assisted in searching and escorting the involved inmates out of the dining room, staff discovered an inmate manufactured weapon on the floor between the fourth dining room table from 4 block and the wall.  The weapon measured approximately 5 3/4 inches long by 3/8 inches in diameter, and was constructed of a sharpened metal point measuring approximately 15/16 inches long, attached to a plastic pen to form a handle.

6.  All eleven inmates were placed in Administrative Segregation and subsequently were transported to the California State Prison in Corcoran.

7.  During a subsequent search of the dining room by the investigative services unit, staff discovered one inmate manufactured weapon secreted inside of a milk carton on the fourth dining room table from 4 block.  The weapon measured approximately 4 3/4 inches long by 3/4 inches in diameter.  It was constructed of round metal rod, sharpened to a  point at one end and wrapped with tape and cellophane at the other.

8.  I was the B Facility Captain at the time, however, I was not on duty on this date.  In my absence, the next in command who would have been the Lieutenant, was in charge and had the authority to order a lockdown subject to the approval or disapproval of the Warden.  A lock down of all inmates in B Facility was ordered and the decision was approved by Warden Pliler.

9.  During a lock down, inmates are confined to their cells.  They are cell fed and they are allowed to exit their cells for controlled showers.  They are provided essential services such as medical attention.  Inmates are not allowed to go to their assigned work or education programs.  They are not allowed to go to the yard because of the degree of danger which presents itself when there are large numbers of inmates on a yard at the same time.

10. Pursuant to CDCR policy and procedures, immediately following the lock down, an investigation was commenced into the cause of the assault on staff. It was unknown at the time whether this was an isolated incident or whether there were other possible planned attacks on staff. Staff worked diligently to identify whether there were other inmates who played a role in the attack on staff and have those inmates removed.

11. The first month following the incident was occupied with conducting searches, interviewing inmates and staff, and gathering intelligence from various sources. This entailed interviewing all of the inmates in B Facility. There were approximately 1000 to 1100 inmates in the facility at that time. I recall that the inmates refused to talk for fear of retaliation by other inmates. As a result, the information was slow in coming forward.

12. Staff also had to conduct very thorough searches of all inmate cells as well as common areas. During these searches, the main yard was dug up in search of weapons which could have been buried.

13. Furthermore, during the process of investigating and gathering intelligence we were presented with information which raised more questions and concerns. Because we could not be certain that this was an isolated incident, it was not safe to unlock or to begin the process of restoring yard privileges to the inmate population.

14. Also of great concern was the fact that the inmates who assaulted staff were Southern Hispanics. This prison group is the most influential, organized, and dangerous prison group. Generally, attacks such as this one do not occur unless it has been approved by the leaders of this group. Because of this, we believed that it was likely that the Southern Hispanics had put a hit out on staff. There was a very serious and viable threat to staff safety which had to be fully investigated. The threat level was the highest I've seen in my career.

15. Staff were also investigating the possibility that the attacks had been ordered by the Mexican Mafia at Pelican Bay State Prison. Staff was communicating with prison staff at Pelican Bay as well as other institutions and comparing information and verifying leads. Inmates at Pelican Bay were also being interviewed in an attempt to gain information.

///

16.  Inmates in the other facilities at CSP-Sacramento were also being interviewed, as well as those in Administrative Segregation.  Staff were reading inmate mail in search of information.  Notes were also being passed by inmates to staff with information which had to be verified.

17.  As a result, during the initial phase of the investigation, the inmates in B Facility were not permitted to return to their regular program activities, including daily yard exercise, until all involved inmates could be identified and removed from the general population and all searches for weapons had been completed.  I and other custodial staff responsible for B Facility concluded that until the investigation was complete and all involved inmates could be identified and removed from the general population in B Facility, release of prisoners to the main exercise yard posed an unacceptable risk of renewed violence which threatened the safety of inmates and staff.

18.  Between January 4, 2002 and March 8, 2002, through interviews and searches, we continued to obtain information which indicated that there was a serious and viable threat to institutional safety.  While it was our goal to return to normal programing, our first priority was to ensure the safety of staff and inmates.  Due to the nature of the information that was being revealed through the investigation process, and our responsibility to follow all leads, it was not safe to begin the process of releasing inmates.

19.  Also, on February 22, 2002, there was an attempted murder of a peace officer by inmates in C Facility.  This incident occurred only one day after C Facility began the process of unlocking that facility.  While this incident occurred in a different facility, it affected both A Facility and B Facility because of the nature of the assault on staff and the fact that there existed a viable threat against staff members.

20.  On March 8, 2002, we began the process of releasing inmates in B Facility to normal programing.  Pursuant to CDCR policy, we started with the critical workers by giving them the opportunity to go to the yard for exercise on Saturdays and Sundays, and restoring various other programs and privileges to this group.  This group consisted of approximately 95 inmates.  This allowed staff to observe these inmates in relatively small numbers.  On March 14,

1   2002, we added about 35 critical workers to this group.

2       21.   Based upon a review of the relevant documents, on March 27, 2002, the critical

3   worker's list was augmented to include approximately 210 workers, including inmate Norwood.

4       22.   Other groups of inmates were incrementally added to the list of inmates to be

5   released.  By April 3, 2002, all non-Hispanic inmates in B Facility were allowed to go to the yard

6   for exercise according to an approved yard schedule.

7       23.   On Monday, April 15, 2002, a stabbing/slashing assault occurred on the main

8   exercise yard involving White inmates.  This incident set back our efforts to resume a full normal

9   program, however, staff continued to work diligently in doing so.

10      24.   The entire time, weekly meetings with the Warden, Associate Warden, Facility

11  Captain, Use of Force Coordinator and other critical staff members were taking place to discuss

12  the progress made and the status of the lock down.  While we were required to meet at least once

13  a week, these meetings were taking place more often than once a week.

14  **May 8, 2002:  Attempted Murder On A Peace Officer**

15      25.   On May 8, 2002, while still in the process of resuming a full normal program in B

16  Facility, officer Tuter was attacked by a Black inmate with an inmate manufactured weapon.  The

17  inmate aggressively attacked officer Tuter by striking him repeatedly in the head with a weapon.

18  The weapon was 4 ½ inches long, ½ inch wide, 1/4 inch thick, and sharpened to a point at one

19  end.  The other end was covered in two inches of plastic wrap as a handle.  The weapon appeared

20  to have been fashioned from a tooth brush.

21      26.   As a result of the attack on officer Tuter, as well as the prior January 4, 2002,

22  attack on other staff members, and the April 15, 2002 stabbing/slashing  assault by White

23  inmates, I ordered a lock down of all inmates in B Facility.  The decision was approved by Terry

24  Rosario who was the acting Warden at that time.

25      27.   All programs were suspended, including the use of the yard for recreation

26  purposes.

27      28.   Pursuant to CDCR policy and procedures, immediately following the lock down,

28  an investigation was commenced into the cause of the attack of officer Tuter.  This included a

search of all cells and common areas, interviews with all inmates and staff, and gathering of intelligence and information from other sources.

29. Inmates were not talking and the information was slow in coming forward.

30. By July 1, 2002, some of the privileges were being restored to inmates such as visiting, canteen, packages, and telephone access. On July 11, 2002, Southern Hispanics and Mexican Nationals were allowed to use the small concrete yards for recreation in groups of up to 16 inmates per yard. The White, American Indian, Others[1/], and critical workers were released to the main yard in groups of up to 50 at a time. By July 16, 2002, Southern Hispanics were released to the small concrete yards in groups of up to 20 inmates. Whites, American Indians, Mexican National, and Others were released to the main yard in groups of up to 100 inmates. By July 31, 2002, Blacks were released to the small concrete yards in groups of up to 20 inmates and all other inmates were normal with a maximum of 150 inmates on the main yard at a time.

31. Over the course of the next few months, staff continued to work towards resuming a full normal program in all respects. On occasion, we experienced some set backs resulting in temporarily suspending yard and privileges at various times due to threats on staff and inmate safety or based on information received which indicated there was a threat of violence. Nonetheless, I and my staff continued to work towards the goal of resuming a full normal program.

32. The entire time, weekly meetings with the Warden, Associate Warden, Facility Captain, Use of Force Coordinator and other critical staff members were taking place to discuss the progress made and the status of the lock down. While we were required to meet at least once a week, these meetings were taking place more often than once a week.

**December 28, 2002: Attempted Murder On a Peace Officer/Melee**

33. On December 28, 2002, a riot occurred on the B Facility main exercise yard where a large number of Black inmates attacked and physically assaulted staff. The attack began when Sergeant Murphy observed two inmates engaged in what appeared to be a fistfight on the facility B main exercise yard. Sergeant Murphy ordered the two inmates to stop and get down, but they

---

1. The classification of "Other" is given to the Asian and Pacific Islander group of inmates.

did not comply.  Sergeant Murphy instructed the central tower officer to order the yard down[2].  Sergeant Murphy used his O.C. Pepper Spray on the two inmates and they immediately got down on the ground.  Sergeant Murphy was then attacked by another inmate.  At the same time, numerous other inmates got up and ran towards Sergeant Murphy and attacked him.  Sergeant Murphy was forced to the ground and five inmates proceeded jump on him and strike him.

34.  As other staff members responded to the yard, inmates continued to get up and run towards responding staff and attack them.  Many of the inmates had inmate manufactured weapons.  In total, six inmate manufactured weapons were recovered.

35.  Based on subsequent staff interviews and reports, it was determined that the fist fight between the two inmates was a diversion for the purpose of distracting and attacking staff.  Further investigation and review of the videotapes of the incident identified at least 24 inmates as active participants on the staff assaults.

36.  Nine staff members sustained injuries as a result of this incident.

37.  At the time of this incident, we were still in the process of unlocking B Facility and resuming a full normal program.  This incident, coupled with numerous other incidents of violence between the inmates, led to me instituting a full lock down again.

38.  Specifically, on August 22, 2002, incidents occurred on the B Facility 7 block and 2 block mini concrete yards involving White and Hispanic inmates, where numerous inmates received serious injuries.  Subsequent to this event, numerous inmate manufactured weapons were discovered in possession of the White and Southern Hispanic inmates.

39.  Then on October 3, 2002, during the unlock process, another incident occurred on the B Facility main yard involving White and Hispanic inmates which also resulted in several inmates receiving serious injuries. Again, numerous inmate manufactured weapons were discovered in possession of the White and Southern Hispanic inmates.

40.  Finally, on December 15, 2002, during evening showers, another incident occurred involving White and Hispanic inmates resulting in an inmate receiving serious injuries.

---

2.  "Yard down" requires that all the inmates get down in the prone position and remain in that position until staff instruct them to get up.

1    41.  Based on all of these incidents, it was determined that there was a threat to

2  everyone's safety and security and therefore, all level four inmates would remain on lock down

3  status until further notice.

4    42.  We immediately started the investigation into the attack on staff.  This included a

5  search of all cells and common areas, interviews with all inmates and staff, and gathering of

6  intelligence and information from other sources.

7    43.  Over the course of the next several months, staff continued to work towards

8  resuming a full normal program in all respects, encountering some set backs as we went along.

9  On February 16, 2003, an incident occurred in B Facility 4 block involving White inmates and

10  the use of a deadly weapon.  This incident also set us back in our efforts to unlock the facility.

11  Nonetheless, I and my staff continued to work towards the goal of resuming a full normal

12  program.

13    44.  By February 21, 2003, we began the process of unlocking B Facility.  We started

14  by releasing a small number of uninvolved inmates first and observing their behavior prior to

15  adding to the groups.  On March 18, 2003, we began releasing the Whites and Hispanics to the

16  small concrete yards in small groups.

17    45.  We continued to encounter set backs.  On May 5, 2003, there were two separate

18  stabbing assaults involving White inmates in which both victims sustained serious injuries.  On

19  June 1, 2003, there was a slashing incident involving White inmates.  However, we continued

20  moving forward with our plan to incrementally unlock the facility.

21    46.  By May 15, 2003, Asians and American Indians were released to the yard on a

22  normal schedule.  Hispanics were released to the small cement yards.  Blacks were released to

23  the small cement yards on a rotating schedule.

24    47.  As with all other lock down situations, weekly meetings with the Warden,

25  Associate Warden, Facility Captain, Use of Force Coordinator and other critical staff members

26  were taking place to discuss the progress made and the status of the lock down.  While we were

27  required to meet at least once a week, these meetings were taking place more often than once a

28  week.

<u>Legitimate Penological Reasons For Suspending Yard Privileges During Lock Downs</u>

48. The main yard in Facility B, which included a running area, and volleyball and basketball courts was the only feasible place for inmates to go for outdoor exercise and recreation.

49. It is CDCR's policy to program inmates of different racial and ethnic groups together. Provided that the inmates fomenting violence are identified and removed from the general population, a single yard program for all inmates created a safer environment for all involved by reducing perceived differences between the different racial and ethnic groups and the hostilities that arose from such perceptions.

50. Integrated outdoor exercise also minimized the changes of releasing an inmate to a hostile yard, or other program facility, e.g., classrooms, work locations, etc., where he could be attacked.

51. Under these circumstances, where four separate incidents where inmates attempted to murder staff, over a short span of time, combined with numerous incidents of violence between inmates, all with use of inmate manufactured weapons, we concluded that it was not safe to release inmates to the yard. Our main priority was to maintain the safety of the institution and at that time, we could not safely release the inmates to the yard in light of the information we had available to us.

52. Nonetheless, at various times during the lock down, when it was safe to do so, the small concrete yards were used to release inmates in small groups to the yard. At most, 20 inmates can use the yard at a time. This is not always a feasible alternative and the decision to release inmates to the small concrete yards depends on whether the information we have indicates that it is safe to do so.

I swear under penalty of perjury that the foregoing statements are true.

Executed this ___16___ day of March 2006, in Sacramento, California.


S. VANCE

K0096568.wpd

*Declaration of S. Vance*

9

# EXHIBIT C

1  BILL LOCKYER
   Attorney General of the State of California
2  JAMES M. HUMES
   Chief Assistant Attorney General
3  FRANCES T. GRUNDER
   Senior Assistant Attorney General
4  ALVIN GITTISRIBOONGUL
   Supervising Deputy Attorney General
5  MARIA G. CHAN, State Bar No. 192130
   Deputy Attorney General
6   1300 I Street, Suite 125
    P.O. Box 944255
7   Sacramento, CA 94244-2550
    Telephone: (916) 323-1940
8   Fax: (916) 324-5205

9  Attorneys for Defendants Goughnour, Knowles,
   Martel, Pliler, Vance, Walker and Willey
10 SF2004401398

11

12            IN THE UNITED STATES DISTRICT COURT

13          FOR THE EASTERN DISTRICT OF CALIFORNIA

14                  SACRAMENTO DIVISION

15

16 **GREGORY LYNN NORWOOD,**          NO. 2:03-cv-2554 GEB GGH P

17                      Plaintiff,    **DECLARATION OF D. WILLEY
                                      IN SUPPORT OF DEFENDANTS'**
18        v.                          **MOTION FOR SUMMARY
                                      JUDGMENT**
19 **EDWARD ALAMEIDA, JR., et al.,**

20                      Defendants.

21

22     I, D. WILLEY, declare:

23     1. I am an employee of the California Department of Corrections and Rehabilitation

24 (CDCR). I have been employed by CDCR for approximately 25 years. I started my career as a

25 correctional officer at Folsom State Prison. In 1986, I activated the California State Prison in

26 Sacramento (CSP-Sacramento).

27 ///

28 ///

*Declaration of D. Willey*

1

2. I left CSP-Sacramento in 1988 and activated Corcoran State Prison. In 1989, I retured to CSP-Sacramento. In 1994 I activated Pleasant Valley State Prison and in 2000, I returned to CSP-Sacramento. Presently, I am a Correctional Counselor II, Specialist at CSP-Sacramento.

3. I was in the position of *acting* Captain of Facility B from September 2, 2003 to September 19, 2003, and then again from October 14, 2003 to January 16, 2004[1].

**September 3, 2003: Attempted Murder of a Peace Officer**

4. On September 3, 2003, officer Curry was brutally attacked by an inmate with an inmate manufactured weapon (metal can lid). Officer Curry was slashed numerous times in the face and neck areas, punched in the nose, and flung down the stairs by the inmate.

5. As a result of the attack on officer Curry, I ordered a lockdown of all inmates in Facility B. The decision was approved by the Warden. Based on staff's perceptions of the staff assault and the injuries incurred, we believed it would be prudent to lock down the inmates at attempt to find out the dynamics of the assault on staff and at the same time give staff an opportunity to decompress after the trauma of the incident. We also believed that due to the unusual number of staff assaults which had taken place in a relatively short period of time, it was necessary to conduct an investigation to gather information from inmates willing to talk with us concerning the reasons for the staff assaults. We needed to ascertain if the causes of the attack and whether there was a conspiracy to attack staff.

6. Additionally, because of the unusually high number of recent staff assaults, a State of Emergency was declared by the Director of the CDCR. A State of Emergency can only be declared by the Director. During a State of Emergency, the Warden may authorize the postponement of nonessential administrative decisions, actions, and the normal time requirements for such decisions and actions as deemed necessary because of the emergency.

---

1. A person is assigned in a particular position as an "Actor," normally a position that is a pay grade above the normal position, and given the responsibility and authority of that position without being placed in that position through promotion, lateral transfer, or appointment. The Actor is only in that position for a limited time, which is vacant due to the assigned individual being on vacation, off sick, or being promoted to another position.

1  This may include, but is not limited to, classification committee hearings, disciplinary

2  proceedings, and the review and action on inmate appeals.

3       7.  Immediately following the lockdown, an investigation was commenced.  The

4  investigation involved interviewing all inmates and conducting searches.  There were

5  approximately 1000 to 1100 inmates in Facility B and all inmates had to be interviewed.  This is

6  a time consuming process because the inmates had to be removed from their cells and escorted to

7  the program office to be interviewed one at a time.

8       8.  In many instances, inmates refused to talk for fear of being labeled snitches.  For

9  example, when an inmate is removed for an interview, the other inmates in the housing unit

10  know why he has been removed from his cell.  If the inmate is gone for a long period of time, say

11  an hour, and all other inmates were only gone for 15 minutes, the others assume the inmate is

12  "talking" and this may jeopardize the safety of that inmate because he is now labeled a snitch.

13  Therefore, sometimes we had to use other means or excuses for removing inmates who have

14  information they are willing to divulge.  Therefore, this process took a great deal of time to

15  complete.

16       9.  The weeks following the incident were also occupied with conducting searches.

17  Every cell had to be searched, as well as all common areas.  This too is a very time consuming

18  process which can take several weeks to complete, depending on what was discovered during the

19  searches.

20       10.  Furthermore, during the interview process and searches, information was

21  discovered or leads were given which had to be pursued.  For example, during interviews,

22  information was divulged indicating that more assaults on staff were planned.  These leads had to

23  be followed and fully investigated before inmates could be released to their normal programs.

24  For example, we received information that the attack on officer Curry was the result of a personal

25  conflict the inmate had with another staff member and officer Curry was the target of

26  opportunity.  However, we also received information that inmates affiliated with the Blue Note

27  Crips were conspiring to assault staff.  In light of this information, it was not safe to release

28  inmates prior to investigating and having a certainty that no further violence was planned.

1    11.  Additionally, the information we discovered had to be shared with other

2  institutions.  Information is routinely shared with all other institutions via the Incident Report.

3  The Incident Report is sent to CDCR Headquarters for tracking purposes.  The Incident Report is

4  also given to the Law Enforcement Investigative Unit (LEIU) for information gathering.  The

5  LEIU is able, by way of these reports, to advise the Director of any patterns that may be

6  occurring statewide.  For example, we would be able to determine if a particular ethnic group,

7  prison gang, or disruptive group was committing an unusual number of staff assaults.  This

8  information is shared via conference calls with the Director's office to all institutions, as well as

9  e-mails.

10    12.  This process took time and in this case, it took approximately four weeks before

11  we felt that we had sufficient information to begin the process of incrementally unlocking the

12  inmates in Facility B.  Our main priority was to ensure the safety and security of all staff and

13  inmates.  The only way to do so was to conduct an investigation and to keep the inmate

14  population locked down until it could be determined that it was safe to being un-locking the

15  inmates.  It was simply not safe to release inmates to yards in great numbers without being

16  confident that similar attacks would not occur.

17    13.  Releasing the inmates to the small yards was not a feasible alternative at that time

18  because we were still in the process of gathering information and we were not confident that it

19  was safe for either staff or inmates to be released even in small groups of 20.  We did not have

20  the information available to determine if a threat to staff existed with the inmates.  Releasing

21  inmates at this point with little or no information could result in more staff/inmate assaults as the

22  inmates were being processed out to the yard, even in small groups.  Without reliable

23  information, inmates allowed to go to the yard could, in fact, have enemies being released at the

24  same time.

25    14.  By October 14, 2003, White, Hispanic, and Other inmates began to be released for

26  normal programing, including the yard, while the investigation was ongoing.

27    15.  On November 4, 2003, the lock down was lifted for non-Crip Black inmates.

28  ///

*Declaration of D. Willey*

4

16  By December 3, 2003, Facility B returned to normal programing.

17.  As groups of inmates were being unlocked, we continued to investigate and obtain information.  Part of this process included observing the conduct and behavior of those inmates as they were unlocked.

18.  While the lock down was instituted as a result of the September 3, 2003 assault on officer Curry, the length of the lock down was directly affected by the information we obtained during the investigation following the assault.  It was also affected by "incidents" between the groups of inmates which occurred during the investigation and the process of incrementally unlocking.  All of these factors were critical in our decisions during the lock down.

19.  Meetings were held at least once a week, but generally more often than that, in which the Warden, Associate Warden, Facility Captain, Use of Force Coordinator, and any other staff member with information were present.  The purpose of these meetings were to report back to the Warden on the progress staff were making in restoring the facility to a normal program.  During these meetings, we discussed the progress of the investigation and the information obtained.  If I felt it was safe to release a group of inmates, I would bring it up at these meetings and the Warden would make a decision on my recommendation.

20.  We also conducted meetings with staff to disseminate information regarding the progress of the investigation and unlock procedure.  This also gave staff the opportunity to pass on information they may have gathered from inmates within their housing units that could impact the unlock process.

21.  Given the nature of the attack on officer Curry, the long history of violent outbreaks in Facility B, and the numerous attacks on staff in the preceding year and a half, as well as other incidents of violence, the lock down was necessary in order to ensure the safety of all staff and inmates.

///

///

///

///

22. During first few weeks of the lock-down, inmates could not be released to yard because we did not have sufficient information to conclude that it was safe to release large numbers of inmates to the yard. It has been my experience that releasing inmates, even in small groups, without the benefit of reliable information, could result in assaults of inmates or staff. In an inmate has a conflict with another inmate and we do not have information to indicate that the conflict is more than a personal issue, it could result in a confrontation not only between the two inmates but also between any associates of the inmates. We also would have no way of knowing if a particular group or affiliation were targeting members of their own group for assault. The number of inmates released is not necessarily relevant to what may occur on a small yard. The leaders of inmate groups/gangs/affiliations expect and demand retribution for any perceived wrong. They expect even one inmate of their group to seek retribution, even if out-numbered. This is why it is imperative that we conduct investigations and follow up on all leads if we are going to ensure the safety of staff and inmates.

23. As soon as we were confident that inmates could be released and returned to normal programing, we did so.

I swear under penalty of perjury that the foregoing statements are true.

Executed this 17th day of March 2006, in Sacramento, California.

D. WILLEY

30096527.wpd

*Declaration of D. Willey*

6

# EXHIBIT D

1 │ BILL LOCKYER
Attorney General of the State of California
2 │ JAMES M. HUMES
Chief Assistant Attorney General
3 │ FRANCES T. GRUNDER
Senior Assistant Attorney General
4 │ ALVING GITTISRIBOONGUL
Supervising Deputy Attorney General
5 │ MARIA G. CHAN, State Bar No. 192130
Deputy Attorney General
6 │  1300 I Street, Suite 125
 P.O. Box 944255
7 │  Sacramento, CA 94244-2550
 Telephone: (916) 323-1940
8 │  Fax: (916) 324-5205

9 │ Attorneys for Defendants Goughnour, Knowles,
Martel, Pliler, Vance, Walker and Willey
10 │ SF2004401398

11 │

12 │ IN THE UNITED STATES DISTRICT COURT

13 │ FOR THE EASTERN DISTRICT OF CALIFORNIA

14 │ SACRAMENTO DIVISION

15 │

16 │ **GREGORY LYNN NORWOOD,**          NO. 2:03-cv-2554 GEB GGH P

17 │                          Plaintiff,   **DECLARATION OF J.
WALKER IN SUPPORT OF
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

18 │    v.

19 │ **EDWARD ALAMEIDA, JR., et al.,**

20 │                          Defendants.

21 │

22 │    I, J. WALKER, declare:

23 │    1. I am an employee of the California Department of Corrections and Rehabilitation

24 │ (CDCR). I have been employed by CDCR since 1977. I have been employed at the California

25 │ State Prison in Sacramento (CSP-Sacramento) since 1987.

26 │    2. During my tenure at CSP-Sacramento, I have held the following positions: I was a

27 │ Program Lieutenant from April 1987 thru September 1995. I was the Facility Captain of

28 │ facilities B and C from September 1995 thru January 1999. I was the Facility Captain of facility

1  A from 1999 thru October 2003.  I was also acting as the Associate Warden of Facility B in

2  September 2003.  From September 2003 to December 2005, I was an Associate Warden.  In

3  December 2005, I was appointed Chief Deputy Warden.  Presently I am acting as Warden of

4  CSP-Sacramento.

5         3.  Since its creation, CSP-Sacramento has been a Level IV prison – a maximum

6  security prison – because the inmates confined at that institution are deemed to pose the greatest

7  threats to institutional security and safety of staff.

8         4.  CSP-Sacramento is organized in three identical sets of buildings – Facility A, B,

9  and C – with each facility comprised of eight blocks, and each block consisting of 64 cells and

10  128 beds.

11         5.  Facility A is considered a "soft" yard.  This is because the inmates housing in

12  Facility A are the former "protective custody" inmates, or those with "sensitive needs."  These

13  inmates tend to be very compliant and generally non violent.  This is a mellow yard where we

14  may have one serious incident per year.  Facility C generally houses those inmates who want to

15  program and stay out of trouble.  Facility B traditionally has housed those inmates who refuse to

16  program and consistently get into trouble.

17         6.  During 2002 and 2003, approximately 1,000 prisoners were confined in each of the

18  three facilities at CSP-Sacramento.  The prisoners in each facility were of all races and ethnic

19  groups – Black, White, Hispanics, Asians, American Indian, etc.

20         7.  At CSP-Sacramento, each facility is self-contained and built around a yard where,

21  absent unusual conditions, inmates are allowed to exercise daily.

22         8.  Each facility also has four small yards, also referred to as concrete yards.  There is

23  one concrete yard between each of the eight housing blocks.  These are very small yards

24  measuring about 50 by 50 feet.  These yards were not intended to be used for general population

25  exercise.  At most, about 20 inmates can be placed on these yards at a time.

26         9.  In certain circumstances, however, one or more of the several concrete yards have

27  been used as areas for inmates to exercise in modified programs, but only when staff are certain

28  that inmates will not assault one another and it is safe to release inmates to such yards.

10.  A lockdown is the restriction of all inmates to their cells/dormitory beds encompassing no less than a housing unit.  True lockdowns are rare occasions, generally following very serious threats to institutional security and the safety of staff and inmates.  During a lockdown, all normal programing is suspended until it is determined that it is safe to resume normal programing.

11.  Normal programing means inmates attend work and education programs. They are released to the yard for recreation in large groups according to their yard schedule.  The yard population is limited to 150 inmates at a time.  Inmates have regular visiting, canteen, and telephone privileges.  They attend the law library and religious services.  During a lockdown, however, these programs are suspended and inmates are confined to their cells.  Inmate movement is controlled, under close supervision, and under escort with mechanical restraints.

12.  Pursuant to CDCR policies and procedures, whenever there is a serious incident the initial incident response is as follows:  The first priority is to isolate, contain, and control the situation to the smallest area possible.  Next, is to provide medical attention for all injured followed by the preservation of evidence.  Staff will then identify all involved persons and ensure appropriate written documentation/reports are completed and submitted within designated time frames.

13.  Once the initial incident response is completed, assessment of the causes and determination of program activity status begins.  Depending on the seriousness of the situation, it may be necessary to modify or restrict program activities.  Available options are to modify programs, lockdown, or declare a State of Emergency.  These options serve to restrict potentially volatile persons or groups, and affords additional time to evaluate overall operations.

14.  If it is determined that a lockdown is necessary, a program status report is immediately developed to ensure both staff and inmates know what is expected.  Maintaining essential services, i.e., medical/mental health, hygiene, and access to courts are mandates.  The plan is reviewed regularly and revised as scheduled activities are resumed.  Staff and inmates are updated as revisions are made.

15. The Facility Captain generally decides to institute a lockdown and makes the recommendation to the Warden who approves or disapproves the recommendation. Once a lockdown is instituted, the Warden makes the decision when it is safe to unlock and return to normal programming.

16. Following an incident which results in the decision to lockdown a facility, the process of investigating and gathering intelligence begins. This includes searches of all inmate cells, common areas, dining halls, janitorial rooms, and the outside yard. Searching the outside yard often consists of digging up the ground in search for weapons. The purpose of these searches is to uncover any weapons that will later be used to harm inmates or staff.

17. While it may take anywhere from 15 to 20 days to complete a search of a facility, this time may be significantly extended if during the search critical information is discovered necessitating further searches.

18. At the same time, inmate interviews are conducted. Every inmate in the facility is interviewed. This can be anywhere from 1000 to 1100 inmates. Staff are also interviewed. The purpose of the interviews is to gather intelligence for the purpose of determining when it is safe to return to normal programing. The interview process may also be extended depending on the type of information obtained and the necessity for following up on leads.

19. In addition, staff are communicating with other institutions as well as headquarters to compare the intelligence gathered and ensure that it is safe to resume normal programing. It is common to have staff at other institutions interview inmates there as well as to monitor their mail and telephone communications. The main priority is always the safety of inmates and staff while working on a plan to unlock the facility.

20. It is the CDCR's policy to return to full normal programing as soon as it is safe to do so. Depending on the magnitude and dynamics of the incident, movement towards full program activities will be made.

///

///

///

1    21. How a facility is unlocked depends greatly on the nature of the incident and is

2  determined on a case by case basis.  Movement back to full normal programing is planned and

3  occurs during normal business hours when the majority of regularly scheduled staff are present

4  and have been fully briefed on the plan of operation.

5    22. The task of releasing inmates to full normal programing is accomplished

6  incrementally beginning with small numbers of inmates and progressing to larger numbers as it is

7  determined that it is safe to do so.  Generally, critical workers are released first.  Additional

8  increases in numbers are accomplished by expanding the critical workers list and returning

9  inmates first to priority assignments.  As inmates are returned to work assignments, their

10  privileges are also restored incrementally.

11    23. The remaining and unassigned inmates are then included in releases for return to

12  full programing.  Generally, non-involved races are released first, followed by non-involved

13  groups (gang affiliations), and so on.  Inmates are released in small groups to the dayroom and/or

14  the recreation yard.  This provides staff an opportunity to observe their conduct in a controlled

15  setting.  During releases of these inmates, incremental positive program activities are also

16  scheduled for them such as telephone calls, canteen, or quarterly packages.

17    24. There are times when during the unlock process, another incident will occur

18  requiring that those inmates who have begun the incremental release process be locked down

19  until an investigation of the incident can be completed.

20    25. During a lockdown, there are mandatory weekly meetings with the Warden (or

21  Chief Deputy Warden) to discuss the status of the lockdown, in addition to daily briefings.  The

22  purpose of the meetings is to report to the Warden on the status of the lockdown and to continue

23  developing a plan to resume normal programming as soon as possible.  The meetings focus on

24  investigation updates to determine progress, review interview/intelligence results, and establish

25  or revise the plan of operation.  The Warden may require more frequent meetings depending on

26  the individual circumstances related to each lockdown.  Those present at these meetings include

27  the Warden or Chief Deputy Warden, Facility Captain, Associate Warden, Use of Force

28  Coordinator, and any other line staff member with relevant information.

1          26.  Between the period of January 2002 through September 2003, there were four very

2    serious inmate assaults on staff in Facility B with the use of inmate manufactured weapons.

3    Following each incident, the decision was made to place the facility on lockdown status until an

4    investigation could be completed and it could be determined that it was safe to unlock.  The

5    lockdowns lasted anywhere from a couple of months to six months.

6          27.  In addition to the staff assaults, there were various other incidents of violence

7    during the relevant time period involving inmates and the use of inmate manufactured weapons.

8    All of these factors, combined with the information that was being uncovered through interviews,

9    searches, and monitoring of inmate mail and communications, contributed to the duration of the

10   lockdowns.

11         28.  Nonetheless, staff were working diligently investigating the causes into the staff

12   assaults and other violent incidents.  Due to the severe nature of the assaults on staff and other

13   incidents, releasing inmates to the yard for exercise pending the investigations was not a feasible

14   or safe alternative.  When there is an incident of the magnitude of these four incidents, it requires

15   investigation into the causes and circumstances of the incident.  We cannot safely release inmates

16   without information regarding the situation.  This information can identify what inmate(s), gangs,

17   or ethnic groups that may have been involved.  The information can also provide information

18   concerning the reasons why the situation occurred and if the "problem" was corrected or whether

19   the incident is still simmering.  Failure to having this type of critical information prior to

20   releasing inmates would most likely result in further assaults on inmates and/or staff.

21         29.  Without critical information obtained through a thorough investigation, releasing

22   inmates to a general population unrestricted yard could result in the stabbing of inmates or staff,

23   battery of inmates or staff, or riots, all of which threaten the safety and security of the institution.

24   In my experience, I have seen these types of things happen repeatedly.

25         30.  For example, on October 3, 2002, the Southern Hispanics were on lockdown

26   status.  During an escort of some Southern Hispanic inmates, a group of White inmates attacked

27   them.  An investigation revealed that the White inmates had been planning the assault due to the

28   previous assault by Southern Hispanics.

*Declaration of J. Walker*

6

1    31.  Another example is when on November 15, 2003, an inmate attacked two

2  correctional officers working in the Facility B office with a weapon.  We released some inmates

3  without the benefit of some investigative information because we believed we had enough

4  information.  Further information revealed a viable threat to staff still existed.

5    32.  During the lockdowns relevant to this litigation, all CDCR policies and procedures

6  were followed in deciding to implement the lockdowns and unlocking Facility B.

7    I swear under penalty of perjury that the foregoing statements are true.

8    Executed this ⟨⟨20⟩⟩ day of March 2006, in Sacramento, California.

9

10                                    J. WALKER

11

10096534.wpd

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Declaration of J. Walker*

7

EXHIBIT E

1  BILL LOCKYER
   Attorney General of the State of California
2  JAMES M. HUMES
   Chief Assistant Attorney General
3  FRANCES T. GRUNDER
   Senior Assistant Attorney General
4  ALVIN GITTISRIBOONGUL
   Supervising Deputy Attorney General
5  MARIA G. CHAN, State Bar No. 192130
   Deputy Attorney General
6    1300 I Street, Suite 125
     P.O. Box 944255
7    Sacramento, CA 94244-2550
     Telephone:  (916) 323-1940
8    Fax:  (916) 324-5205

9  Attorneys for Defendants Goughnour, Knowles,
   Martel, Pliler, Vance, Walker and Willey
10 SF2004401398

11

12                 IN THE UNITED STATES DISTRICT COURT

13              FOR THE EASTERN DISTRICT OF CALIFORNIA

14                        SACRAMENTO DIVISION

15
   ┌─────────────────────────────────────┬──────────────────────────
16 │ **GREGORY LYNN NORWOOD,**            │ NO. 2:03-cv-2554 GEB GGH P
   │                                      │
17 │                        Plaintiff,    │ **DECLARATION OF C. PLILER
   │                                      │ IN SUPPORT OF DEFENDANT'S
18 │         v.                           │ MOTION FOR SUMMARY
   │                                      │ JUDGMENT**
19 │ **EDWARD ALAMEIDA, JR., et al.,**    │
   │                                      │
20 │                        Defendants.   │
   └─────────────────────────────────────┴──────────────────────────

21

22         I, C. PLILER, declare:

23         1.  I was employed by the California Department of Corrections and Rehabilitation

24 (CDCR) from 1968 to 2004.  I am now retired.

25         2.  I was the Warden of the California State Prison, Sacramento (CSP-SAC) from July

26 1998 to October 2003.  For a period of about 8 months, between January 2002 and August 2002,

27 I was working out of the CDCR Headquarters on a special assignment.  During my absence,

28 Terry Rosario was in the position of Acting Warden at CSP-SAC.

                            *Declaration of C. Pliler*
                                       1

3. My responsibilities as the Warden of CSP-Sac consisted generally of the overall administration of the prison including safety and security.

4. Between the period of January 2002 through November 2003, there were numerous inmate assaults on staff in B Facility. The most serious of these assaults in terms of sustained staff injuries follow. On January 4, 2002, 11 inmates attacked several staff members, during which, inmate manufactured weapons were used. One of the staff members sustained injuries so severe that he had to be hospitalized and was in intensive care.

5. On May 8, 2002, an inmate attacked a staff member with an inmate manufactured weapon. The officer sustained serious injuries consisting of puncture wounds to the head and neck areas.

6. On December 28, 2002, during an apparent fist fight between two inmates, a staff member was attacked by a number of inmates. As responding staff arrived to stop the attack, they too were attacked. Nine staff members sustained injuries during the attack and a total of 24 inmates were positively identified as being involved in the incident. It was later determined that the fist fight was a diversion for the purpose of attacking staff members.

7. On September 3, 2003, an officer was attacked by an inmate and slashed with an inmate manufactured weapon, punched in the nose, and flung over the stairs.

8. Following each one of these incidents, the decision was made to place the facility on lock-down status until an investigation could be completed into the cause of the brutal attacks on staff members. The decision to lock down the facility was based on concerns for both inmate and staff safety.

9. Termination of a lock down and a return to normal programming could not occur until all the perpetrators of the violence were identified and transferred to other Level IV institutions, and a determination was made that it was safe for staff and inmates to return to normal programming.

///

///

///

*Declaration of C. Pliler*

2

10.  Historically, until this time, there had not been many life threatening assaults on staff.  Due to the nature of the inmate attacks on staff in these four incidents, and the fact that these were more than simple assaults, they were attempts to murder staff, we took extra precautions and investigated thoroughly to find out the causes of these attacks.

11.  The investigations were time and labor intensive as we had to interview all the inmates in the facility which was a very time consuming process.  We also had to conduct thorough searches of the cells, common areas, and yard.  We had to examine every piece of evidence and information and follow all leads.  Additionally, we were sharing the information we uncovered with staff at CDCR headquarters and other institutions in order to determine if this was a statewide conspiracy to attack staff.  Reports had to be completed.  Finally, as we were progressing in the investigations, and inmates were being identified as posing threats to the security of the prison, those inmates had to be transported to other prisons.  This process also took time.

12.  Our main priority was maintaining the safety and security of the institution.  Our goal was to resume normal programing as quickly as possible while ensuring that staff and inmates were safe.

13.  Additionally, while staff were investigating the attacks on staff and working toward the goal of unlocking the facility, there continued to be other incidents of violence among inmates, often involving the use of inmate manufactured weapons.  This obviously delayed our goal of resuming a full normal program.

14.  For example, following the January 4, 2002 incident, while the investigation was ongoing and staff were working toward unlocking and resuming a full normal program, there was another attempt on a peace officer's life which occurred only one day after C Facility had begun the process of unlocking that facility.

15.  Following the May 8, 2002 incident, while still in the process of incrementally unlocking B Facility and resuming a full normal program, there were a number of serious incidents between inmates.  On August 22, 2002, there were two separate incidents on the small concrete yards involving White and Hispanic inmates; on October 3, 2002, still during the unlock

1   process, there was an incident on the main exercise yard involving Whites and Hispanics; on

2   December 15, 2002, during the evening showers, there was another incident between White and

3   Hispanic inmates.  Inmates sustained serious injuries during these incidents and inmate

4   manufactured weapons were discovered in the possession of White and Hispanic inmates.

5        16.  Shortly after, we had the December 28, 2002, attack on staff where 24 inmates

6   participated in attacking several staff members with weapons.

7        17.  While investigating the December 28, 2002 incident and attempting to restore a

8   normal program, other incidents of violence continued to occur.

9        18.  We were faced with a very serious and volatile situation.  Staff members were

10   being attacked and inmates continued their racial and/or gang related wars at every opportunity.

11   The safety risk was one of the highest I had seen in my career.

12        19.  At the onset of the various lock downs, the inmates could not have outdoor

13   exercise because of the risk of renewed violence and injuries.  Identification and removal of those

14   inmates involved in both the staff assaults and the racial and gang related wars, before permitting

15   inmates to congregate was the surest way to reduce the changes for renewed violence against

16   staff and inmates.

17        20.  As a result, inmates were not permitted outdoor exercise in the main yard, the

18   small yards, or in any other area of CSP-Sacramento, because the risk of violence and injury was

19   too great.  As the investigations progressed, however, and we decided it was safe, we started by

20   allowing small groups of inmates to the yard.

21        21.  In certain circumstances, I approved of the use of one or more of several small

22   yards within the main yards of CSP-Sacramento as areas for inmates to exercise in modified

23   programs, but only when I was sure that the inmates would not assault one another.  As

24   evidenced above, when allowed to go to the small yards, inmates continued the violence against

25   each other.

26   ///

27   ///

28   ///

1    22.  Pursuant to CDCR policy, meetings were held at least twice a week during which
2  the Chief Deputy Warden, Associate Wardens, Facility Captains, Use of Force Coordinator, and
3  any other staff members with information were present.  The purpose of these meetings was to
4  obtain and share information regarding the progress being made in restoring the facility to a
5  normal program.  During these meetings, we discussed the progress of the investigation and the
6  information obtained.  We discussed modifying the program and plans to resume a normal
7  program as quickly as possible.  If a Facility Captain wanted to modify a program for a group of
8  inmates, he would generally present his recommendations at these meetings for my consideration
9  and approval.

10    23.  While these meetings were generally held at least twice a week, if on any other day
11 of the week, a Captain or Associate Warden requested a meeting, we met then as well.

12    24.  This entire process of unlocking a facility following a lock down is a time
13 consuming process.  Our main goal was to return to a full normal program as quickly as possible.
14 Our first priority, however, was to ensure staff and inmate safety.  The process takes time and
15 cannot be accomplished hastily without risk to safety.

16    I swear under penalty of perjury that the foregoing statements are true.

17    Executed this 21st day of March 2006, in Sacramento, California.

19    C. PLILER

20 300983-42.wpd