IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

GREGORY LYNN NORWOOD,

        Plaintiff,               No. CIV S-03-2554 GEB GGH P

    vs.

EDWARD ALAMEIDA, JR., et al.,

        Defendants.         FINDINGS AND RECOMMENDATIONS

_____/

Introduction

        Plaintiff, a state prisoner proceeding pro se, seeks relief pursuant to 42 U.S.C. § 1983. Pending before the court is defendants' March 23, 2006, motion for summary judgment; plaintiff filed opposition[1] to the motion on May 12, 2006.[2] By Order, filed on September 21,

---

[1] Plaintiff's opposition has been put together in a wholly haphazard fashion. It consists of almost 700 pages, much of it wholly unnecessary and almost all of it hopelessly disorganized. For example, and to no apparent purpose, plaintiff includes defendants' motion for summary judgment as part of his opposition. He includes, inter alia, many duplicative pages of exhibits, an earlier motion to compel, a litany of defendants' discovery responses, without identifying in his opposition the basis for their submission. In his opposition to the defendants' undisputed facts, plaintiff does not identify or cite to the exhibits upon which he seeks to rely to counter defendants' evidence. Plaintiff has placed an undue burden on this court in making it so difficult to navigate his filing.

[2] Per the mailbox rule, the opposition was filed on May 9, 2006.

1    2006, the court, inter alia, granted plaintiff's motion pursuant to Fed. R. Civ. P. 56(f) only to the

2    extent of allowing plaintiff to file a supplemental response within 30 days of service upon him of

3    defendant Vance's supplemented response to a specific interrogatory, therein set forth, in

4    plaintiff's first set of interrogatories propounded upon Vance.  Defendants filed notice of having

5    re-served the supplemented response on September 27, 2006.  Plaintiff has not filed a supplement

6    to his opposition and the time for doing so has long since expired.  Even though the time for

7    doing so had passed, on February 26, 2007, plaintiff expressly informing the court that he did not

8    intend to file any supplemental opposition.  Therefore, the court proceeds to adjudicate the

9    defendants' dispositive motion.

10   Second Amended Complaint

11              This matter, originally filed on December 15, 2003, proceeds on the verified

12   second amended complaint, filed on June 7, 2005, naming as defendants two former California

13   State Prison-Sacramento (CSP-Sac) wardens Cheryl Pliler and Mike Knowles; two former CSP-

14   Sac B-Facility captains, Steve J. Vance and David Willey; and three former associate wardens of

15   CSP-Sac B-Facility: Michael F. Martel; Thomas P. Goughnour; and James P. Walker.  Plaintiff

16   alleges that during four lockdown periods, he was deprived of outdoor exercise causing him

17   physical and psychological injury, including stress, anxiety, depression, headaches and muscle

18   cramps.  He and other inmates on lockdown were confined to a double-bunk cell 24 hours a day

19   seven days a week with the exception of a five-minute shower period every other day, excluding

20   Sundays.  He alleges that the extended lockdown periods without permitting outdoor physical

21   exercise constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth

22   Amendments.  Second Amended Complaint (SAC), pp. 2-4.

23              Black general population inmates were denied outdoor exercise for fourteen of the

24   22 months from January 4, 2002, until November 4, 2003, arising from no individual misconduct

25   or propensity to escape.  SAC, p. 4.  The first period lockdown period at issue began on January

26   4, 2002, and concluded on April 3, 2002, and was instituted because of an alleged staff stabbing

1  purportedly by Mexican inmates in CSP-Sac dining hall two.  Memoranda rescinding outdoor

2  exercise were passed out to inmates and were signed by defendant CSP-Sac B-Facility Captain

3  Vance, at which time plaintiff suffered anxiety, depression, stress, headaches and muscle cramps.

4  Defendant Warden Plyler not only had to have approved the excessive deprivation of outdoor

5  exercise but did nothing to intervene to prevent the suffering and deprivation caused over the

6  thirteen-week period.  SAC, p. 5, Exhibit (Ex.) A.[3]

7        The second lockdown period occurred from May 8, 2002, until July 31, 2002.

8  This lockdown occurred because of an alleged staff stabbing assault involving a single black

9  inmate who attacked his work supervisor.  Defendants Vance and Assoc. Warden Goughnour

10  signed memoranda rescinding outdoor physical exercise until July 31, 2002.  Defendant Pliler, at

11  a minimum, implicitly approved the extended (thirteen-week) period of exercise deprivation and

12  failed to intervene to prevent plaintiff's suffering, causing the plaintiff to suffer and endure the

13  conditions previously noted.  SAC, p. 5, Ex. B.

14        The third period of outdoor exercise deprivation occurred during a lockdown

15  which began on December 28, 2002, and ended on June 1, 2003.  This lockdown was

16  precipitated by a melee in the B-Facility's main yard wherein staff was allegedly stabbed.

17  Defendant Vance and Assoc. Warden Martel signed various memoranda depriving plaintiff of

18  outdoor physical exercise for a twenty-week period.  Defendant Pliler, as warden, had to have

19  approved the deprivation and, in any event, failed to intervene on plaintiff's behalf to stop his

20  suffering from headaches, stress, anxiety, depression and muscle cramps, as a result of not being

21  allowed outdoor exercise for an extended period.  SAC, p. 6, Ex. C.

22        The fourth outdoor exercise period ran from September 3, 2003, until November

23  4, 2003, during which plaintiff suffered the stress, anxiety, depression, headaches and muscle

24

25  _____

26  [3] The exhibits to which plaintiff refers are attached to the first amended complaint, of which the court takes judicial notice. (Judicial notice may be taken of court records.  Valerio v. Boise Cascade Corp., 80 F.R.D. 626, 635 n.1 (N.D. Cal. 1978), aff'd, 645 F.2d 699 (9th Cir.), cert. denied, 454 U.S. 1126 (1981)).

1  cramps which he claims to have suffered during each lockdown period described herein as a

2  result of the lack of outdoor exercise.  This more than eight-week lockdown (eight weeks, six

3  days) occurred as a result of a staff stabbing assault in CSP-SAC B-Facility housing block four.

4  Memoranda rescinding outdoor exercise were passed out to plaintiff and the other inmates that

5  were signed by defendant CSP-SAC B-Facility Captain D. Willey and defendant B-Facility

6  Assoc. Warden James P. Walker.  Defendant Warden Mike Knowles is responsible for having

7  approved, or otherwise permitted, the rescission of exercise and for not having intervened to keep

8  plaintiff from suffering.  SAC, p. 6, Ex. D.

9         Plaintiff states that CSP-SAC has three facilities, A, B, & C, with each having

10  eight individual housing units; all are Level 4, one eighty (180) designed.  All cells are the same

11  size with the same showers and dayroom design.  Each facility's housing unit has a mini concrete

12  yard, along with a main exercise yard.  Inmates in Administrative Segregation (Ad Seg) have

13  access to the mini-concrete yard ten days (mandatory) after placement in Ad Seg.  Plaintiff

14  alleges that Ad Seg inmates after ten days are allowed mini concrete yard access that general

15  population (GP) inmates are deprived of for months at a time.  Plaintiff contends that GP inmates

16  should be allowed access to these mini yards after the facility search during the investigative

17  stages.  SAC, p. 7.

18         Plaintiff contends that the four stabbing assaults were isolated and/or spontaneous,

19  that the deprivation of outdoor exercise was punitive and retaliatory, rather than based on safety

20  or security concerns; that investigations of stabbing assaults involving staff take months, while

21  the entire facility, when incidents other than staff assaults are implicated, can and have been

22  searched in a matter of days.  SAC, p. 8, Exs. E, F & G.  Only staff assaults are deemed serious.

23  Analysis of the need for a lockdown should be based on whether an assault was spontaneous and

24  isolated and whether a continued threat exists in the GP, not needlessly prolonged ostensibly for

25  security reasons, but in actuality as a form of punishment and retaliation. SAC, p. 9.

26  \\\\\

1                     Plaintiff seeks both injunctive relief and money damages.[4]

2 <u>Motion for Summary Judgment</u>

3                     Defendants move for summary judgment on the grounds that: 1) the undisputed

4 facts show defendants did not act maliciously or sadistically, or with deliberate indifference, in

5 violation of plaintiff rights under the Eighth Amendment, that is, a) the lockdown(s) were

6 properly imposed and maintained for staff and inmate safety and security, and b) there were no

7 feasible exercise alternatives during the lockdown(s); and 2) each defendant is entitled to

8 qualified immunity because a reasonable person in each defendant's position could have believed

9 his or her conduct was lawful.  Notice of Motion for Summary Judgment (NMSJ), p. 1, MSJ

10 Memorandum (hereafter, MSJ),  p. 2.

11                *<u>Legal Standard for Summary Judgment</u>*

12                     Summary judgment is appropriate when it is demonstrated that the standard set

13 forth in Fed. R. Civ. P. 56(c) is met.  "The judgment sought shall be rendered forthwith if . . .

14 there is no genuine issue as to any material fact, and . . .  the moving party is entitled to judgment

15 as a matter of law."  Fed. R. Civ. P. 56(c).

16                     Under summary judgment practice, the moving party

17                always bears the initial responsibility of informing the district court
               of the basis for its motion, and identifying those portions of "the

18                pleadings, depositions, answers to interrogatories, and admissions
               on file, together with the affidavits, if any," which it believes

19                demonstrate the absence of a genuine issue of material fact.

20 <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S. Ct., 2548, 2553 (1986).  "[W]here the

21 nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

22 judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

23

24         [4] Even with the broadest construction of plaintiff's allegations, which the court grants, in
consideration of both the liberal pleading rules of federal courts and plaintiff's pro se status,

25 plaintiff simply has not framed any colorable Fourteenth Amendment equal protection claim.
Plaintiff's claims center wholly on allegations of violations of his rights under the Eighth

26 Amendment.

to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  See id. at 322, 106 S. Ct. at 2552.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323, 106 S. Ct. at 2553.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11, 106 S. Ct. at 1356 n. 11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

1   genuine need for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P.

2   56(e) advisory committee's note on 1963 amendments).

3           In resolving the summary judgment motion, the court examines the pleadings,

4   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

5   any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

6   477 U.S. at 255, 106 S. Ct. at 2513.  All reasonable inferences that may be drawn from the facts

7   placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S.

8   at 587, 106 S. Ct. at 1356.  Nevertheless, inferences are not drawn out of the air, and it is the

9   opposing party's obligation to produce a factual predicate from which the inference may be

10  drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),

11  aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing

12  party "must do more than simply show that there is some metaphysical doubt as to the material

13  facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the

14  nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct.

15  1356 (citation omitted).

16          On October 27, 2004, and again on October 6, 2005, the court advised plaintiff of

17  the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil

18  Procedure.  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), cert. denied, 527

19  U.S. 1035 (1999), and Klingele v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir. 1988).

20          *Injunctive Relief Claims Mooted*

21          The court observes that plaintiff filed a notice of change of address to Tehachapi

22  on June 26, 2006.  This prison transfer occurred after this motion for summary judgment was

23  submitted, so the motion does not include as a ground that plaintiff's requests for injunctive

24  relief have now been mooted.  Nevertheless, the court sua sponte finds that when an inmate seeks

25  injunctive relief concerning an institution at which he is no longer incarcerated, his claims for

26  such relief become moot.  See  Sample v. Borg, 870 F.2d 563 (9th Cir. 1989); Darring v.

                                                    7

1   Kincheloe, 783 F.2d 874, 876 (9th Cir. 1986).  See also Reimers v. Oregon, 863 F.2d 630, 632

2   (9th Cir. 1988).  Plaintiff has demonstrated no reasonable possibility that he will be incarcerated

3   at CSP-Sac at any predictable time in the future.  Accordingly, judgment should be entered for

4   defendants as to the claims for injunctive relief plaintiff makes in this case.

5             *Undisputed and Disputed Facts*

6             Plaintiff attempts to take issue with a majority of defendants' undisputed facts;

7   however, unless he provides some evidentiary basis for an objection to a fact for which

8   defendants provide evidentiary support, the objection will be noted but found to be without merit

9   and the fact at issue will be deemed undisputed.

10            On March 1, 1995, plaintiff, Gregory Lynn Norwood, was sentenced to a term of

11  life without the possibility of parole in state prison following convictions for first degree murder

12  (Cal. Pen. Code § 187(a)) and second degree robbery (Cal. Pen. Code § 211).  At all times

13  relevant to this action, plaintiff, a black inmate, was incarcerated at the California State Prison in

14  Sacramento (CSP-Sac) in Facility B.  DUF # 1.  Plaintiff asserts that he is classified as a non-

15  affiliated inmate, and the court has been able to locate among his filings a copy of a 1998

16  classification committee report for plaintiff which includes in the report "Gangs: None."

17  Opposition (Opp.), Ex. C, Ex. 14, p. 3.  Plaintiff includes an exhibit which states that in 6/9/95,

18  when he was received at CSP-Sac, he was placed in Ad Seg and remained there pending a review

19  because his central file showed him to be a member of the Black Gorilla Family Prison Gang.

20  Opp., Ex. 12, p. 1.  In July, 1995, plaintiff received a CDC-128 B chrono which states that after a

21  June, 1995 review, it was found that there was insufficient information in his file to indicate "any

22  prison gang or disruptive group activities."  Opp., Ex. 12, p. 2.  Plaintiff apparently indicated in

23  an interview at the time that he associated with a Crips gang on the streets but not in prison.  Id.

24  However, none of this disputes the fact that plaintiff was a black inmate incarcerated at CSP-Sac

25  during the times at issue in this action, which fact remains undisputed.

26  \\\\\

1    At all times relevant to this action, defendants were employed by the California

2    Department of Corrections and Rehabilitation (CDCR) at CSP-Sac.  Cheryl Pliler was the

3    Warden of CSP-Sac from July 1998 to October 2003; Michael Knowles was the Warden of CSP-

4    Sac beginning in October 2003; Steve Vance was the Captain of Facility B from September 2001

5    to September 2003; David Willey was the Acting Facility B Captain, from September 2, 2003 to

6    September 19, 2003, and from October 14, 2003 to January 16, 2004; James Walker was the

7    Acting Facility B Associate Warden, in September 2003; Thomas Goughnour was the Facility B

8    Associate Warden during the May 2002 lockdown; and Michael Martel was the Facility B

9    Associate Warden beginning in March 2003.  DUF # 2.

10    Since its creation, CSP-Sac has been a Level IV prison – a maximum security

11    prison – because the inmates confined at that institution are deemed to pose the greatest threats to

12    institutional security and safety of staff.  DUF # 3, supported by defendant Walker's declaration.

13    Plaintiff seeks to dispute this fact by asserting that not all inmates housed at CSP-Sac pose a

14    security threat, that many are "virtually free of any disciplinary acts of violence....," but are

15    deemed Level IV inmates because of the sentences they received upon conviction.  Opp., Ex. C,

16    p. 1.  None of this sufficiently refutes defendant Walker's declaration, currently Acting Warden

17    of CSP-Sac, based on his personal knowledge, and this fact remains undisputed.

18    CSP-Sacramento is organized in three identical sets of buildings – Facility A, B,

19    and C – with each facility comprised of eight blocks, and each block consisting of 64 cells and

20    128 beds.  DUF # 4.

21    Facility A is considered a "soft" yard.  This is because the inmates housed in

22    Facility A are the former "protective custody" inmates, or those with "sensitive needs."  These

23    inmates tend to be very compliant and generally non-violent.  This is a mellow yard where there

24    may be one serious incident per year.  Facility C generally houses inmates who want to program

25    and stay out of trouble.  Facility B traditionally has housed inmates who refuse to program and

26    consistently get into trouble.  DUF # 5, supported by defendant Walker's declaration.  Plaintiff

9

takes issue with the characterization of Facility A as a "soft yard," averring that it is a yard housing protective custody, Ad Seg, and psychiatric unit inmates per CAL. CODE REGS. tit.xv, § 3341.5.  Opp., Ex. C, p. 2.  Defendant Walker's description, however, is not refuted by this regulation.

Plaintiff concedes that Facility B has less jobs than the other facilities, and the most "SHU kickouts," but also avers that it has had less riots since 1999.  Id.  He also maintains that when there is no room available in B-Facility or an inmate has an enemy there, one stays in B-Facility and the other is sent to C-Facility.  Plaintiff's objections, however, do not materially dispute defendant Walker's representation based on his personal knowledge.

During 2002 and 2003, approximately 1,000 prisoners were confined in each of the three facilities at CSP-Sacramento.  The prisoners in each facility were of all races and ethnic groups – black, white, Hispanic, Asian, American Indian, etc.  DUF # 6.

At CSP-Sac, each facility is self-contained and built around a yard where, absent unusual conditions, inmates are allowed to exercise daily.  DUF # 7.

 Each facility also has four small yards, also referred to as concrete yards.  There is one concrete yard between each of the eight housing blocks.  These are very small yards measuring about 50 by 50 feet.  These yards were not intended to be used for general population exercise.  At most, about 20 inmates can be placed on these yards at a time.  DUF # 8. Defendants rely again on defendant Walker's declaration in support of these facts.  Plaintiff disputes that any one inmate has the opportunity for exercise every day, stating that general population (GP) inmates, when allowed access, are given two-hour exercise periods every other day.  Op., Ex. C, p. 2.  However, the defendants merely set forth that, under normal conditions, there are daily exercise periods for inmates, not that each inmate has a daily exercise period.

Plaintiff agrees that about 20 inmates at a time are placed on the small concrete yards, but argues that the facilities do not have a small yard between each housing unit, so that two buildings share one mini-concrete yard, but states that in B-Facility there is a small concrete

1  yard attached to each building but Building 5, such that inmates in that building go to the

2  concrete yards for Buildings 6, 7, and 8.  Id.  In his verified second amended complaint, plaintiff

3  states that each housing unit has its own mini-concrete yard.  Plaintiff asserts in Ex. E, p. 5, to his

4  Opp., that there are seven mini-concrete yards in B-Facility.  After much searching the court

5  located plaintiff's declaration wherein he sets forth that in his years at CSP-Sac, he has been in

6  each of the eight housing units of B-Facility and all but one has a mini-concrete yard, for a total

7  of seven.  Opp., Ex. F, p. 15.  Therefore, as to the number of small concrete yards, at least in B-

8  Facility, defendants' assertion that there are only four is disputed.  Plaintiff also seeks to dispute

9  that the yards measure 50 feet by 50 feet, maintaining instead that "they are slightly bigger in

10  length, and bigger in width then [sic] length."  Id.  Plaintiff points to no exhibit to clarify his

11  representations as to the size of these concrete yards; therefore, as to the size of these yards that

12  fact is essentially undisputed.

13            In certain circumstances, one or more of the several concrete yards have been used

14  as areas for inmates to exercise in modified programs, but only when staff are certain that

15  inmates will not assault one another and it is safe to release inmates to such yards.  DUF # 9.

16  Plaintiff seeks to dispute this fact by saying that the mini-concrete yards are used for lengthy time

17  periods when cells are being searched and/or during lockdowns.  Opp., Ex. C, p. 3.  He asserts

18  that black inmates go to the mini-concrete yards at different times from when whites go which is

19  different from the time when Hispanics go, with whites and Hispanics occasionally going at the

20  same time.  Id.  He also asserts that officials cannot prevent fights on any yard but can only

21  minimize injury by preventing weapons from coming on the yards by conducting strip searches

22  as they do routinely.  Id.  None of these contentions substantively dispute defendants'

23  representation that inmates in these areas are in modified programs, although plaintiff is probably

24  correct that staff can never be certain that inmates will not assault each other.  However, it is

25  plain that defendants make limited use of the mini-concrete yards, which is not refuted by

26  plaintiff.

1    A lockdown is the restriction of all inmates to their cells/dormitory beds

2 encompassing no less than a housing unit.  True lockdowns are rare occasions, generally

3 following very serious threats to institutional security and the safety of staff and inmates.  During

4 a lockdown, all normal programing is suspended until it is determined that it is safe to resume

5 normal programing.  DUF # 10.

6    Normal programing means inmates attend work and education programs.  They

7 are released to the yard for recreation in large groups according to their yard schedule.  The yard

8 population is limited to 150 inmates at a time.  Inmates have regular visiting, canteen, and

9 telephone privileges.  They attend the law library and religious services.  During a lockdown,

10 however, these programs are suspended and inmates are confined to their cells.  Inmate

11 movement is controlled, under close supervision, and under escort with mechanical restraints.

12 DUF # 11.

13    Pursuant to CDCR policies and procedures, whenever there is a serious incident

14 the initial incident response is as follows:  the first priority is to isolate, contain, and control the

15 situation to the smallest area possible.  Next, is to provide medical attention for all injured

16 followed by the preservation of evidence.  Staff will then identify all involved persons and ensure

17 appropriate written documentation/reports are completed and submitted within designated time

18 frames.  DUF # 12.  Plaintiff states that he is "without sufficient information to admit or deny"

19 this representation, so he denies it.  Opp., Ex. C, 4.  Lack of information is, of course, wholly

20 inadequate as the basis for disputing an issue of fact on a motion for summary judgment.  Thus,

21 this fact is undisputed.

22    Once the initial incident response is completed, assessment of the causes and

23 determination of program activity status begins.  Depending on the seriousness of the situation, it

24 may be necessary to modify or restrict program activities.  Available options are to modify

25 programs, lockdown, or declare a State of Emergency.  These options serve to restrict potentially

26 volatile persons or groups, and affords additional time to evaluate overall operations.  DUF # 13.

1   Plaintiff disputes this fact in the case of assaults on staff with weapons, asserting that in such

2   cases, there is no program assessment, rather there is a total lockdown; he contends that even

3   when the race classified as "others," which he maintains is locked down less than other racial

4   groups, has yard access, this is denominated as a modified program even though other races

5   remain totally locked down.  Opp., Ex. C, 4.  Plaintiff's opinion as to the protocol for response to

6   an incident, however, does not raise a genuine issue of material fact in light of defendant

7   Walker's personal knowledge.  This fact is deemed undisputed.

8          If it is determined that a lockdown is necessary, a program status report is

9   immediately developed to ensure both staff and inmates know what is expected.  Maintaining

10  essential services, i.e., medical/mental health, hygiene, and access to courts are mandates.  The

11  plan is reviewed regularly and revised as scheduled activities are resumed.  Staff and inmates are

12  updated as revisions are made.  DUF # 14.  Plaintiff contends that only hygiene is afforded in the

13  first seven or eight weeks of a lockdown and that memoranda are not passed out "as they should

14  be," without defining either how they are passed out or how he believes they should be.  Opp.,

15  Ex. C, 4.  He does not deny that they are passed out; indeed, his filings and exhibits amply

16  demonstrate his access to multiple copies of these memoranda.  This fact is deemed undisputed.

17         The facility captain generally decides to institute a lockdown and makes the

18  recommendation to the warden who approves or disapproves the recommendation.  Once a

19  lockdown is instituted, the warden makes the decision when it is safe to unlock and return to

20  normal programming.  DUF # 15.  Plaintiff avers that the decision to institute a lockdown is not

21  made solely by the facility captain but is a responsibility shared by an associate warden who also

22  signs the memoranda.  Opp., Ex. C, p. 5.  However, this does not dispute defendant Walker's

23  declaration that it is the facility captain who generally makes the decision about lockdowns and

24  then makes the recommendation to the warden.

25         Following an incident that results in the decision to lock down a facility, the

26  process of investigating and gathering intelligence begins.  This includes searches of all inmate

cells, common areas, dining halls, janitorial rooms, and the outside yard.  Searching the outside

yard often consists of digging up the ground in search for weapons.  The purpose of these

searches is to uncover any weapons that will later be used to harm inmates or staff.  DUF # 16.

Plaintiff argues that that entire ground is not dug up, but only that portion which activates metal

detectors.  Opp., Ex. C, p. 5.  Defendant Walker does not state that all of the ground is dug up,

but only that digging the ground is often involved in the search process. This fact also remains

undisputed.

        While it may take anywhere from 15 to 20 days to complete a search of a facility,

this time may be significantly extended if during the search critical information is discovered

necessitating further searches.  DUF # 17.  Plaintiff contends that it does not take 20 days to

conduct a search and that cell housing units are never searched twice during a lockdown.  Opp.,

Ex. C, p. 5.  Plaintiff does not provide an adequate basis for this conclusion.  Plaintiff has

elsewhere stated that lockdowns to search for missing metal have not involved a long period,

from nine to fourteen days, but although he provides exhibits as to when such a lockdown began,

he does not present evidence, other than his own recollection, showing when they ended.  See,

e.g., Opp., Ex. 15, p. 1.  Plaintiff does not adequately support the basis for his disagreement with

a fact supported by the personal knowledge of the Acting Warden, and the court will deem the

fact undisputed.

        [While searches are conducted], inmate interviews are also conducted.  Every

inmate in the facility is interviewed.  This can be anywhere from 1000 to 1100 inmates.  Staff are

also interviewed.  The purpose of the interviews is to gather intelligence for the purpose of

determining when it is safe to return to normal programing.  The interview process may also be

extended depending on the type of information obtained and the necessity for following up on

leads.  DUF # 18.  Plaintiff disputes that with the four staff stabbing assaults at issue that the

entire inmate population "accepted" an interview each time, such that the number of inmates

interviewed would be reduced.  Opp., Ex. C, p. 5.  Plaintiff also contends that "[t]he process of

interviews is never extended."  Plaintiff does not adequately set forth a basis to support these

conclusory statements, failing to effectively dispute the personal knowledge sworn to by

defendant Walker.

In addition, staff are communicating with other institutions as well as

headquarters to compare the intelligence gathered and ensure that it is safe to resume normal

programing.  It is common to have staff at other institutions interview inmates there as well as to

monitor their mail and telephone communications.  The main priority is always the safety of

inmates and staff while working on a plan to unlock the facility.  DUF # 19.  Plaintiff disputes

that inmates at other institutions were interviewed about the four stabbing attacks on CSP-Sac B-

Facility staff.  He also does not believe that inmates can help staff to gain information if the acts

are spontaneous or isolated and the inmates have no information about them and that an inmate's

fear of being labeled a snitch is not what slows up an investigation.  Opp., Ex. C, 6.  Plaintiff

does not reveal to the court how he knows that inmates at other facilities were not interviewed

and his belief that lockdowns are not conducive to information-gathering is irrelevant to this fact.

This fact is deemed undisputed.

It is the CDCR's policy to return to full normal programing as soon as it is safe to

do so.  Depending on the magnitude and dynamics of the incident, movement towards full

program activities will be made.  DUF # 20.  Although plaintiff objects to this approach, he does

not deny that this is what occurs.

How a facility is unlocked depends greatly on the nature of the incident and is

determined on a case-by-case basis.  Movement back to full normal programing is planned and

occurs during normal business hours when the majority of regularly scheduled staff are present

and have been fully briefed on the plan of operation.  DUF # 21.  Plaintiff denies that when the

incident at issue is an assault on staff that the unlocking is on a case-by-case basis, but he does

not clarify how the process actually worked in his view.  This fact is deemed undisputed.

\\\\\

1          The task of releasing inmates to full normal programing is accomplished

2   incrementally beginning with small numbers of inmates and progressing to larger numbers as it is

3   determined that it is safe to do so.  Generally, critical workers are released first.  Additional

4   increases in numbers are accomplished by expanding the critical workers list and returning

5   inmates first to priority assignments.  As inmates are returned to work assignments, their

6   privileges are also restored incrementally.  DUF # 22.  Plaintiff contends that it is never unsafe to

7   unlock uninvolved inmates.  Opp., Ex. C, p. 7.  The fact that plaintiff takes issue with the manner

8   in which prisoners are released from lock down does not dispute the actual method by which they

9   are unlocked.  This fact is deemed undisputed.

10          The remaining and unassigned inmates are then included in releases for return to

11  full programing.  Generally, non-involved races are released first, followed by non-involved

12  groups (gang affiliations), and so on.  Inmates are released in small groups to the dayroom and/or

13  the recreation yard.  This provides staff an opportunity to observe their conduct in a controlled

14  setting.  During releases of these inmates, incremental positive program activities are also

15  scheduled for them such as telephone calls, canteen, or quarterly packages.  DUF # 23.  Plaintiff

16  denies that this was the process defendants took in three of the four lockdown periods at issue.

17  Plaintiff claims that privileges came first and then critical care workers were released.  Plaintiff

18  maintains that CSP-Sac B-facility inmates were not given dayroom rights.  Opp., Ex. C, p. 7.

19  (That plaintiff also maintains that staff assaults cannot be prevented by observing inmate conduct

20  is irrelevant to what the process is).  Plaintiff does not substantively dispute this fact which sets

21  forth what the general unlock process is and that access to a recreation yard can be an alternative

22  to dayroom access.

23          There are times when during the unlock process, another incident will occur

24  requiring that those inmates who have begun the incremental release process be locked down

25  until an investigation of the incident can be completed.  DUF # 24.

26  \\\\\

1    During a lockdown, there are mandatory weekly meetings with the warden (or

2  chief deputy warden) to discuss the status of the lockdown, in addition to daily briefings.  The

3  purpose of the meetings is to report to the warden on the status of the lockdown and to continue

4  developing a plan to resume normal programming as soon as possible.  The meetings focus on

5  investigation updates to determine progress, review interview/intelligence results, and establish

6  or revise the plan of operation.  The warden may require more frequent meetings depending on

7  the individual circumstances related to each lockdown.  Those present at these meetings include

8  the Warden or Chief Deputy Warden, Facility Captain, Associate Warden, Use of Force

9  Coordinator, and any other line staff member with relevant information.  DUF # 25.  Plaintiff

10  bases his dispute with this fact on his lack of information about the process (Opp., Ex. C, p. 8),

11  which renders the fact undisputed.

12    Between the period of January 2002 through September 2003, there were four

13  very serious inmate assaults on staff in Facility B with the use of inmate manufactured weapons.

14  Following each incident, the decision was made to place the facility on lockdown status until an

15  investigation could be completed and it could be determined that it was safe to unlock.  DUF #

16  26.  Plaintiff does not take issue with the fact that there were four serious staff assaults from

17  January 2002 through September 2003, involving inmate manufactured weapons. Opp., Ex. C, p.

18  8.  Nor does he deny the facility was placed on lockdown status following each incident.

19  Therefore, in essence, plaintiff does not dispute this fact.

20    In addition to the staff assaults, there were various other incidents of violence

21  during the relevant time period involving inmates and the use of inmate manufactured weapons.

22  All of these factors, combined with the information that was being uncovered through interviews,

23  searches, and monitoring of inmate mail and communications, contributed to the duration of the

24  lockdowns.  DUF # 27.  Plaintiff asserts that the staff assault incidents were unrelated, that

25  beyond the January 4, 2002 interview process, it was unnecessary to delay or deny black inmates

26  mini-concrete yard access.  He claims that the inmate involved in the January 4, 2002, attack on

1    Officer Haggard was called back by the officer as he was returning to his cell, demonstrating that

2    the attack was not planned.  Plaintiff also argues that inmate assaults involve only the race or

3    groups who take part even when serious and that only the perpetrator's cellmate was put in Ad

4    Seg, signifying no reliable evidence from interviews and interviews take at most three days.

5    Opp., Ex. C, p. 8.  Plaintiff mentions elsewhere that all eleven individuals involved in the attack

6    were placed in Ad Seg as well, but his point seems to be that having no one else placed in Ad

7    Seg means that the interviews netted no significant information and thus there was no basis for

8    keeping uninvolved races, including blacks, locked down.  However, plaintiff does not explain

9    how he could know what information was garnered in the interview process between prison staff

10   and other inmates.  The court will deem this fact undisputed.

11        *January 4, 2002 until April 3, 2002*

12        Defendant Steve Vance was the Facility captain over B Facility from September

13   2001, to September 2003.  DUF # 28.

14        On January 2, 2002, an inmate turned on Officer Haggard and attempted to

15   murder him.  As staff responded to the incident, other inmates joined in and attacked responding

16   staff members.  In total, 11 inmates brutally attacked four correctional officers in the B Facility

17   3/4 dining room.  Inmate manufactured weapons were used in the attack.  The involved inmates

18   refused several orders to stop the attack.  DUF # 29.  Plaintiff seeks to dispute that the attack was

19   attempted murder because he believes that an attempted murder is a planned attack and he

20   contends that the Hispanic inmates who joined in the attack were following peer pressure rules to

21   assist a fellow race or gangmember.  Opp., Ex. C, p. 9.  Plaintiff's belief as to whether or not the

22   attack was an attempt to murder or not is essentially irrelevant without his providing any basis for

23   it; he does not allege that he witnessed the attack.  He has no information to dispute what

24   weapons were or were not used.  This fact is deemed undisputed.

25        Three of the four officers received injuries consisting of puncture wounds.  They

26   were transported to the hospital where they received treatment for their injuries.  Officer Haggard

18

1   was hospitalized in the intensive care unit.  DUF # 30.

2              As responding staff assisted in searching and escorting the involved inmates out

3   of the dining room, staff discovered an inmate manufactured weapon on the floor between the

4   fourth dining room table from 4 block and the wall.  The weapon measured approximately 5 3/4

5   inches long by 3/8 inches in diameter, and was constructed of a sharpened metal point measuring

6   approximately 15/16 inches long, attached to a plastic pen to form a handle.  DUF # 31.

7              During a subsequent search of the dining room by the investigative services unit,

8   staff discovered one inmate manufactured weapon secreted inside a milk carton on the fourth

9   dining room table from 4 block.  The weapon measured approximately 4 3/4 inches long by 3/4

10  inches in diameter.  It was constructed of round metal rod, sharpened to a point at one end and

11  wrapped with tape and cellophane at the other.  DUF # 32.

12             A lockdown of all inmates in B Facility was ordered and the decision was

13  approved by Warden Pliler. Exh. B, ¶ 8.  During a lockdown, inmates are confined to their cells.

14  They are cell fed and are allowed to exit their cells for controlled showers.  They are provided

15  essential services such as medical attention.  Inmates are not allowed to go to their assigned work

16  or education programs.  They are not allowed to go to the yard because of the degree of danger

17  which presents itself when there are large numbers of inmates on a yard at the same time.  DUF #

18  33.

19             Pursuant to CDCR policy and procedures, immediately following the lockdown,

20  an investigation was commenced into the cause of the assault on staff.  It was unknown at the

21  time whether this was an isolated incident or whether there were other possible planned attacks

22  on staff.  Staff worked diligently to identify whether there were other inmates who played a role

23  in the attack on staff and have those inmates removed.  DUF # 34.  Plaintiff seeks to dispute that

24  defendants did not know whether or not the incident was isolated or planned.  Plaintiff refers to

25  defendant Vance's response to interrogatory 5, set two, with no identification as to its location.

26  After culling through a myriad of discovery documents plaintiff submitted with his opposition

19

1   (but did not cross-reference), the court located the following response, after objections were

2   posed, to plaintiff's inquiry as to whether the January 4, 2002, incident was "planned,

3   spontaneous or isolated."   Defendant Vance responded: "The January 4, 2002 staff stabbing

4   assault was planned by those involved."  This does not supply plaintiff with adequate support to

5   dispute that defendants did not know at the time whether or not the assault was planned.  Plaintiff

6   further avers that no other inmates than the eleven involved (and one of their cellmates,

7   according to plaintiff earlier) were placed in Ad Seg as a result of the January 4, 2002, incident,

8   apparently attempting to cite the incident report filed by defendants.  Opp., Ex. C, p. 9.

9   However, defendants do not assert otherwise.  This fact is undisputed.

10          The first month following the incident was occupied with conducting searches,

11   interviewing inmates and staff, and gathering intelligence from various sources.  This entailed

12   interviewing all of the inmates in B Facility consisting of approximately 1000 to 1100 inmates in

13   the facility at that time.  The inmates refused to talk for fear of retaliation by other inmates.  As a

14   result, the information was slow in coming forward.  DUF # 35.  Plaintiff disputes that searching

15   the facility and interviewing inmates takes a month.  He asserts that housing block floor officers

16   conduct the interview at least at the rate of a unit a day and that a search takes 9 to 14 days for

17   support of which he cited an unidentified exhibit.  The court located one of plaintiff's many

18   affidavits in which he bases his knowledge of how long searches take on the general knowledge

19   of inmates without proffering any substantiating information as to when a search ended.  Opp.,

20   Ex. C, p. 10; Ex. G, p.6.  This fact is deemed undisputed.

21          Additionally, staff had to conduct thorough searches of all inmate cells as well as

22   common areas.  During these searches, the main yard was dug up in search of weapons that could

23   have been buried.  DUF # 36.  Plaintiff disputes that searches were more thorough than when

24   metal is missing or would take more time and again denies that the entire yard was dug up.  Opp.,

25   Ex. C, p. 10.

26   \\\\\

1    Furthermore, during the process of investigating and gathering intelligence, staff

2  were presented with information which raised more questions and concerns.  Because they could

3  not be certain that this was an isolated incident, it was not safe to unlock or to begin the process

4  of restoring yard privileges to the inmate population.  DUF # 37.  Defendants cite defendant

5  Vance's declaration in support of this fact (defendants' Ex. B).  Plaintiff disputes that defendants

6  ever received reliable information that the incident was other than isolated.  He contends that no

7  reliable information ever emerged that black non-affiliated inmates were involved in a continued

8  threat to staff.  He cites defendant Vance's response to his interrogatory wherein Vance answers

9  "No" to plaintiff's question whether any black inmate was involved in the January 4, 2002 staff

10  stabbing assault.  Opp., Opp., Ex. C, p. 10; Ex. 7, p. 3.  Plaintiff's objections to defendants'

11  representation that information presented during any investigation raised more questions and

12  concerns is well-founded in that defendants do not provide any description of the information.

13  This fact is disputed.

14    Also of great concern was the fact that the inmates who assaulted staff were

15  Southern Hispanics.  This prison group is the most influential, organized, and dangerous prison

16  group.  Generally, attacks such as this one do not occur unless it has been approved by the

17  leaders of this group.  Because of this, it was believed that the Southern Hispanics had put a hit

18  out on staff.  DUF # 38.  Plaintiff does not deny that the Southern Hispanics were the ones

19  involved in this incident or that they are the most dangerous of prison groups but asserts his

20  opinion that the melee could have been caused without a leader orchestrating it.  However,

21  plaintiff does not thereby materially dispute this fact, which remains undisputed.

22    There was a very serious and viable threat to staff safety that had to be fully

23  investigated.  The threat level was the highest defendant Vance had seen in his 22-year career

24  with CDCR.  DUF # 39.

25    Staff were also investigating the possibility that the attacks had been ordered by

26  the Mexican Mafia at Pelican Bay State Prison (PBSP).  Staff was communicating with prison

1   staff at PBSB as well as other institutions and comparing information and verifying leads.

2   Inmates at PBSB were also being interviewed in an attempt to gain information.  DUF # 40.

3   Plaintiff seeks to dispute DUF # 39 & # 40 by averring that after the eleven inmates involved

4   were placed in Ad Seg that there was no further threat and that any further investigation was

5   based on fear or was a fishing expedition.  Plaintiff's opinion is not enough to dispute the

6   defendant Vance's assessment based on personal knowledge.  These facts are deemed

7   undisputed.

8            Inmates in the other facilities at CSP-Sac were also being interviewed, as well as

9   those in Ad Seg.  Staff were reading inmate mail in search of information.  Notes were also being

10  passed by inmates to staff with information which had to be verified.  DUF # 41.  Plaintiff seeks

11  to dispute this fact on the ground that he has no information about it, which, of course, does not

12  raise a genuine issue of material fact.  This fact is undisputed.

13           As a result, during the initial phase of the investigation, the inmates in B Facility

14  were not permitted to return to their regular program activities, including daily yard exercise,

15  until all involved inmates could be identified and removed from the general population and all

16  searches for weapons had been completed.  Defendant Vance and other custodial staff

17  responsible for B Facility concluded that until the investigation was complete and all involved

18  inmates could be identified and removed from the general population in B Facility, release of

19  prisoners to the main exercise yard posed an unacceptable risk of renewed violence that

20  threatened the safety of inmates and staff.  DUF # 42.  Plaintiff avers that all involved inmates

21  were identified when the eleven involved in the attack were sent to Ad Seg on the day of

22  incident, citing the Crime Incident Report (MSJ, Ex. F, p. 3); that black inmates posed no threat

23  and that there was no reason to deny black inmates access to the small concrete yards.  Opp., Ex.

24  C, p. 12.  At the time, defendant Vance was the captain of B-Facility and his assessment based on

25  his own personal experience and knowledge and the assessment of other custodial staff to which

26  he also refers is not disputed by plaintiff's contentions and this fact is deemed undisputed.

1    Between January 4, 2002 and March 8, 2002, through interviews and searches,
2    staff continued to obtain information, which indicated that there was a serious and viable threat
3    to institutional safety.  While the goal was to return to normal programing, defendant Vance's
4    first priority was to ensure the safety of staff and inmates.  Due to the nature of the information
5    that was being revealed through the investigation process, and staff's responsibility to follow all
6    leads, it was not safe to begin the process of releasing inmates.  DUF # 43.  Plaintiff concedes
7    that searches were needed, but maintains that they could have been completed within 14 days and
8    that those not involved in the attacks could have been released to the mini-concrete yards; he
9    disputes that the safety of non-Hispanic inmates was jeopardized.  Because defendants do not in
10   any way demonstrate or describe the information that they represent that they obtained upon
11   which they found a serious, viable threat, preventing them from processing the release of inmates
12   to normal programming, the court finds plaintiff's dispute as to this fact raises a genuine issue of
13   material fact.

14   Also, on February 22, 2002, there was another attempted murder of a peace officer
15   by inmates in C-Facility.  This incident occurred only one day after C-Facility began the process
16   of unlocking that facility.  While this incident occurred in a different facility, it affected both A-
17   Facility and B-Facility because of the nature of the assault on staff and the fact that there existed
18   a viable threat against staff members.  DUF # 44.  Plaintiff contends that the incident in C-
19   Facility did not implicate B-Facility and that the fact that 14 days later B-Facility was being
20   unlocked demonstrates this; moreover, plaintiff declares that no investigation was conducted on
21   B-Facility re: the February 22, 2002 assault in C-Facility.  Opp., Ex. C, p. 13; Ex. G, p. 3.  The
22   problem with this opinion is that plaintiff does not make clear how he could know if any
23   investigation concerning this incident took place on B-Facility.  Moreover, defendants do not
24   state that they conducted such an investigation, merely that it indicated a threat to staff and that it
25   had an impact on A-Facility and B-Facility.  This fact is deemed undisputed.

26   \\\\\

On March 8, 2002, staff began the process of releasing inmates in B-Facility to normal programing.  Pursuant to CDCR policy, the critical workers were released first by giving them the opportunity to go to the yard for exercise on Saturdays and Sundays, and restoring various other programs and privileges to this group.  This group consisted of approximately 95 inmates.  This allowed staff to observe these inmates in relatively small numbers.  On March 14, 2002, about 35 critical workers were added to the group.  DUF # 45.  Plaintiff disputes that the release of critical workers first is pursuant to CDCR policy but does not show how it does not comport with that policy in the face of defendant Vance's declaration based on his personal knowledge.  This fact is deemed undisputed.

On March 27, 2002, the critical worker's list was augmented to include approximately 210 workers, including plaintiff.  DUF # 46.  Plaintiff does not dispute this fact but actually represents that he was released a day earlier, rendering this fact essentially undisputed.

Other groups of inmates were incrementally added to the list of inmates to be released.  By April 3, 2002, all non-Hispanic inmates in B Facility were allowed to go to the yard for exercise according to an approved yard schedule.  DUF # 47.

On April 15, 2002, a stabbing/slashing assault occurred on the main exercise yard involving white inmates.  This incident delayed efforts to resume a full normal program, however, staff continued to work diligently in doing so.  DUF # 48.  Plaintiff disputes that he ever was locked down due to this incident, but that does not dispute defendants' point that this incident delayed the resumption of a full normal program.  This fact is deemed undisputed.

The entire time, weekly meetings with the warden, associate warden, Facility captain, Use of Force coordinator and other critical staff members were taking place to discuss the progress made and the status of the lockdown.  DUF # 49.  Plaintiff sets forth no basis to dispute this fact but nevertheless seeks to do so.  This fact is deemed undisputed.

\\\\\

1    *May 8, 2002, until July 31, 2002*

2              On May 8, 2002, while still in the process of resuming a full normal program in

3    B-Facility, Officer Tuter was attacked by a black inmate with an inmate-manufactured weapon.

4    The inmate aggressively attacked Officer Tuter by striking him repeatedly in the head with a

5    weapon.  The weapon was 4 & ½ inches long, ½ inch wide, 1/4 inch thick, and sharpened to a

6    point at one end.  The other end was covered in two inches of plastic wrap as a handle.  The

7    weapon appeared to have been fashioned from a tooth brush.  DUF # 50.  MSJ, Exh. B, Vance

8    Declaration ¶ 25; Exh. G, 5/8/02 Crime Incident Report.  Plaintiff denies that prison officials

9    were in process of resuming a full normal program in B-Facility because whites were still locked

10   down.  Plaintiff does not make clear how he knows whites were still locked down; more

11   significantly, he does not show how even if they were, how that would signify that staff was not

12   in the process of resuming a normal program.  This fact is deemed undisputed.

13             As a result of the attack on Officer Tuter, as well as the prior January 4, 2002,

14   attack on other staff members, and the April 15, 2002, stabbing/slashing assault by white

15   inmates, defendant Vance ordered a lockdown of all inmates in B-Facility.  The decision was

16   approved by Terry Rosario who was the acting warden at that time.  DUF # 51.  Plaintiff takes

17   issue with whether or not any of these incidents were related, contending that each was an

18   isolated event (Opp., Ex. C, pp. 1-16), but this does not materially dispute what defendant Vance

19   states was behind his decision to order a lockdown.  This fact is deemed undisputed.

20             All programs were suspended, including the use of the yard for recreation

21   purposes.  DUF # 52.  Plaintiff contends that white inmates (except for critical workers) and

22   Southern Hispanics were still on lockdown from the April 15, 2002, assault and the January 4,

23   2002, incident, respectively, so only black inmates actually had programs suspended by the May

24   8, 2002, incident.  However, as that means that all inmates had program suspended at this point,

25   there is no dispute as to this fact.

26   \\\\\

25

1    Pursuant to CDCR policy and procedures, immediately following the lockdown,

2  an investigation was commenced into the cause of the attack of Officer Tuter.  This included a

3  search of all cells and common areas, interviews with all inmates and staff, and gathering of

4  intelligence and information from other sources.  DUF # 53.  Plaintiff protests that an

5  investigation was unnecessary, pointing to defendant Vance's response to one of plaintiff's

6  interrogatories in support of the finding that a lone inmate was responsible for the May 8, 2002,

7  incident.  However, defendant Vance's response to plaintiff's query on the subject of who was

8  responsible for that incident does not support his position that no investigation was needed: "At

9  the time of the assault on Officer Tuter, we did not know if the assault had been planned and

10  carried out by one inmate, or by a number of inmates.  At the conclusion of the investigation, it

11  was determined that the assaulting inmate was acting alone."  Opp., Ex. C, p. 16; Ex. 7, p. 4.

12  This fact is deemed undisputed.

13    Inmates were not talking and the information was slow in coming forward.  DUF

14  # 54.  Plaintiff asserts that inmates were not talking because they did not know anything as the

15  incident was isolated.  However, whether this is true or not, it does not dispute the fact as set

16  forth by defendant Vance based on his personal knowledge.

17    By July 1, 2002, some of the privileges were being restored to inmates such as

18  visiting, canteen, packages, and telephone access.  On July 11, 2002, Southern Hispanics and

19  Mexican nationals were allowed to use the small concrete yards for recreation in groups of up to

20  16 inmates per yard.  The whites, American Indians, others,[5] and critical workers were released

21  to the main yard in groups of up to 50 at a time.  By July 16, 2002, Southern Hispanics were

22  released to the small concrete yards in groups of up to 20 inmates.  Whites, American Indians,

23  Mexican nationals, and others were released to the main yard in groups of up to 100 inmates.  By

24  July 31, 2002, blacks were released to the small concrete yards in groups of up to 20 inmates

25

26    [5]  Defendants state that the classification of "Other" is given to the Asian and Pacific
Islander group of inmates.

1   and all other inmates were normal with a maximum of 150 inmates on the main yard at a time.

2   DUF # 55.  Plaintiff does not really dispute the facts as set forth, that is, he does not raise an

3   issue as to when privileges and exercise periods were restored to which group of inmates, but

4   simply maintains that privileges and exercise were not restored as a result of the investigation

5   having uncovered any information, but only because no progress was made, which does not

6   dispute the fact as declared by defendant Vance.

7           Over the course of the next few months, staff continued to work towards resuming

8   a full normal program in all respects.  On occasion, they experienced some setbacks resulting in

9   temporarily suspending yard and privileges at various times due to threats on staff and inmate

10  safety, or based on information received indicating there was a threat of violence.  Nonetheless,

11  Defendant Vance and other staff continued to work towards the goal of resuming a full normal

12  program.  DUF # 56.  Plaintiff does not dispute this fact substantively but merely states that a

13  full normal program is not needed, only access to the a mini-concrete yard.  This fact is not

14  disputed.

15          The entire time, meetings with the warden, associate warden, Facility captain, Use

16  of Force coordinator and other critical staff members were taking place to discuss the progress

17  made and the status of the lockdown.  The meetings were taking place at least twice a week.

18  DUF # 57.  Plaintiff has no basis to dispute this fact and admits it but still seeks to do so.  Opp.,

19  Ex. C, p. 18.  (From this point, the court, without noting it, will simply deem a fact undisputed if

20  plaintiff offers an opinion without making a relevant point or does not proffer at least some basis

21  for a dispute).

22          _December 28, 2002, and ended on June 1, 2003_

23          On December 28, 2002, a riot occurred on the B Facility main exercise yard where

24  a large number of black inmates attacked and physically assaulted staff.  The attack began when

25  Sergeant (Sgt.) Murphy observed two inmates engaged in what appeared to be a fistfight on the B

26  Facility main exercise yard.  Sgt. Murphy ordered the two inmates to stop and get down, but they

27

did not comply.  Sgt. Murphy instructed the central tower officer to order the yard down.[6]  Sgt. Murphy used his O.C. pepper spray on the two inmates and they immediately got down on the ground.  Sgt. Murphy was then attacked by another inmate.  At the same time, numerous other inmates got up and ran towards Sgt. Murphy to attack him.  Sgt. Murphy was forced to the ground and five inmates jumped on him and struck him numerous times.  DUF # 58.  MSJ, Exh. B, Vance declaration ¶ 33; Exh. H, Crime Incident Report for incident on 12/28/02.

As other staff members responded to the yard, inmates got up from the prone position and attacked the responding staff.  Many of the inmates had inmate manufactured weapons.  In total, six inmate manufactured weapons were recovered.  DUF # 59.

Based on subsequent staff interviews and reports, it was determined that the fist fight between the two inmates was a diversion for the purpose of distracting and attacking staff. Further investigation and review of the videotapes of the incident identified at least 24 inmates as active participants on the staff assaults.  DUF # 60.  Plaintiff purports to dispute both defendant Vance's declaration and the finding in the Crime Incident Report that there were 24 inmates involved because defendant Vance stated in an interrogatory response that "at least a dozen gang affiliated Crips were involved in the assaults on staff on December 28, 2002." Opp., Ex. C, p. 18; Ex. 7, p. 4.  Defendant Vance's interrogatory response does not dispute his declaration or the Incident Report.  This fact is undisputed.

Nine staff members sustained injuries as a result of this incident.  DUF # 61.

At the time of this incident, B-Facility was still in the process of unlocking and resuming a full normal program.  This incident, coupled with numerous other incidents of violence between the inmates, led to defendant Vance instituting a full lockdown again.  DUF # 62.

\\\\\

---

[6]  Defendants explain that "yard down" requires that all the inmates get down in the prone position and remain in that position until staff instruct them to get up.

1    The other incidents of violence included an incident on August 22, 2002, on the

2  B-Facility 7 block and 2 block mini concrete yards involving white and Hispanic inmates, where

3  numerous inmates received serious injuries.  Subsequent to this incident, numerous inmate-

4  manufactured weapons were discovered in possession of the white and Southern Hispanic

5  inmates.  DUF # 63.

6    Also, on October 3, 2002, during the unlock process, another incident occurred on

7  the B-Facility main yard involving white and Hispanic inmates which also resulted in several

8  inmates receiving serious injuries.  Again, numerous inmate manufactured weapons were

9  discovered in possession of the white and Southern Hispanic inmates.  DUF # 64.

10    Finally, on December 15, 2002, during evening showers, another incident

11  occurred involving white and Hispanic inmates resulting in an inmate receiving serious injuries.

12  DUF # 65.  Plaintiff expressly agrees with this fact.  Opp., Ex. C, p. 19.

13    Due to all of these violent incidents, it was determined that there was a threat to

14  everyone's safety and security and therefore, all Level IV inmates would remain on lockdown

15  status until further notice.  DUF # 66.  Plaintiff points to his Ex. 17, a copy of an August 19,

16  1999, memorandum which sets forth an unlock procedure and which plaintiff contends supports

17  his contention that white, black and Hispanic inmates could have been separated and given

18  access to the mini-yards; in other words, plaintiff asserts that full lockdown status was not

19  required for non gang-affiliated blacks (or whites or Hispanics).  Opp., Ex. C, p. 19; Ex. 17.

20  Notwithstanding, this does not dispute the fact that prison authorities determined there was a

21  threat and ordered a lockdown.  This fact is deemed undisputed.

22    An investigation into the December 28, 2002, attack on staff was immediately

23  commenced.  This included a search of all cells and common areas, interviews with all inmates

24  and staff, and gathering of intelligence and information from other sources.  DUF # 67.

25    Over the course of the next several months, staff continued to work towards

26  resuming a full normal program in all respects, encountering setbacks in the process.  On

29

1  February 16, 2003, an incident occurred in B-Facility 4 block involving white inmates and the

2  use of a deadly weapon, causing a delay in staff's efforts to unlock the facility.  Nonetheless,

3  defendant Vance and his staff continued to work towards the goal of resuming a full normal

4  program.  DUF # 68.  Plaintiff contends that a full normal program could not exist with white

5  and Hispanic inmates at war, and with whites assaulting each other; however, he avers that non-

6  affiliated black inmates did not need to be separated from each other, nor did Hispanic inmates.

7  Ex. C, p. 20.  Whether true or not, none of this disputes the fact as set forth.

8           By February 21, 2003, the process of unlocking B-Facility began.  Staff started by

9  releasing a small number of uninvolved inmates first and observing their behavior prior to adding

10  to the groups.  On March 18, 2003, they began releasing the whites and Hispanics to the small

11  concrete yards in small groups.  DUF # 69.  Plaintiff protests that this took too long but does not

12  actually dispute the fact.

13           Staff continued to encounter setbacks.  On May 5, 2003, there were two separate

14  stabbing assaults involving white inmates in which both victims sustained serious injuries.  On

15  June 1, 2003, there was a slashing incident involving white inmates.  Staff, however, continued

16  moving forward with the plan to incrementally unlock the facility.  DUF # 70.

17           By May 15, 2003, Asians and American Indians were released to the yard on a

18  normal schedule.  Hispanics were released to the small cement yards.  Blacks were released to

19  the small cement yards on a rotating schedule.  DUF # 71.  Plaintiff protests that all these groups

20  could have received mini-yard access sooner, but this, of course, does not dispute the fact of

21  when the releases actually occurred.

22           As with all other lockdown situations, weekly meetings with the warden, associate

23  warden, Facility captain, Use of Force coordinator and other critical staff members were taking

24  place to discuss the progress made and the status of the lockdown.  These meetings were taking

25  place more often than once a week.  DUF # 72.

26  \\\\\

1     *September 3, 2003, until November 4, 2003*

2           Defendant David Willey was in the position of Acting Captain of Facility B from

3 September 2, 2003 to September 19, 2003, and then again from October 14, 2003 to January 16,

4 2004. DUF # 73. MSJ, Ex. C, defendant Willey's declaration ¶ 3.

5           On September 3, 2003, Officer Curry was brutally attacked by an inmate with an

6 inmate manufactured weapon (metal can lid). Officer Curry was slashed numerous times in the

7 face and neck areas, punched in the nose, and flung down the stairs by the inmate. DUF # 74.

8 Exh. C, ¶ 4; Exh. I, Crime Incident Report for 9/3/03 incident.

9           As a result of the attack on Officer Curry, defendant Willey ordered a lockdown of

10 all inmates in Facility B. The decision was approved by the defendant warden. Based on staff's

11 perceptions of the staff assault and the injuries incurred, defendant Willey believed it would be

12 prudent to lock down the inmates and attempt to find out the dynamics of the assault on staff and

13 at the same time give staff an opportunity to decompress after the trauma of the incident.

14 Defendant Willey also believed that due to the unusual number of staff assaults, which had taken

15 place in a relatively short period of time, it was necessary to conduct an investigation to gather

16 information from inmates willing to talk with staff concerning the reasons for the staff assaults.

17 Prison officials needed to ascertain the causes of the attack and whether there was a conspiracy to

18 attack staff. DUF # 75. Plaintiff points to interrogatory responses by defendants Vance 12/28/02

19 attack was committed by Crips, see above, and defendant Walker, Opp., Ex. 8, p. 3, which shows

20 that the 9/3/03 assault was initiated by a Crips-affiliated inmate. This does not dispute the fact as

21 set forth by defendants.

22           Additionally, because of the unusually high number of recent staff assaults, a State

23 of Emergency was declared by the director of the CDCR. A state of emergency can only be

24 declared by the director. During a state of emergency, the warden may authorize the

25 postponement of nonessential administrative decisions, actions, and the normal time

26 requirements for such decisions and actions as deemed necessary because of the emergency.

1   This may include, but is not limited to, classification committee hearings, disciplinary

2   proceedings, and the review and action on inmate appeals.  DUF # 76.

3           Immediately following the lockdown, an investigation was commenced.  The

4   investigation involved interviewing all inmates and conducting searches.  There were

5   approximately 1000 to 1100 inmates in Facility B and all inmates had to be interviewed.  This is

6   a time-consuming process because the inmates had to be removed from their cells and escorted to

7   the program office to be interviewed one at a time.  DUF # 77.  Plaintiff asserts that interviews

8   are quickly completed, involving a few formulaic questions, but he does not provide adequate

9   support for how he could know how any inmate's interview other than his own could have

10  unfolded.  This fact is deemed undisputed.

11          In many instances, inmates refused to talk for fear of being labeled snitches.  For

12  example, when an inmate is removed for an interview, the other inmates in the housing unit

13  know why he has been removed from his cell.  If the inmate is gone for a long period of time, say

14  an hour, and all other inmates were only gone for 15 minutes, the others assume the inmate is

15  "talking" and this may jeopardize the safety of that inmate because he is now labeled a snitch.

16  Therefore, staff was forced to use other means or excuses for removing inmates who had

17  information they were willing to divulge.  The process took a great deal of time to complete.

18  DUF # 78.

19          The weeks following the incident were also occupied with conducting searches.

20  Every cell had to be searched, as well as all common areas.  This too is a very time-consuming

21  process that takes several weeks to complete.  DUF # 79.  Plaintiff repeatedly takes issue with the

22  amount of time defendants state that it takes to complete searches, asserting that it takes twenty

23  to thirty minutes to search a cell, that there are twenty to twenty-four cells in a section, three

24  sections to a block and eight housing blocks, and that at most even if each second and third

25  watch searched a section a day, it would not take more than 14 days to conduct a search in total.

26  Opp., Ex. C, p. 23.  Plaintiff raises some dispute as to the precise length of time it should take

32

1  officials to conduct a search; although defendant Willey does not posit a particular length of time

2  in this fact, plaintiff raises an issue with respect to how time-consuming the search could be.

3          Furthermore, during the interview process and searches, information was

4  discovered or leads were given, which had to be pursued.  For example, during interviews,

5  information was divulged indicating that more assaults on staff were planned.  These leads had to

6  be followed and fully investigated before inmates could be released to their normal programs.

7  For example, staff received information that the attack on Officer Curry was the result of a

8  personal conflict the inmate had with another staff member and Officer Curry was the target of

9  opportunity.  However, staff also received information that inmates affiliated with the Blue Note

10 Crips were conspiring to assault staff.  In light of this information, it was not safe to release

11 inmates prior to investigating and having a certainty that no further violence was planned.  DUF

12 # 80.

13         Additionally, the information discovered had to be shared with other institutions.

14 Information is routinely shared with all other institutions via the Incident Report.  The Incident

15 Report is sent to CDCR Headquarters for tracking purposes.  The Incident Report is also given to

16 the Law Enforcement Investigative Unit (LEIU) for information gathering.  The LEIU is able, by

17 way of these reports, to advise the director of any patterns that may be occurring statewide.  For

18 example, staff would be able to determine if a particular ethnic group, prison gang, or disruptive

19 group was committing an unusual number of staff assaults.  This information is shared via

20 conference calls with the director's office to all institutions, as well as e-mails.  DUF # 81.

21         This process took time, and in this case, it took approximately four weeks before

22 prison officials felt they had sufficient information to begin the process of incrementally

23 unlocking the inmates in Facility B.  The main priority was to ensure the safety and security of all

24 staff and inmates.  The only way to do so was to conduct an investigation and to keep the inmate

25 population locked down until it could be determined that it was safe to begin unlocking the

26 inmates.  It was simply not safe to release inmates to yards in great numbers without being

confident that similar attacks would not occur.  DUF # 82.

Releasing the inmates to the small yards was not a feasible alternative at that time because officials were still in the process of gathering information and were not confident that it was safe for either staff or inmates to be released even in small groups of 20.  Prison officials did not have the information available to determine if a threat to staff existed with the inmates. Releasing inmates at this point with little or no information could result in more staff/inmate assaults as the inmates were being processed out to the yard, even in small groups.  Without reliable information, inmates allowed to go to the yard could, in fact, have enemies being released at the same time.  DUF # 83.  Plaintiff disputes that it would have been unsafe to release inmates in small groups, segregated on the basis of ethnicity, who were not among the group involved in the attack.  Plaintiff avers that the method could have been similar to the Ad Seg process, whereby inmates are handcuffed one cell at a time, with a metal detector wanded over them.  Opp. Ex. C, p. 24.  This fact is in dispute.

By October 14, 2003, white, Hispanic, and other inmates began to be released for normal programing, including the yard, while the investigation was ongoing.  On November 4, 2003, the lockdown was lifted for non-Crip black inmates.  By December 3, 2003, Facility B returned to normal programing.  DUF # 84.

As groups of inmates were being incrementally unlocked, prison officials continued to investigate and obtain information.  Part of this process included observing the conduct and behavior of those inmates as they were unlocked.  DUF # 85.

While the lockdown was instituted as a result of the September 3, 2003, assault on Officer Curry, the length of the lockdown was directly affected by the information obtained during the investigation following the assault.  It was also affected by "incidents" between the groups of inmates which occurred during the investigation and the process of incrementally unlocking.  All of these factors were critical in the decisions during the lockdown. DUF # 86. Plaintiff disputes that any information gathered related to Hispanic and white stabbing assaults

1  could have impacted the black non-gang affiliated inmates or the group known as "others."  This

2  raises an issue because defendant Willey does not characterize or describe the information

3  obtained.

4          Weekly meetings were held in which the warden, associate warden, Facility

5  captain, Use of Force coordinator, and any other staffmember with information were present.

6  The purpose of these meetings were to report back to the warden on the progress staff were

7  making in restoring the facility to a normal program.  During these meetings, staff discussed the

8  progress of the investigation and the information obtained.  DUF # 87.

9          Meetings with staff were also held to disseminate information regarding the

10  progress of the investigation and unlock procedure.  This also gave staff the opportunity to pass

11  on information they may have gathered from inmates within their housing units that could impact

12  the unlock process.  DUF # 88.  Plaintiff avers that no information obtained ever resulted in

13  disciplinary action against any inmate other than those who took part in the four incidents at issue

14  who were identified by their participation on the days of the incidents.  However, even if true,

15  this does not dispute the fact that officials were sharing whatever information they had with each

16  other.

17          Given the nature of the attack on Officer Curry, the long history of violent

18  outbreaks in Facility B, and the numerous attacks on staff in the preceding year and a half, as

19  well as other incidents of violence, the lockdown was necessary in order to ensure the safety of

20  all staff and inmates.  DUF # 89.  Plaintiff maintains that the responsible inmates had been

21  punished for the three preceding incidents and that the 9/03/03 incident should not have led to the

22  extended deprivation of all physical exercise for non-gang affiliated blacks, others, Southern

23  Hispanics, Mexican nationals.  Opp., Ex. C, p. 26.  Notwithstanding defendant Willey's

24  representation, this fact is disputed.

25          During the first few weeks of the lockdown, inmates could not be released to the

26  yard because prison officials did not have sufficient information to conclude that it was safe to

1   release large numbers of inmates to the yard.  DUF # 90.

2          It has been defendant Willey's experience that releasing inmates, even in small

3   groups, without the benefit of reliable information, could result in assaults of inmates or staff.  If

4   an inmate has a conflict with another inmate and staff do not have information to indicate that the

5   conflict is more than a personal issue, it could result in a confrontation not only between the two

6   inmates but also between any associates of the inmates.  Staff have no way of knowing if a

7   particular group or affiliation were targeting members of their own group for assault.  The

8   number of inmates released is not necessarily relevant to what may occur on a small yard.  The

9   leaders of inmate groups/gangs/affiliations expect and demand retribution for any perceived

10  wrong.  They expect even one inmate of their group to seek retribution, even if out-numbered.

11  For these reasons, it is imperative that staff conduct investigations and follow up on all leads if

12  they are going to ensure the safety of staff and inmates.  DUF # 91.  Plaintiff continues to aver

13  that each of the four incidents were spontaneous and unrelated such that no amount of

14  investigation could uncover information that did not exist.  However, his assessment is

15  insufficient to dispute the personal knowledge and experience of defendant Willey.

16         As soon as prison officials were confident that inmates could be released and

17  returned to normal programing, the facility was unlocked.  DUF # 92.  Plaintiff's dispute on this

18  point is more well-taken.  Plaintiff contends that the facility was only unlocked when officials

19  were sure that the deprivation to which they had punitively subjected inmates was such that

20  future violence would be deterred, rather than on any undefined information they may have

21  received.  Defendants do not provide any specific basis for the confidence that allowed them to

22  unlock the facility.   This fact is in dispute.

23         Following each one of these incidents, the decision was made to place the facility

24  on lockdown status until an investigation could be completed into the cause of the brutal attacks

25  on staff members.  The decision to lock down the facility was based on concerns for both inmate

26  and staff safety.  DUF # 93.  Termination of a lockdown and a return to normal programming

36

could not occur until all the perpetrators of the violence were identified and transferred to other
Level IV institutions, and a determination was made that it was safe for staff and inmates to
return to normal programming.  DUF # 94.  Historically, there had not been many life threatening
assaults on staff.  Due to the nature of the inmate attacks on staff in these four incidents, and the
fact that these were attempts to murder staff, prison officials were forced to take extra
precautions and investigate thoroughly to find out the causes of these attacks.  DUF # 95.
Plaintiff attempts to dispute these facts, attested to by defendant Pliler, the former warden of
CSP-Sac (MSJ, Ex. E, Pliler dec.), by arguing that the incidents at issue did not involve attempts
at murder because they were spontaneous or isolated, a wholly spurious point even if it were true
that the attacks did not entail elaborate planning; he further asserts that the individuals involved
were all identified early on.  However, without some investigation, officials could not ascertain
this.  These facts are not sufficiently disputed by plaintiff to raise a genuine issue.

The investigations were time and labor intensive as prison staff were required to
interview all the inmates in the facility, and conduct thorough searches of the cells, common
areas, and yard.  Every piece of evidence was examined and all leads were followed.  Staff were
also sharing the information uncovered with staff at CDCR headquarters and other institutions in
order to determine if this was a statewide conspiracy to attack staff.  Reports had to be
completed.  As the investigations were progressing, and inmates were being identified as posing
threats to the security of the prison, those inmates had to be transported to other prisons.  This
process also took time.  DUF # 96.  Plaintiff raises an issue with respect to the declaration that
inmates had to be transported to other prisons, maintaining that no general population B-Facility
inmates had to be transported to other prisons, and defendants do no meet their initial burden by
making a statement even in the form of a declaration without showing any specific record of this
having occurred.  As to that point, this fact is disputed.

The main priority for prison officials was maintaining the safety and security of
the institution.  The goal was to resume normal programing as quickly as possible while ensuring

that staff and inmates were safe from further acts of violence.  DUF # 97.  Additionally, while

staff were investigating the attacks on staff and working toward the goal of unlocking the facility,

there continued to be other incidents of violence among inmates, often involving the use of

inmate manufactured weapons, delaying the prison's goal of resuming a full normal program.

DUF # 98.  Staff were faced with a very serious and volatile situation.  Staff members were being

attacked and inmates continued their racial and/or gang related wars at every opportunity.  The

safety risk was one of the highest defendant Pliler had seen in her long career with CDCR.  DUF

# 99.  At the onset of the various lockdowns, the inmates could not have outdoor exercise

because of the risk of renewed violence and injuries.  Identification and removal of those inmates

involved in both the staff assaults and the racial and gang related wars, before permitting inmates

to congregate was the surest way to reduce the changes for renewed violence against staff and

inmates.  DUF # 100.  As a result, inmates were not permitted outdoor exercise in the main yard,

the small yards, or in any other area of CSP-Sac, because the risk of violence and injury was too

great.  As the investigations progressed, however, and it was determined that it was safe, prison

officials started by allowing small groups of inmates to the yard.  DUF # 101.  Plaintiff points to

a May 14, 2003, memorandum that permitted normal yard programming for Asians, American

Indians, and Others; concrete yard for Southern Hispanics; and, as of May 15, 2003, concrete

yard for black inmates.  Opp., Ex. 24, p. 15.  The memorandum notes, inter alia, that there had

been two stabbing assaults nine days earlier involving white inmates.  Plaintiff cites this as

evidence that prison officials know that violence involving particular individuals or a particular

race or ethnic group does not require a lockdown of all inmates, even for recent violent acts.

Plaintiff raises an issue of fact as to defendants' representation that an extended lockdown

depriving all inmates of physical exercise is called for when there is violence within identifiable

groups.

       The main yard in Facility B, which included a running area, and volleyball and

basketball courts was the only feasible place for inmates to go for outdoor exercise and

1   recreation.  DUF # 102.  This is a point of dispute because, as plaintiff points out, there would be

2   no point in allowing inmates access to the mini-yards for outdoor physical exercise, as the prison

3   evidently does, if doing so were not feasible.

4   　　　　It is CDCR's policy to program inmates of different racial and ethnic groups

5   together.  Provided that the inmates fomenting violence are identified and removed from the

6   general population, a single yard program for all inmates created a safer environment for all

7   involved by reducing perceived differences between the different racial and ethnic groups and the

8   hostilities that arose from such perceptions.  Integrated outdoor exercise also minimized the

9   changes of releasing an inmate to a hostile yard, or other program facility, e.g., classrooms, work

10  locations, etc., where he could be attacked.  DUF # 103.

11  　　　　In DUF # 104, defendants aver that the four separate violent incidents involving

12  attempts to murder staff, combined with numerous incidents of violence between inmates, all

13  with use of inmate manufactured weapons, led to officials' conclusion that yard-release was not

14  safe.  In DUF # 105, defendant Pliler maintains that she approved of the use of one or more of

15  the small yards within the main yards of CSP-Sac as areas for inmates to exercise in modified

16  programs, but that this alternative is not always feasible.

17  　　　　In DUF # 106, defendants reiterate that the four incidents required investigation

18  into the causes and circumstances of the incidents before safely releasing inmates but without

19  identifying the information which was obtained which ultimately determined release was

20  appropriate when it was finally allowed.  In DUF #107 and #108, defendants maintain that the

21  unlocking process for a facility following a lockdown is time consuming, that returning to full

22  normal program quickly is a goal but the priority is staff and inmate safety; and that all CDCR

23  policies and procedures were followed in deciding to implement the lockdowns at issue herein.

24  　　　　*Discussion*

25  　　　　Defendants move for summary judgment as to plaintiff's Eighth Amendment

26  deprivation of physical exercise claim on grounds that they are entitled to qualified immunity.

Accordingly, the court begins the qualified immunity analysis by determining whether defendants violated plaintiff's constitutional rights.

The deprivation of outdoor exercise by prison officials to prisoners can constitute cruel and unusual punishment in violation of the Eighth Amendment. Spain v. Procunier, 600 F.2d 189 (9th Cir. 1979). "[S]ome form of regular outdoor exercise is extremely important to the psychological and physical well being of the inmates." Id. at 199. The longterm deprivation of outdoor exercise is a denial of a basic need in violation of the Eighth Amendment. Allen v. Sakai, 48 F.3d 1082, 1087-1088 (9th Cir. 1994); see also, Keenan v. Hall, 83 F.3d 1083, 1090 (9th Cir. 1996) (defendants not entitled to summary judgment where plaintiff produced evidence showing deprivation of outdoor exercise for six-month period in administrative segregation). Regular outdoor exercise is necessary "unless inclement weather, unusual circumstances, or disciplinary needs ma[k]e that impossible." Spain, supra, at 199. In Hayward v. Procunier, 629 F.2d 599, 603 (9th Cir. 1980), the Ninth Circuit found that the deprivation of outdoor exercise and a five-month lockdown in response to a genuine emergency did not violate the Eighth Amendment; however, plaintiffs therein "were allowed approximately the minimum exercise mandated in Spain within a month after imposition of the lockdown."[7]

The court will separately analyze each of the at-issue lockdowns. Plaintiff was first on lockdown and denied outdoor exercise from January 4, 2002, to April 3, 2002, i.e., for approximately three months. The attempted murder of Officer Haggard and the attack on the other prison staff by a total of eleven inmates, on January 4, 2002, justify the initial decision to impose the lockdown. It is undisputed that following this incident, searches and interviews of inmates were conducted. However, the record contains no specific evidence regarding why it was determined that the emergency which justified the lockdown in the first place no longer

---

[7] The Ninth Circuit in Spain required at least one hour of outdoor exercise per day, five days a week, in the absence of, as noted "inclement weather, unusual circumstances, or disciplinary needs" rendering it "impossible." Hayward, supra, at 603, citing Spain, supra.

1   existed on April 3, 2002, as opposed to March 3, for example.  Rather, the undisputed facts only

2   generally provide that interviews and searches occurred.  Because defendants have not provided

3   evidence specifically demonstrating that the security emergency existed until April 3, 2002, the

4   court does not find that they have met their initial burden of demonstrating the absence of a

5   genuine issue as to this material fact.  To hold to the contrary would be to endorse a blank check

6   with respect to time for which exercise is deprived, i.e., "investigation continues" would sanction

7   whatever period prison officials in their unfettered discretion would choose.

8        Plaintiff was on lockdown next from May 8, 2002, to July 31, 2002, i.e., for

9   almost three months.  The attack on Officer Tuter and the previous incidents of violence in B-

10  Facility justified the initial decision to impose the lockdown.  Again, it is undisputed that

11  following the attack on Officer Tuter searches and interviews of inmates were conducted.

12  However, the record contains no specific evidence regarding why it was determined that the

13  emergency which justified the lockdown in the first place no longer existed on July 31, 2002,

14  when African American inmates were released to small concrete yards.  Because defendants have

15  not provided evidence specifically demonstrating that the security emergency existed until July

16  31, 2002, the court does not find that they have met their initial burden of demonstrating the

17  absence of a genuine issue as to this material fact.

18       Thereafter, plaintiff was on lockdown from December 28, 2002, to May 15, 2003,

19  i.e. approximately 4 ½ months.[8]  The December 28, 2002, riot clearly justified the initial decision

20  to impose the lockdown.  Again, it is undisputed that following the riot, searches and interviews

21  of inmates were conducted.  However, the record contains no specific evidence regarding why it

22  was determined that the emergency which justified the lockdown in the first place no longer

23  existed on May 15, 2003, when African American inmates were allowed to use small concrete

24

25       [8] Although plaintiff maintains in his second amended complaint that he was on lockdown
26  until June 1, 2003, evidence that he himself submits with his opposition indicates that he at least
    had some mini-concrete yard access as of May 15, 2003.

41

1  yards.  In other words, the record contains no specific evidence regarding why African American

2  inmates were not permitted outdoor exercise sooner.  Because defendants have not provided

3  evidence specifically demonstrating that the security emergency existed until May 15, 2003, the

4  court does not find that they have met their initial burden of demonstrating the absence of a

5  genuine issue as to this material fact.

6          Finally, for the two-month period, from September 3, 2003, until November 4,

7  2003, while the attack on Officer Curry justified the initial lockdown decision, defendants simply

8  do not provide adequate specific relevant evidence.  Again, it is undisputed that following the

9  attack, searches and interviews of inmates were conducted.  However, the record contains no

10  specific evidence regarding why it was determined that the emergency which justified the

11  lockdown in the first place no longer existed on November 4, 2003.  Because defendants have

12  not provided evidence specifically demonstrating that the security emergency existed until

13  November 4, 2003, the court finds that defendants have not met their initial burden of

14  demonstrating the absence of a genuine issue of material fact.

15          As discussed above, defendants have not demonstrated that they did not violate

16  plaintiff's constitutional rights.  Assuming that defendants violated plaintiff's constitutional

17  rights by depriving him of outdoor exercise for the periods of time discussed above, the next step

18  of the qualified immunity analysis is to determine whether plaintiff's right to exercise was clearly

19  established and whether a reasonable prison official would have understood that to deprive him

20  of exercise was unconstitutional.

21          At the time of the alleged deprivations, it was clearly established that inmates had

22  a constitutional right to outdoor exercise.  Spain v. Procunier, 600 F.2d 198 (9th Cir. 1979).  It

23  was also clearly established that denying inmates outdoor exercise for the times at issue in this

24  action was constitutional if a genuine emergency existed.  Hayward v. Procunier, 629 F.2d 599

25  (9th Cir. 1980).

26  \\\\\

1    The issue is whether a reasonable prison official would have understood that

2    depriving plaintiff of outdoor exercise during the at-issue times violated his constitutional rights.

3    As discussed above, the record as to all four lockdowns is not clear as to when the emergency

4    ceased to exist.  While it is clear that investigations had to be conducted, the record contains no

5    specific evidence regarding how and when it was determined that it was safe to release African

6    American inmates to the exercise yards.  Although plaintiff does not frame an equal protection

7    claim, the record should also contain evidence regarding why African American inmates were

8    released to the exercise yards after inmates of other races, at least with respect to the May 8,

9    2002, and December 28, 2002, and September 3, 2003, lockdowns.  Without this information, the

10   court cannot determine whether a reasonable officer would have known that denying plaintiff

11   outdoor exercise was unconstitutional.  Accordingly, defendants are not entitled summary

12   judgment based on qualified immunity as to plaintiff's Eighth Amendment claim alleging a

13   denial of outdoor exercise.

14   Accordingly, IT IS HEREBY R ECOMMENDED that plaintiff's claims for

15   injunctive relief be found mooted and judgment be entered for defendants as to those claims, and

16   that defendants' March 23, 2006, motion for summary judgment be denied as to plaintiff's claim

17   for money damages with respect to his allegations of Eighth Amendment violations during the

18   four lockdown periods involving a deprivation of outdoor exercise.

19   These findings and recommendations are submitted to the United States District

20   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

21   days after being served with these findings and recommendations, any party may file written

22   objections with the court and serve a copy on all parties.  Such a document should be captioned

23   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

24   shall be served and filed within ten days after service of the objections.  The parties are advised

25   \\\\\

26   \\\\\

that failure to file objections within the specified time may waive the right to appeal the District

Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: 3/5/07

/s/ Gregory G. Hollows

GREGORY G. HOLLOWS
UNITED STATES MAGISTRATE JUDGE

GGH:009
norw2554.msj

44