1 | EDMUND G. BROWN JR.
Attorney General of the State of California
2 | DAVID S. CHANEY
Chief Assistant Attorney General
3 | FRANCES T. GRUNDER
Senior Assistant Attorney General
4 | MONICA N. ANDERSON
Supervising Deputy Attorney General
5 | JAMES M. SOBOLEWSKI, State Bar No. 99559
Deputy Attorney General
6 |  1300 I Street, Suite 125
 P.O. Box 944255
7 |  Sacramento, CA 94244-2550
 Telephone: (916) 327-6758
8 |  Fax: (916) 324-5205
 Email: James.Sobolewski@doj.ca.gov
9 |

10 | Attorneys for Defendants Martel, Willey, Knowles,
Goughnour, Walker, Vance, and Pliler

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| GREGORY LYNN NORWOOD,<br><br>Plaintiff,<br><br>v.<br><br>EDWARD ALAMEIDA, JR., et al.,<br><br>Defendants. | 2:03-cv-2554 GEB GGH P<br><br>**DEFENDANTS' PRETRIAL STATEMENT**<br><br>Trial Date: October 30, 2007<br>Time: 9:00 a.m.<br>Courtroom: No. 10 – 13th Floor<br>Judge: The Honorable<br>Garland E. Burrell, Jr. |

Pursuant to the Court's Further Scheduling Order dated April 9, 2007, and Local Rule 16-281, Defendants hereby submit the following Pretrial Statement.

**(1) Jursidiction-Venue.**

Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1343(a)(3).  Venue is proper under 28 U.S.C. §§ 1391(b).

**(2) Jury - Non-Jury.**

Defendants have requested a jury trial.  Plaintiff has also requested a jury trial.

**(3) Undisputed Facts.**

1.    Plaintiff is a black prisoner in the custody of the California Department of Corrections and Rehabilitation (CDCR.)

2.    Plaintiff was convicted of first-degree murder and second-degree robbery on December 9, 1994.

3.    Plaintiff was sentenced on March 1, 1995, to a term of life without parole.

4.    Plaintiff was incarcerated at California State Prison-Sacramento (CSP-SAC), during the period of July 1995 to November 2005.  Plaintiff was housed in B Facility at all times relevant in his complaint.

5.    CSP-SAC is a Level IV facility.  A Level IV facility is the maximum security prison that confines inmates who are deemed to pose the greatest threat to institutional security and safety of staff.

6.    B Facility traditionally has housed inmates who refuse to program and consistently get into trouble.

7.    B Facility at CSP-SAC consists of 8 blocks with 64 cells and 128 beds per block. Each cell is configure to hold two prisoners.

8.    The total population of B Facility in 2002 and 2003 was approximately 1,000 inmates.  The inmates housed in this facility are of all ethnic groups and races, including Black, White, Hispanic Asian, American Indian, and other.

9.    B Facility at CSP-SAC is built around a yard where, absent unusual circumstances, daily exercise periods are available to inmates.  The yard will accommodate a maximum of 150 inmates at one time.

10.   B Facility at CSP-SAC had four dining halls at the time of the lockdowns.  There is one dining hall located between two blocks.

11.   B Facility at CSP-SAC has seven concrete yards.  There is one concrete yard for each housing block except block 5.  Each yard is approximately 50' by 50', and is intended for a maximum of twenty inmates at one time.

/ / /

12. An assault occurred on four correctional officers by eleven inmates in the B Facility 3/4 dining room on January 4, 2002. The assault started when an inmate turned on Officer Haggard and attempted to murder him.

13. Three of the four correctional officers involved in the incident of January 4, 2002, received injuries consisting of puncture wounds. The officers were transported to the hospital for treatment, and Officer Haggard was hospitalized in the intensive care unit.

14. Two inmate-manufactured weapons were discovered following the incident of January 4, 2002.

15. As a result of the assault of January 4, 2002, a lockdown of B Facility was ordered by the acting Lieutenant and approved by Warden C. Pliler.

16. During a lockdown, all inmates are confined to their cells. Inmates are cell fed and allowed to exit their cells for controlled showers. Inmates are also provided essential services such as medical/mental health, hygiene, and access to courts. Inmates are not allowed to go their assigned work or education programs, and all such programs, yard recreation, law library and religious services, regular visiting, canteen, and telephone privileges are suspended.

17. An attempted murder of staff occurred in C Facility on February 22, 2002.

18. Plaintiff was released from lockdown on March 27, 2002, as part of the process of returning B Facility to normal programing.

19. The lockdown triggered on January 4, 2002, continued until April 3, 2002.

20. A stabbing/slashing incident involving white inmates occurred on the main exercise yard on April 15, 2002.

21. Officer Tuter was assaulted by a black inmate with an inmate-manufactured weapon on May 8, 2002,

22. As a result of the stabbing/slashing incident of April 15, 2002, and the attack on Officer Tuter, a lockdown of B Facility was ordered by Defendant Vance. Defendant Vance was the Facility Captain for B Facility. The lockdown was approved by Terry Rosario, acting warden.

/ / /

23.   A lockdown was in place from May 8, 2002, to July 31, 2002.

24.   Plaintiff was released from lockdown on July 31, 2002.

25.   A fight occurred between white and Hispanic inmates in B Facility concrete yards on August 22, 2002.  Numerous inmate-manufactured weapons were discovered in the possession of white and Souther Hispanic inmates after this incident.

26.   A fight occurred between white and Hispanic inmates in the B Facility main yard on October 3, 2002, which resulted in several inmates receiving serious injuries.  Numerous inmate-manufactured weapons were discovered in the possession of white and Southern Hispanic inmates after this incident.

27.   A fight occurred between white and Hispanic inmates during evening showers on December 15, 2002, which resulted in an inmate receiving serious injuries.

28.   A riot occurred on the main exercise yard on December 28, 2002, wherein a large number of black inmates attacked prison staff.  The riot began when Sergeant Murphy observed and attempted to break up a fight between two inmates.  Sergeant Murphy and responding prison staff were then attacked by several inmates.

29.   Subsequent investigation of the incident of December 28, 2002, determined that the fight between inmates was a diversion for the purpose of distracting and attacking prison staff.

30.   At least 24 inmates were active participants in the assault on staff on December 28, 2002.

31.   Some of the attacking inmates on December 28, 2002, had inmate-manufactured weapons.  Six inmate-manufactured weapons were recovered following the incident.

32.   Nine staff members sustained injuries as a result of the incident of December 28, 2002.

33.   As a result of the incident of December 28, 2002, as well as prior incidents of violence between the inmates, a lockdown of B Facility was ordered by Defendant Vance.  Defendant Vance was the Facility Captain for B Facility.

/ / /

1        34.   A fight involving white inmates and the use of deadly weapons occurred in B

2  Facility, block 4, on February 16, 2003.  This incident delayed efforts to unlock B Facility.

3        35.   The process of unlocking B Facility began on February 21, 2003, with the release

4  of a small number of uninvolved inmates and observing their behavior.  The process continued

5  with the release of white and Hispanic inmates to concrete yards in small groups on

6  March 18, 2003.

7        36.   Two separate stabbing incidents involving white inmates occurred on

8  May 5, 2003, in which both victims sustained serious injuries.

9        37.   Black inmates, including Plaintiff, were allowed to use the concrete yards on or

10  after May 15, 2003.

11        38.   A slashing incident involving white inmates occurred in B Facility, block 3, on

12  June 1, 2003. The victims of both incidents sustained serious injuries.

13        39.   The lockdown triggered on December 28, 2002, continued to June 1, 2003.

14        40.   Officer Curry was assaulted and slashed numerous times with a can lid formed

15  into a weapon by an black inmate on September 3, 2003.  The assault occurred in B Facility.

16        41.   As a result of the assault on Officer Curry, a lockdown of B Facility was ordered

17  by Defendant Willey.  Defendant Willey was the acting Facility Captain for B Facility at the time

18  of this assault.  The lockdown was approved by the warden.

19        42.   A correction officer was stabbed and seriously wounded by an inmate in C

20  Facility of CSP-SAC on September 29, 2003.

21        43.   Because of the unusually high number of recent staff assaults, a State of

22  Emergency was declared by the Director of CDCR in September 2003.

23        44.   Release of white, Hispanic and inmates of other races in B Facility began on

24  October 14, 2003.

25        45.   Plaintiff was released from the lockdown on November 4, 2003.

26        46.   The lockdown triggered on September 3, 2003, continued to December 3, 2003.

27        47.   The lockdowns were ordered to insure the security and safety of the staff and

28  inmates, and to facilitate investigation of each of the assault incidents and the reasons behind the

1   incidents.  The lockdowns were not ordered to punish or retaliate against the inmates.

2          48.   During the lockdowns, investigation was conducted into the cause of each

3   incident to determine if it was an isolated incident or part of a planned attack, and whether other

4   attacks were planned on staff.  The investigation included searches of all cells, interviews of all

5   inmates at the facility, searches of common areas of the prison facility, digging up the outside

6   yard as necessary, contact with and gathering of information from other prisons, interviewing

7   inmates at other housing facilities in CSP-SAC and at other prisons as necessary, verifying and

8   following up on leads obtained, and analyzing information.

9          49.   After completion of the investigation following a lockdown, a return to full

10  programming is accomplished incrementally.  The process generally involves releasing critical

11  workers first.  Thereafter, non-involved inmates are normally released to full programming,

12  followed by non-involved groups and then involved groups.  Inmates are released in small groups

13  initially to provide staff an opportunity to observe their conduct in a controlled setting.

14         50.   During the entire period of each lockdown, weekly meetings involving the

15  Warden, Associate Warden, Facility Captain, Use of Force Coordinator, and other critical staff

16  members were conducted to discuss progress of investigation of the assaults and the status of the

17  lockdown.  Frequently, the meetings took place more than once per week.

18         51.   It is CDCR's policy to return to full programming as soon as it is safe to do so.

19         **(4) Disputed Factual Issues.**

20         1.   Defendants dispute knowing or having any information that the assaults on prison

21  staff precipitating the four lockdowns were isolated and spontaneous.

22         2.   Defendants dispute that a proper and thorough search of B Facility at CSP-SAC

23  can be completed in nine to fourteen days.

24         3.   Defendants dispute that an interview of all inmates of B Facility at CSP-SAC can

25  be completed in three days.

26         4.   Defendants dispute that the lockdowns continued longer than necessary to

27  complete the investigation of each of the assault incidents and to ensure the safety and security of

28  staff and inmates at CSP-SAC.

5.   Defendants dispute that the lockdowns were ordered to punish or retaliate against the inmates.

6.   Defendants dispute that use of the small yards by Plaintiff for exercise during the lockdowns was feasible.

7.   Defendants dispute that the denial of outdoor exercise during the four lockdowns was a violation of Plaintiff's Eighth Amendment right.

8.   Defendants dispute that Plaintiff is entitled to the recovery of damages for the denial of outdoor exercise during the four lockdowns.

**(5) Disputed Evidentiary Issues.**

1.   Evidence regarding disciplinary detention or administrative segregation policies and procedures is inadmissible and irrelevant and inadmissible.

2.   Evidence of CDCR policy changes that occurred during the period of lockdowns relating to shaving razors and tobacco products is irrelevant and inadmissible.

3.   Evidence regarding the number and adequacy of medical and health care staff during the periods of lockdown is irrelevant and inadmissible.

4.   Evidence regarding the trial of former CDCR employee Stephen Scarsella and the alleged "code of silence" referenced during the trial is irrelevant and inadmissible.

5.   Evidence of grievances submitted against prison staff prior to the assaults that preceded the lockdowns is irrelevant and inadmissible.

6.   Evidence of removal of the Prison Industry Authority from B Facility is irrelevant and inadmissible.

7.   Evidence of inmates taken out of the general population and placed in administrative segregation as a result of anonymous letters to prison officials is irrelevant and inadmissible.

8.   Opinion testimony by percipient inmates to the assaults that preceded the four lockdowns on the issue of whether the subject assaults were isolated and spontaneous is irrelevant and inadmissible.

/ / /

1     9.   Testimony of inmates at other institutions that they were not questioned or locked

2 down is irrelevant and inadmissible.

3          **(6) Special Factual Information in Certain Actions.**

4          Not applicable.

5          **(7) Relief Sought.**

6          Plaintiff's amended complaint filed June 7, 2005, requests damages for alleged

7 physical and psychological injuries allegedly resulting from the denial of outdoor exercise during

8 four lockdown periods.  He requested injunctive relief and "one million dollars monetary relief to

9 send a message that these acts of retaliation will not be tolerated."  (Am. Compl. ¶ V.)  As this is

10 a federal civil rights action brought by a prisoner, Plaintiff cannot recover for mental or

11 emotional injury suffered in custody without a prior showing of physical injury.

12 42 U.S.C. § 1997e(e).

13          The court has ruled that Plaintiff's claim for injunctive relief is moot and enter

14 judgment for Defendants on this issue by order filed March 30, 2007.

15          Plaintiff's pretrial statement makes a claim for money he would have made from his

16 job assignment during the lockdown.  Since Plaintiff's claim relates only to the lack of outdoor

17 exercise during the lockdown, he is not entitled to recovery of this claim.

18          Plaintiff does not include any other claim for compensatory damages in his pretrial

19 statement.  Plaintiff does include a claim for one million dollars for punitive damages, and costs.

20          **(8) Points of Law.**

21          **A.   Liability for deprivation of Eighth Amendment Right to Exercise.**

22          Plaintiff's action is brought pursuant to 42 U.S.C. Section 1983.  Liability under

23 Section 1983 exists where a person "under color of any statute of any state ... subjects, or causes

24 to be subjected, any citizen . . . to the deprivation of any rights . . . secured by the Constitution . .

25 . ."

26          The language of Section 1983 requires a degree of causation as an element of

27 individual liability.  *Sims v. Adams,* 537 F.2d 829, 831 (5th Cir. 1976).  "A person 'subjects'

28 another to deprivation of a constitutional right, within the meaning of § 1983, if he does an

1   affirmative act, participates in another's affirmative act or omits to perform an act which he is

2   legally required to do that caused the deprivation of which complaint is made."

3   *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).

4          Plaintiff has named the wardens, associate wardens, and facility captains as Defendants

5   in this case.[1/]  The Defendants are supervisory personnel at CSP-SAC.  Supervisory personnel are

6   not liable under the theory respondeat superior in a Section 1983 action.  *Jones v. Williams,*

7   297 F.3d 930, 934 (9th Cir. 2002); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  There

8   must be some showing of personal participation in the alleged rights deprivation.

9   *Jones v. Williams,* 297 F.3d at 934.  Therefore, Plaintiff must prove that each Defendant did an

10  affirmative act, participated in another's affirmative act, or omitted to perform an act which he or

11  she is legally required to do and which violated a right of the Plaintiff secured by the

12  Constitution. *Johnson v. Duffy*, 588 F.2d at 743.

13         Plaintiff was incarcerated at CSP-SAC at the time of the lockdowns complained of in

14  his complaint.  The Constitution "does not mandate comfortable prisons," but neither does it

15  permit inhumane ones. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes v.*

16  *Chapman,*  452 U.S. 337, 349 (1981)).  The treatment a prisoner receives in prison and the

17  conditions under which he is confined are subject to scrutiny under the Eighth Amendment.

18  *Helling v. McKinney*, 509 U.S. 25, 31 (1993).  It is only the "unnecessary and wanton infliction

19  of pain" that implicates  the Eighth Amendment. *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)

20  (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)).

21         Plaintiff alleges excessive deprivation of outdoor exercise during four lockdown

22

23  ──────────────────────────────

24         1.  Plaintiff has sued Defendants in both their official and personal capacity.  An action
    against a government official in their official capacity is to be treated as an action against the entity.
25  *Brandon v. Holt*, 469 U.S. 464, 469 (1985).  Agencies and subdivisions of the state, including
    CDCR, are not "persons" subject to suit under § 1983. *Will v. Michigan Dept. of State Police*, 491
26  U.S. 58, 70 (1989); *Taormina v. California Dept. of Corrections*, 946 F.Supp. 829, 831 (S.D.Cal.
    1996).  Moreover, an action against a state official is barred by the Eleventh Amendment. *Edelman*
27  *v. Jordan*, 415 U.S. 651, 663 (1974).  The exception to these immunities for a claim for prospective
    injunctive relief is not applicable since the court ruled that Plaintiff's claim for injunctive relief is
28  moot by order filed March 30, 2007.  Plaintiff's action is therefore limited to a claim for damages
    against Defendants in their personal capacity.

1   periods violated  his Eighth Amendment right.  An Eighth Amendment claim regarding

2   conditions of confinement must meet two requirement, one subjective and one objective.

3   *Farmer v. Brennan*, 511 U.S. at 834.  Under the objective requirement, the prison official's act or

4   omission must result in a denial of the "minimal civilized measure of life's necessities."  *Id.*

5   (quoting *Rhodes v. Chapman*, 452 U.S. at 347).  The punishment imposed "cannot be so totally

6   without penological justification that it results in the gratuitous infliction of suffering."

7   *Gregg v. Georgia*, 428 U.S. at 183.  The subjective requirement relates to the defendant's state of

8   mind, and requires that the prison official act with deliberate indifference.  *Id.*  A prison official

9   must both know of and consciously disregard an excessive risk of harm to an inmate's health or

10   safety.  *Farmer v. Brennan*, 511 U.S. at 837, 839.

11        The Ninth Circuit has recognized the need for outdoor exercise.  In *Spain v. Procunier*,

12   600 F.2d 189 (9th Cir. 1979), the court stated that some form of regular outdoor exercise is

13   extremely important to the psychological and physical well being of the inmates.  *Id.* at 199.

14   A long term deprivation of outdoor exercise can constitute cruel and unusual punishment.

15   *Spain v. Procunier*, 600 F.2d at 200; *Allen v. Sakai*, 48 F.3d 1082, 1087 (9th Cir. 1994).

16        The denial of outdoor exercise occurred only during four lockdowns at CSP-SAC.

17   A lockdown generally refers to a condition of abnormally heightened security during which

18   prisoners are confined to their cells totally or for a much greater portion of the day than usual.

19   *Hayward v. Procunier*, 629 F.2d 599, 600 n.1 (9th Cir. 1980.)  The lockdowns were in response

20   to four separate assaults on prison staff in 2002 and 2003 by Level IV inmates.  These are

21   inmates classified as requiring the highest level of security in custody based on their

22   precommitment history, commitment offense, term of imprisonment, and other case factors.

23   *Toussaint v. McCarty,* 597 F.Supp. 1388, 1394 (N.D.Cal. 1984).

24        Prison officials have a right and a duty to take the necessary steps to reestablish order

25   in a prison when such order is lost.  *Hoptowit v. Ray*, 682 F.2d 1237, 1259 (9th Cir. 1982).  This

26   is for the benefit of the prisoners as much as for the benefic of the prison officials.  *Id.*  The

27   warden is the chief executive officer at the prison, and is responsible for the custody, treatment,

28   training and discipline at the prison.  Cal. Code Regs, tit. 15, § 3380(a).  A state of emergency

1  shall exist when the warden temporarily suspends any non-essential operation, procedure, service

2  or function, and the normal time limits or schedules for activities in order to prevent, contain, or

3  control a disturbance.  Cal. Code Regs, tit. 15, § 3383(a).  The prison's affected areas, programs,

4  and operations shall be returned to normal as soon as the warden determines that it is safe to do

5  so.  Cal. Code Regs, tit. 15, § 3383(d).

6          When the emergency exists, prison officials may be more restrictive than they

7  otherwise may be, and certain services may be suspended temporarily.  *Hoptowit v. Ray*,

8  682 F.2d at 1259.  More basic needs can be withheld for a shorter time, while less critical needs

9  may be denied for reasonable periods of time when disciplinary needs warrant.  *Id.*  Outdoor

10  exercise can be restricted where factors such as disciplinary needs or other unusual circumstances

11  make exercise impossible.  *Spain v. Procunier*, 600 F.2d at 1999.    In determining the existence

12  of prisoner needs, the court must give reasonable leeway to prison officials.  *Hoptowit v. Ray*,

13  682 F.2d at 1259.

14          The inquiry concerning the constitutional adequacy of exercise must proceed from the

15  individual fact of each case.  *Toussaint v. Yockey*, 722 F.2d 1490, 1492 (9th Cir. 1984).

16  Therefore, each lockdown must be examined in light of the circumstances that existed at the

17  prison, the incident that lead to the lockdown, and the nature and extent of investigation that was

18  necessary following the lockdown to insure the safety of staff and inmates and the security of the

19  institution.  This review of the restrictions of the lockdown in light of the emergency conditions

20  that existed will permit a determination of the restriction of outdoor exercise was reasonable, or

21  whether prison officials crossed the Eighth Amendment line.  *Hayward v. Procunier*, 629 F.2d at

22  603.

23          Defendants recognize that the courts have found that some form of outdoor exercise is

24  important to maintaining the physical and mental health of prisoners.  *Spain v. Procunier*,

25  600 F.2d at 1999.  In this case, the objective requirement for a determination of an Eighth

26  Amendment violation under *Farmer v. Brennan* is acknowledged.  Therefore, if the then-existing

27  state of emergency did not justify the denial of outdoor exercise for the full extent of the

28  lockdown, the fact-finder must determine if the named Defendants acted with deliberate

1  indifference to the Plaintiff's right to outdoor exercise.  This requires consideration of each

2  Defendant's state of mind regarding the denial of exercise, and a finding that each Defendant

3  knew of an excessive risk of harm to the Plaintiff due to the denial of outdoor exercise and

4  consciously disregarded this risk.  *Farmer v. Brennan*, 511 U.S. at 837, 839.

5  **B.  Qualified Immunity**

6  If one or more of the Defendants are found liable to Plaintiff, they are entitled to

7  consideration of the defense of qualified immunity.  Defendants' entitlement to qualified

8  immunity is based on the reasonableness of their belief that their actions were lawful, and not on

9  the reasonableness of their actions.  *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1050

10  (9th Cir. 2002).  Defendants are entitled to qualified immunity, even if they were deliberately

11  indifferent, if the Court finds that they could have reasonably believed that their actions were

12  lawful.  *Id.*  This is a matter of law for the Court, not a matter of fact for the jury.

13  Defendants motion for summary judgment on the issue of qualified immunity was

14  denied because the record was not clear as to when the emergency necessitating the lockdowns in

15  B Facility ceased to exist such that it was safe to release African American inmates to the

16  exercise yard.  (*See* Findings and Recommendations of March 5, 2007, at 43:3-6.)  Defendants'

17  entitlement to qualified immunity at trial will depend on what evidence is produced to the court

18  for determination of this issue.

19  **C.  Punitive Damages**

20  Plaintiff's only monetary claim is for punitive damages.  Plaintiff must prove more

21  than a violation of his Eighth Amendment right to recover punitive damages.

22  In a Section 1983 action, punitive damages are recoverable only if the defendants

23  intended to violate federal law, or acted in a reckless or callous disregard of plaintiff's federally

24  protected rights.  *Smith v. Wade*, 461 U.S. 30, 51 (1983).  It is not enough that defendants may

25  have acted in an objectively unreasonable manner; their subjective state of mind must be

26  assessed.  *Wulf v. City of Wichita*, 883 F.2d 842, 867 (10th Cir. 1989).  Where there is no

27  evidence that a Section 1983 defendant has acted with evil intent, there is no legal right to

28  punitive damages.  *Ward v. City of San Jose*, 967 F.2d 280, 286 (9th Cir. 1991).

### D.   Impeachment by Evidence of Prior Felony Convictions

Rule 609 of the Federal Rules of Evidence provides that evidence of a witness's prior conviction of a felony may be used to impeach that witness's testimony.  Defendants contend that no one who has a prior felony conviction is entitled to the false aura of veracity, which would occur if impeachment were not allowed.  Accordingly, Defendants will seek to impeach the trial testimony of Plaintiff or any of Plaintiff's witnesses with evidence of any prior felony convictions.

**(9) Abandoned Issues.**

Defendant has not abandoned any issues.

**(10) Witnesses.**

Plaintiff NORWOOD

Defendant M. KNOWLES

Defendant STEVEN VANCE

Defendant J. WALKER

Defendant T. GOUGHNOR

Defendant M. MARTEL

Defendant D. WILLEY

Defendant C. PLILER

Terry Rosario

A. Nanganama, M.D.

Officer Zamudio

Cpt.  F.  Schroeder

J. Kidney, Use of Force Coordinator

I, O'Brian, Appeals Coordinator

R. Carter, Appeals Coordinator

Joseph Sherman, RN, PHN

B. Swift, R.N.

K. Todd, P.A.

1       S. Edmondsen, R.N.

2       M. Burvant, M.D.

3       J. Robertson, R.N.

4       L. Barry, M.T.A.

5       Russell Ewing, M.D.

6       Officer S.B. Curry

7       Officer C. Kirshner

8       Officer Navarrete

9       Officer S. Cook

10      Officer D. Lytle

11      Officer R. Woods

12      Office R. Mendoza

13      Cadet E. Gonzales

14      Officer I. Reyes

15      Officer R. Bishop

16      Officer Mitchell

17      Officer D. Kaiser

18      Officer Tuter

19      Officer Fallon

20      Officer L. Brichetti

21      Officer D. Rodriguez

22      Sgt. Murphy

23      Officer Stewart

24      Officer Whitted

25      Officer Cervantes

26      Officer Cook

27      Officer Ray

28      Sgt. D. Just

1   Lt. D. Just

2   Officer M. Nielson

3   Sgt. Shannon

4   Officer E. Advincula

5   Officer E. Vela

6   Officer D. Eddy

7   Officer I. Reyes

8   Officer J. Moore

9   Officer C. King

10   Sgt. Graham

11   Officer Nielson

12   Officer C. Wuest

13   Officer R. Viles

14   Officer Tiang Trong

15   Officer R. Compton

16   Officer Stotts

17   Officer Ellin

18   Sgt. Lytle

19   Officer S. Zanini

20   Sgt. Lytle

21   Lt. D. Connor

22   Officer G. Elliot

23   Officer B. Maxham

24   Officer E. Lopez

25   Officer Nolan

26   Officer R. Garcia

27   Officer J. Haggard

28   Officer T. Huggins

1      Officer V. Casey

2      Officer M. Elliot

3      Officer M. Frasier

4      Officer Leonard

5      Custodian of Records, California Department of Corrections and Rehabilitation for

6 California State Prison, Sacramento.[2/]

7      Custodian of Records, California Department of Corrections and Rehabilitation for

8 California Substance Abuse Treatment Facility, Corcoran.

9      **(11) Exhibits–schedules and summaries.**

10      A.      Declaration of STEVE VANCE

11      B.      Declaration of D. WILLEY

12      C.      Declaration of J. WALKER

13      D.      Declaration of C. PLILER

14      E.      Crime/Incident Report, Log No. SAC FAB 02 01 0008 with attached

15      diagrams and photographs

16      F.      Crime/Incident Report, Log No. SAC FAB 02 05 0162 with attached

17      photographs of scene, weapon, victims, and suspect

18      G.      Crime/Incident Report, Log No. SAC FAB 02 12 0613 with attached

19      photographs of victims, suspects, weapons, and scene of incident

20      H.      Crime/Incident Report, Log No. SAC FAB 03 09 0377 with attached

21      photographs of victim, suspect, weapon, and scene of incident

22      I.      Plaintiff's Abstract of Judgment

23      J.      Photographs of B Facility main yard, dining area and concrete yard.

24      K.      Appeal log no. 03-00661

25

26      2. The custodians of records for both facilities will be available to testify at trial. Absent any

27 dispute about the authenticity of the documents to be presented, Defendants request that they be permitted to use the declarations listed as exhibits BBBB, CCCC, and DDDD to authenticate documents at trial and thereby avoid undue expense. Defendants will provide Plaintiff with copies

28 of all documents they intend to introduce into evidence, with the custodian of records' declarations, 30 days before trial or as ordered by the court.

1    L.    First Level Reviewer's Response to appeal log no. 03-00661 dated April 1,
2          2003

3    M.    Second Level Reviewer Response dated May 6, 2003, re Log no. SAC 03-
4          00661

5    N.    Director's Level Appeal Decision dated June 27, 2003, re Log no. SAC 03-
6          00661

7    O.    Appeal log no. SAC-B-03-02172

8    P.    First Level Reviewer's Response to appeal log no. SAC-B-03-02172 dated
9          9/24/2003

10   Q.    Inmate/Parolee Appeal Screening Form dated 10/7/03 re log no. SAC-B-
11         02172

12   R.    Inmate Appeals Branch correspondence to Plaintiff dated November 18,
13         2003 re Log no. SAC 03-2172

14   S.    Plaintiff's complete medical records and file, including but not limited to:

15         1.    Health Care Services Request Form dated 9/1/04

16         2.    Health Care Services Request Form dated 3/3/05

17         3.    Health Care Services Request Form dated 7/26/05

18         4.    Health Care Services Request Form dated 9/27/05

19         5.    Health Care Services Request Form dated 11/20/05

20         6.    Health Care Services Request Form dated 1/8/06

21         7.    Health Care Services Request Form dated 3/10/06

22         8.    Health Care Services Request Form dated 5/30/06

23         9.    Health Care Services Request Form dated 8/31/06

24         10.   Health Care Services Request Form dated 10/27/06

25         11.   Health Care Services Request Form dated 3/4/07

26         12.   Health Care Services Request Form dated 4/8/07

27         13.   Health Care Services Request Form dated 4/13/07

28         14.   Progress Notes dated 1/9/96 and 3/28/96

15. Progress Notes dated 7/31/96 to 11-13-96

16. Progress Notes dated 5/26/02 to 10/18/02

17. Progress Notes dated 3/9/05

18. Progress Notes dated 4/2/05

19. Progress Notes dated 5/4/05

20. Progress Notes dated 4/2/05 to 5/30/05

21. Progress Notes dated 5/4/05 to 7/26/05

22. Progress Notes dated 6/6/06

23. Progress Notes dated 8/30/06 to 11/17/06

24. Progress Notes dated 1/22/07

25. Physician's Orders dated 8/21/96

26. Physician's Orders dated 11-13-96

27. Physician's Orders dated 9/7/04

28. Physician's Orders dated 3-9-05

29. Physician's Orders dated 4-12-05

30. Physician's Orders dated 5-4-05

31. Physician's Orders dated 12/7/05

32. Physician's Orders dated 12/11/05

33. Physician's Orders dated 3/6/06

34. Inmate Health Screening dated 5/25/06

35. Condensed Mental Health Assessment dated 1/5/06

36. Encounter Form dated 5-30-06

37. Mental Health Progress note dated 11/24/98

38. Medical Report of Injury dated 12/10/05 (2 pages)

39. Mental Health Screening dated 12-11-05

T. SAC B Facility Lockdown/Modifies Program Matrix

U. B Facility Program Status memorandum dated August 19, 1999

V. B Facility Program Status memorandum dated May 20, 2000

1   W.    B Facility Program Status memorandum dated September 25, 2000

2   X.    B Facility Program status memorandum dated January 8, 2002

3   Y.    B Facility Program status memorandum dated January 18, 2002

4   Z.    B Facility Staff memorandum dated January 22, 2002

5   AA.   B Facility Program status memorandum dated January 29, 2002

6   BB.   B Facility Program status memorandum dated February 4, 2002

7   CC.   B & C Facility Canteen Procedures memorandum dated February 11, 2002

8   DD.   B Facility Shower Program memorandum dated February 16, 2002

9   EE.   B Facility Program status memorandum dated February 22, 2002

10  FF.   B Facility Shower Program memorandum dated February 22, 2002

11  GG.   B Facility Canteen Program memorandum dated March 1, 2002

12  HH.   B Facility Canteen Procedures memorandum dated March 4, 2002

13  II.   B Facility Program status memorandum dated March 5, 2002

14  JJ.   B Facility Critical Worker List dated March 7, 2002

15  KK.   B Facility Program status memorandum dated March 8, 2002

16  LL.   B Facility Critical Workers List dated March 14, 2002

17  MM.   B Facility Program status memorandum dated March 19, 2002

18  NN.   B Facility Program status memorandum dated March 20, 2002

19  OO.   B Facility Program status memorandum dated March 27, 2002

20  PP.   B Facility Critical Workers List dated March 27, 2002

21  QQ.   B Facility Program status memorandum dated April 3, 2002

22  RR.   B Facility Program Critical Workers List dated April 3, 2002

23  SS.   B Facility Program status memorandum dated April 10, 2002

24  TT.   B Facility Program status memorandum dated April 30, 2002

25  UU.   B Facility Program status memorandum dated May 9, 2002

26  VV.   B Facility Program status memorandum dated June 3, 2002

27  WW.   B Facility Program status memorandum dated June 6, 2002

28  XX.   B Facility Program status memorandum dated July 2, 2002

1    YY.    B Facility Program status memorandum dated July 11, 2002

2    ZZ.    B Facility Program status memorandum dated July 19, 2002

3    AAA.   B Facility Program Status memorandum dated July 30, 2002

4    BBB.   B Facility Program Status memorandum dated August 16, 2002

5    CCC.   B Facility Program Status memorandum dated August 19, 2002

6    DDD.   B Facility Program Status memorandum dated August 29, 2002

7    EEE.   B Facility Program Status memorandum dated November 27, 2002

8    FFF.   B Facility Program Status memorandum dated December 5, 2002

9    GGG.   B Facility Program Status memorandum dated December 16, 2002

10   HHH.   B Facility Program Status memorandum dated February 4, 2003

11   III.   B Facility Program Status memorandum dated February 7, 2007

12   JJJ.   B Facility Program Status memorandum dated March 3, 2003

13   KKK.   B Facility Program Status memorandum dated March 14, 2003

14   LLL.   B Facility Program status memorandum dated May 2, 2003

15   MMM.   B Facility Program status memorandum dated May 7, 2003

16   NNN.   B Facility Program Status memorandum dated May 14, 2003

17   OOO.   B Facility Program status memorandum dated May 27, 2003

18   PPP.   B Facility Program status memorandum dated June 2, 2002

19   QQQ.   B Facility Program Status memorandum dated June 20, 2003

20   RRR.   B Facility Program Status memorandum dated June 26, 2003

21   SSS.   B Facility Program Status memorandum dated July 19, 2003

22   TTT.   B Facility Program status memorandum dated September 10, 2003

23   UUU.   B Facility Program status memorandum dated October 28, 2003

24   VVV.   Program Status Reports; executed:

25           1.    1-8-02

26           2.    1-15-02

27           3.    2/4/02

28           4.    2/13/02

| | |
|---|---|
| 5. | 3/6/02 |
| 6. | 3/11/02 |
| 7. | 3/19/02 |
| 8. | 3/25/02 |
| 9. | 4/8/02 |
| 10. | 4/9/02 |
| 11. | 5/13/02 |
| 12. | 5/13/02 |
| 13. | 5/13/02 |
| 14. | 5/13/02 |
| 15. | 5/22/02 |
| 16. | 5/22/02 |
| 16. | 5/28/02 |
| 17. | 5/28/02 |
| 18. | 6/3/02 |
| 19. | 6/3/02 |
| 20. | 6/10/02 |
| 21. | 6/10/02 |
| 22. | 6/18/02 |
| 23 | 6/18/02 |
| 24. | 6/23/02 |
| 25. | 6/23/02 |
| 26. | 7/13/02 |
| 27. | 7/13/02 |
| 28. | 7/13/02 |
| 29. | 7/13/02 |
| 30. | 7/15/02 |
| 31. | 7/15/02 |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

32.   12/30/02

33.   1/7/03

34.   1/14/03

35.   1/22/03

36.   1/28/03

37.   2/4/03

38.   2/18/03

39.   2/27/03

40.   3/6/03

41.   3/11/03

42.   3/20/03

43.   3/28/03

44.   4/7/03

45.   4/16/03

46.   4/25/03

47.   5/5/03

48.   5/5/03

49.   5/13/03

50.   5/22/03

51.   5/30/03

52.   6/10/03

53.   6/10/03

54.   9/16/03

55.   9/24/03

56.   9/30/03

57.   10/6/03

58.   10/14/03

59.   10/20/03

60.   10/28/03

61.   11/3/03

62.   11/13/03

WWW.   Departmental Operations Manual Section 55015

XXX.   Unlock Checklist

YYY.   Custodial Counseling Chrono dated 8-17-02

ZZZ.   Custodial Counseling Chrono dated 11-7-02

AAAA.   Videotape of incident of 12/28/02

BBBB.   Declaration of Kyle Kypke dated June 10, 2004

CCCC.   Declaration of Kyle Kypke dated December 1, 2004

DDDD.   Declaration of Aida Gonzalez dated 6/12/07

**(12) Discovery Documents.**

Defendants may offer Plaintiff's responses to Defendants' First Set of Interrogatories into evidence at the time of trial, or use these responses to impeach Plaintiff's testimony.

**(13) Further Discovery or Motions.**

Defendants do not anticipate any further discovery or motions at this time.

**(14) Stipulations.**

Defendants stipulate to the undisputed facts set forth in paragraph 3, *supra.*

**(15) Amendments – Dismissals.**

None.

**(16) Settlement Negotiations.**

Settlement negotiations or a court settlement conference will not be helpful.

**(17) Agreed Statements.**

None.

**(18) Separate Trial of Issues.**

Defendants seek bifurcation on the issue of punitive damages if the court deems that Plaintiff has made a claim for punitive damages.

/ / /

1   **(19) Impartial Experts-Limitation of Experts.**

2   Defendants do not believe there is any necessity to appoint an impartial expert or limit

3   the number of experts in this matter.

4   **(20) Attorneys' Fees.**

5   Plaintiff is proceeding in propria persona.  Therefore, he may not seek attorneys' fees

6   under 42 U.S.C. §1988.  Defendants may seek attorneys' fees and costs after trial, if they prevail,

7   pursuant to 42 U.S.C. §1988(b) or 28 U.S.C. §1919.

8   **(21) Trial Exhibits.**

9   Special handling of trial exhibits is not anticipated.

10   **(22) Miscellaneous.**

11   A.    Defendants estimates a three-day jury trial.

12   B.    Defendants will submit proposed voir dire questions as directed by the Court.

13   C.    Defendants request that the parties exchange documentary evidence thirty days

14   before the trial date.

15

16   Dated:  June 15, 2007

17   Respectfully submitted,

18   EDMUND G. BROWN JR.
    Attorney General of the State of California

19   DAVID S. CHANEY
    Chief Assistant Attorney General

20   FRANCES T. GRUNDER
21   Senior Assistant Attorney General

22   MONICA N. ANDERSON
    Supervising Deputy Attorney General

23
    */s/ James M. Sobolewski*
24

25
    JAMES M. SOBOLEWSKI
26   Deputy Attorney General
    Attorneys for Defendants

27

28   30276907.wpd
    SF2004401398